# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN

---

Barclay Lofts LLC, *a Minnesota limited liability company*,

    Plaintiff,

vs.

PPG Industries, Inc., *a Pennsylvania corporation*; WCC, Inc,. *a dissolved Wisconsin corporation;* MD Fifth Ward Properties, Inc.; *a dissolved Wisconsin corporation;* Michael Denesha; Hydrite Chemical Co., *a Wisconsin corporation*; and Lumimove, Inc. d/b/a WPC Technologies, Inc., *a Missouri corporation*,

    Defendants.

**Case No. _____**

**COMPLAINT**

---

   Plaintiff, Barclay Lofts LLC, by its attorneys, Winthrop & Weinstine, P.A. and Davis & Kuelthau, s.c., as its complaint states as follows:

## <u>INTRODUCTION</u>

   1.  This is an action for recovery of response costs, damages and declaratory relief arising from environmental contamination existing in the soil, soil vapor and groundwater at, and buildings on, property formerly owned and/or operated by Defendants and/or their predecessors at 300 South Barclay Street (the "South Barclay Parcel") and 139 East Oregon (the "East Oregon Parcel") (collectively, the "Properties") in Milwaukee, Wisconsin.

   2.  Defendants PPG Industries, Inc. ("PPG"), Hydrite Chemical Co. ("Hydrite"), Lumimove, Inc. ("Lumimove"), WCC, Inc. ("WCC"), MD Fifth Ward Properties, Inc. ("MD Fifth Ward"), and Michael Denesha (collectively, "Defendants") are all former owners and/or operators

of the Properties and caused or contributed to the environmental contamination that is present on and around the Properties.

3.     Plaintiff Barclay Lofts LLC, ("Barclay") is the current owner of the Properties and brings this civil action pursuant to Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), to recover response costs incurred by Barclay and for declaratory judgment for future damages from all Defendants pursuant to 42 U.S.C. § 9613(g)(2).

4.     Barclay also seeks injunctive relief requiring PPG to conduct response actions pursuant to Section 702(a) of the Resources Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a).

5.     Barclay further seeks relief based on pendent state law claims of negligence, nuisance, equitable or common law contribution and unjust enrichment.

## THE PARTIES

6.     Plaintiff Barclay is a Minnesota limited liability company with its principal place of business located in Minneapolis, Minnesota. Barclay's members are Sherman Associates, Inc., a Minnesota corporation with its principal place of business located in Minneapolis, Minnesota and PPG GP LLC, a Minnesota limited liability company with its principal place of business located in Minneapolis, Minnesota.

7.     Barclay's predecessor in interest, PPG GP LLC, acquired the Properties in January 2017 from MD Fifth Ward with the intent of redeveloping the Properties, including redeveloping buildings located at the Properties, for residential use. PPG GP LLC transferred the Properties to Barclay in December 2017.

8.     Defendant PPG is a Pennsylvania corporation with its principal place of business located in Pittsburgh, Pennsylvania.

2

9. PPG owned and operated the Properties for 70 years, from 1905 to 1975.

10. WCC was a Wisconsin corporation incorporated as Wayne Chemical Corp. in 1960. It changed its name to WCC, Inc. in 1988 and dissolved later that year.

11. WCC owned and operated the Properties, or some portion thereof, from approximately 1975-1985.

12. MD Fifth Ward was a Wisconsin corporation incorporated as Wayne Pigment Corp. in 1983. It was renamed WPC Technologies, Inc. in 2011, and renamed MD Fifth Ward in 2012. MD Fifth Ward was dissolved in 2017.

13. On information and belief, MD Fifth Ward operated as a continuation of WCC's business at the Properties.

14. MD Fifth Ward owned and/or operated the Properties, or some portion thereof, from approximately 1985 to 2017.

15. Denesha was the principal of MD Fifth Ward, and on information and belief, was responsible for operations at the Properties from at least 1989, when he (along with three partners) purchased MD Fifth Ward from WCC, until 2017, when MD Fifth Ward sold the Properties to Barclay.

16. Defendant Hydrite is a Wisconsin corporation with its principal place of business located in Brookfield, Wisconsin.

17. Hydrite is a former owner and operator of at least a portion of the East Oregon parcel from approximately 1976 to 1986.

18. On information and belief, Hydrite is and was the alter ego of WCC from at least 1975 until 1985.

19.     On information and belief, Hydrite is and was the alter ego of Defendant MD Fifth Ward during 1983.

20.     On information and belief, Hydrite was an operator of the Properties through its provision of environmental compliance services to Defendant MD Fifth Ward for some or all of the time that Defendant MD Fifth Ward operated at the Properties.

21.     Defendant Lumimove is a Missouri corporation with its principal place of business located in Oak Creek, Wisconsin.

22.     Lumimove operated the Properties from approximately 2012 to 2015 while doing business under the assumed name WPC Technologies ("WPC"). Lumimove acquired the WPC Technologies name when it, on information and belief, purchased substantially all of the assets of MD Fifth Ward (with the exception of the Properties) in 2012.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over the claims set forth in this complaint under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a); 7002(a) of RCRA, 42 U.S.C. § 6972(a); 28 U.S.C. § 1331, the federal question jurisdiction statute; 28 U.S.C. § 1332, the diversity jurisdiction statute; and 28 U.S.C. § 1367, providing for pendent jurisdiction over state law claims.

24.     To the extent necessary for jurisdiction, there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.

25.     This Court has personal jurisdiction over Defendants and is the appropriate venue under 28 U.S.C. § 1391(b)(2); 42 U.S.C. § 9613; and 42 U.S.C. § 6972(a). The Properties are located within this District, and multiple Defendants reside in this District.

## FACTUAL ALLEGATIONS

### A.  The Properties

26.     The Properties consist of two parcels, the South Barclay Parcel and the East Oregon Parcel.

27.     The South Barclay Parcel is 0.72 acres in size and is occupied by a five-story building, known as Building 11, with a full basement and penthouse.

28.     The East Oregon Parcel is 0.877 acres in size and contains three vacant buildings, Buildings 33, 34, and 35. Buildings 33 and 34 are three-story buildings with concrete slab-on-grade construction. Building 35 is a single-story building, with the single floor below grade.

29.     The four buildings located on the Properties are listed on the Wisconsin State and National Registers of Historic Places as contributing buildings within the East Oregon and South Barclay Industrial Historic District.

### B.  Environmental Investigation of the Properties

30.     On information and belief, none of the Defendants reported to either state or federal regulators that any hazardous substances had been discharged to the environment at the Properties during their periods of ownership or operation until MD Fifth Ward reported the existence of petroleum contamination at the Properties in June 2006.

31.     On or about June 6, 2006, MD Fifth Ward notified the Wisconsin Department of Natural Resources ("WDNR") of a discharge from an underground storage tank ("UST") at the South Barclay Parcel.  This report was based on environmental work conducted in connection with an April 2006 Phase II investigation at the Properties.

32.     The April 2006 Phase II showed that, in addition to the petroleum contamination that was the subject of the notification, the soil and groundwater at the Properties were

contaminated by volatile organic compounds ("VOCs"), polycyclic aromatic hydrocarbons ("PAHs"), and RCRA metals.

33. In soil, the concentration of trichloroethylene ("TCE") (a VOC) was noted as likely exceeding risk screening criteria. Arsenic, cadmium and lead concentrations exceeded the then-current NR 720 Table 2 levels. PAHs in one soil boring exceeded the generic industrial residual contamination levels ("RCLs").

34. In groundwater, 1,1,1 trichloroethane, a VOC, exceeded the preventive action limit ("PAL") established under NR 140. TCE exceeded both the PAL and the Enforcement Standard ("ES"), also established under NR 140, which is based on the protection of human health. Arsenic, barium, cadmium, chromium, lead, mercury and seleneium were all detected above the ES.

35. On or about June 29, 2006, WDNR issued a letter to MD Fifth Ward requiring MD Fifth Ward to investigate the nature and extent of the contamination and to remediate the contamination to the extent practicable. The WDNR opened a Bureau for Remediation and Redevelopment Tracking System ("BRRTS") number for the Leaking UST report, 03-41-547627.

36. After reporting the UST release and receiving a Responsible Party letter from the WDNR in 2006, MD Fifth Ward took only limited action with respect to investigating or remediating the site until after it received a request for status update from the WDNR in 2009. By that time, the WDNR had opened an additional BRRTS numbers: 02-41-553395 (Environmental Repair) at the South Barclay Parcel. In 2017, WDNR established 02-41-580427 (Environmental Repair) at the East Oregon Parcel. The environmental activities reported in BRRTS under each number have been substantially duplicative.

37. In 2009, MD Fifth Ward requested site closure. In December 2009, the WDNR denied closure, finding in relevant part that "the degree and extent of contamination present in soil

and groundwater has not been sufficiently defined and the origin of contaminant sources has not been sufficiently identified."

38. In 2011, MD Fifth Ward provided additional information to the WDNR and again sought site closure. MD Fifth Ward did not propose any active remediation, but instead indicated that it intended to achieve closure based solely on registering the Properties on the GIS Registry for Soil and Groundwater and capping the site, despite the extensive contamination.

39. WDNR once again denied closure, specifically noting that soil contamination still had not been adequately defined and that additional information on groundwater flow direction and plume definition was required, as well as information demonstrating that "natural attenuation" would suffice as an acceptable remedy to address the contaminated groundwater. WDNR also noted that an assessment of the potential threat of vapor intrusion was required.

40. In April 2012, MD Fifth Ward responded to the 2011 closure denial with some additional data. With respect to vapor intrusion, MD Fifth Ward merely stated, without any support, that the observed concentrations of VOC and petroleum-based contamination at the site "appear to be such" that vapor intrusion would not pose significant exposure concerns at this "industrial" site. MD Fifth Ward undertook no subsurface investigation of potential vapor intrusion.

41. WDNR responded in May 2012, once again, that additional work would need to be completed to achieve closure. Specifically, WDNR pointed out that while it had requested additional investigation with respect to soil contamination, MD Fifth Ward did not conduct any additional investigation. It also pointed out that, with respect to groundwater, MD Fifth Ward had not established that the contaminant plume was stable or evaluated contaminant trends. Finally, WDNR found that MD Fifth Ward's statements regarding vapor intrusion lacked a basis and

7

disagreed with the conclusion.  WDNR once again stated that the vapor intrusion pathway needed to be evaluated.

42.    In June of 2013, MD Fifth Ward informed the WDNR that no additional work was planned.

43.    MD Fifth Ward filed three semi-annual progress reports in 2014 and 2015 stating only that "The Wayne Pigment Corp. property is awaiting initiation of brownfield redevelopment activities by the prospective developer of the site.  The site is currently capped and used for industrial purposes."  On information and belief, MD Fifth Ward took no further action to investigate or remediate the extensive contamination at the Properties.

44.    In connection with due diligence prior to purchasing the Properties and after the purchase, Barclay has analyzed the soil, soil vapor and groundwater contamination at the Properties.  This work has been completed under the oversight of the WDNR pursuant to Chapter NR 700 of the Wisconsin Administrative Rules.

45.    Barclay's investigations demonstrated that the soil at the Properties is contaminated with VOCs, PAHs and polychlorinated biphenyls ("PCBs") as well as various metals (primarily chromium, hexavalent chromium, trivalent chromium, arsenic and lead) as a result of Defendants' operations at the Properties.  Contamination at the Properties exceeds standards established by the WDNR, including RCLs, as well as background threshold levels for certain metals.

46.    Petroleum VOCs were detected in soils at higher concentrations on the east side of the Properties, near the historic location of USTs, as well as the railroad tracks that were used to deliver product to the USTs.

47.    Chlorinated VOCs in soil were higher on the west side of the Properties, where the historic lacquer and varnish operations were located.

8

48.     The highest total chromium, trivalent chromium and hexavalent chromium concentrations in soil were observed near the southeast corner of Building 11 near where the USTs were located. Based on historical information, these USTs contained chromium compounds.

49.     High concentrations of lead were found in the soil in the same area. A high concentration of PAHs in soil near the USTs indicates that this contamination resulted from Defendants' use of the Properties as well.

50.     In groundwater, Barclay's investigations demonstrate that contamination exceeded the relevant ES for a number of contaminants.

51.     Petroleum VOCs were found in groundwater wells south and east of Building 11.

52.     The existence of petroleum constituents in the groundwater is likely related to the USTs and the nearby railroad tracks.

53.     Chlorinated constituents were detected in wells on the east side of the Properties near Buildings 33 and 34, where, for example, PPG manufactured Minimax varnish and lacquers.

54.     The source of these chlorinated constituents in the groundwater is likely the historical use of solvents by Defendants at the Properties.

55.     The primary chlorinated VOC identified in soil and groundwater in the area of Buildings 33 and 34 is TCE. TCE was widely used as a solvent prior to 1980, and was likely used by Defendants in their operations as a degreaser and/or a thinner and remover/stripper for paints, lacquers and varnishes.

56.     Barclay's investigation also found exceedances of target sub-slab vapor risk screening levels ("VRSLs") for benzene and tetrachloroethene, requiring that a vapor mitigation system be installed in Building 11.

57.    In addition to the contaminants in the soil, groundwater, and soil vapor at the Properties, the building on the Properties are also contaminated.

58.    Twenty-five (25) bulk samples were collected from porous building materials (wood, concrete and brick) in March 2017.  Based on known historical operations conducted in the various buildings and chemical usage, the compounds of potential concern ("COPCs") included VOCs, semi-volatile organic compounds ("SVOCs"), PCBs, target analyte list metals, and cyanide.

59.    The sampling of porous building materials detected 24 COPCs - 15 metals, SVOCs, cyanide and PCBs. Compounds of concern ("COCs") were subsequently identified as a result of this sampling.  COCs were detected in each of the buildings as follows:

Building 11:

- PCBs (numerous samples above the Toxic Substances Control Act ("TSCA") disposal limit of 50 mg/kg on a variety of surfaces);

- Cyanide (detected below the residential bulk sample clearance standard of 23 mg/kg);

- SVOC (benzaldehyde) (above the residential bulk sample clearance standard of 170 mg/kg);

- Hexavalent chromium (several samples above the residential bulk sampling clearance standard of 0.3 mg/kg, including one sample at 330 mg/kg);

- Cadmium (above the residential bulk sample clearance standard of 71 mg/kg);

- Arsenic (two samples above the residential bulk sample clearance standard of 35 mg/kg); and

- Lead (one sample above the residential bulk sample clearance standard of 400 mg/kg).

Building 33:

- PCBs (at less than the high occupancy cleanup level without a cap of 1mg/kg);

10

- Cyanide (below the residential bulk sample clearance standard of 23 mg/kg);

- SVOC (benzaldehyde) (above the residential bulk sample clearance standard of 170 mg/kg);

- SVOC (bis(2-chlorhexyl)phthalate)) (above the residential bulk sample clearance standard of 0.23 mg/kg);

- Hexavalent chromium (several samples above the residential bulk sampling clearance standard of 0.3 mg/kg); and

- Lead (one sample above the residential bulk sample clearance standard of 400 mg/kg).

Building 34:

- PCBs (at less than the high occupancy cleanup level without a cap of 1mg/kg);

- Cyanide (below the residential bulk sample clearance standard of we23 mg/kg);

- SVOC (benzaldehyde) (above the residential bulk sample clearance standard of 170 mg/kg);

- SVOC (bis(2-chlorhexyl)phthalate)) (above the residential bulk sample clearance standard of 0.23 mg/kg);

- Hexavalent chromium (several samples above the residential bulk sampling clearance standard of 0.3 mg/kg); and

- Cobalt (several samples above the residential bulk sampling clearance standard of 23 mg/kg).

60.     Defendants used metals, including chromium, in their operations at the Properties, and the Properties were used in Defendants' manufacturing of lacquers and varnishes.

61.     PCBs were domestically manufactured from 1929 until their manufacture was banned in 1979. PCBs were commonly used in plasticizers in paints, plastics and rubber products. The PCB releases therefore likely occurred prior to 1979, and are most likely associated with PPG's operations in the buildings before 1975.

62. Visual evidence shows that hexavalent chromium contamination from the building interiors has permeated the buildings through porous materials, such as mortar.

63. In order for the buildings to be usable, this contamination will have to be reduced to acceptable levels.

64. There are at least three pathways of exposure for contamination of the building interiors to pose an imminent and substantial risk to human health: through dermal contact (i.e. absorption through skin), hand-to-mouth (i.e. ingestion), and inhalation.

65. To the extent this contamination is also present in dust within the buildings, wind and movement of air through openings in the buildings and across exterior surfaces with leeching through mortar and walls could lead to contamination spreading. This contamination therefore poses imminent and substantial risk to the environment.

66. Barclay continues to work with the City of Milwaukee and other regulatory authorities to limit access to the buildings and limit migration of the contamination inside the buildings to areas outside the building.

C.    **PPG's Ownership, Operation, and Pollution of the Properties**

67. PPG owned and/or operated property in Milwaukee, Wisconsin, in the general area of the Properties, from approximately 1905 until 1975. PPG's operations spread across approximately nine acres, and they included the Properties and a number of parcels near the Properties.

68. PPG's presence at the Properties began when it acquired Milwaukee-based Patton Paint Co. ("Patton") sometime between 1900 and 1920.

69. PPG consolidated Patton into PPG in 1920, and thereafter operated the Properties as part of its paint and varnish division.

70.     PPG's products made at the Properties included at least dry color, insecticide, varnish, lacquer, paint and pigment.

71.     In approximately 1940, during PPG's ownership and operation at the Properties, records show that there were at least twenty-five (25) USTs at the South Barclay Parcel.

72.     The USTs stored thinner, mineral spirits, resin, lacquer thinner, fuel oil, arsenic acid, hydrochloric acid, sulfuric acid, acetic acid, nitric acid, bichromate and dichromate.

73.     The 1951 Sanborn Fire maps depicting the Properties indicate that Building 11 was a "dry color factory," and had outdoor storage with twenty-six (26) storage tanks; Building 33 was a manufacturing building for Minimax varnish and lacquer; Building 34 was labeled as the "Manway Warehouse;" and Building 35 had sixteen (16) above-ground storage tanks ("ASTs").

74.     The building located east of Barclay Street is labeled as a building with wood floors and was described as a "lacquer plant."

75.     In approximately 1975, PPG closed its operations in Milwaukee and began operating the same, or a substantially similar, operation in Oak Creek, Wisconsin.

76.     PPG's operations at the Properties used and produced materials that now contaminate the soil, groundwater and buildings at the Properties.

77.     The location and nature of the contamination demonstrate that the release of these substances was associated with PPG's operations at the Properties.

78.     PPG disposed, arranged for disposal, dumped, spilled, abandoned, and/or released pollutants, contaminants, hazardous wastes and/or hazardous substances, including but not limited to VOCs, metals, PCBs, and PAHs, thus contaminating the soil, groundwater and buildings located at the Properties.

79. The VOCs, PAHs, PCBs and metals found in the soil, groundwater and interior of the buildings at the Properties are, or are evidence of, the disposal of, solid and hazardous waste by PPG.

80. PPG generated and contributed to the past or present handling, storage, treatment, transportation, or disposal of solid or hazardous waste and hazardous substances at the Properties, which may present an imminent and substantial endangerment to health or the environment.

81. PPG caused, participated in and made decisions about the use, handling, storage and disposal of hazardous substances, solid and hazardous waste that resulted in contamination of the Properties.

82. When PPG moved its operations from the Properties in 1975, it did not undertake to remediate the Properties despite having left substantial contamination in the Properties' soil, groundwater, soil vapor and buildings.

83. In a letter dated May 1, 2018 and in subsequent correspondence, Barclay gave notice to PPG of the contamination at the Properties and demanded that PPG compensate Barclay for costs incurred, and that PPG pay for costs of remediation at the Properties going forward.

84. In a letter dated May 27, 2020, Barclay provided notice of its intent to file a RCRA claim against PPG (the "RCRA Notice").

**D.** **WCC's and MD Fifth Ward's Ownership, Operation, and Pollution of the Properties**

85. WCC owned and operated the South Barclay Parcel and a portion of East Oregon Parcel (Buildings 33 and 35) from 1975-1985. WCC owned and operated Building 34 from 1975-1976.

86. MD Fifth Ward owned the Properties from approximately 1985 through 2017 and operated the Properties from approximately 1985 through 2012.

14

87.    WCC and MD Fifth Ward generated waste in the form of hydraulic oil, oil, chromium sludge, hexavalent chromium, and trivalent chromium.

88.    WCC and MD Fifth Ward also used USTs and ASTs at the Site, which are believed to have stored hazardous chemicals, such as thinner, mineral spirits, resin, lacquer thinner, fuel oil, arsenic acid, hydrochloric acid, sulfuric acid, acetic acid, nitric acid, bichromate and dichromate.

89.    In 1982, WCC was found to be in violation of waste handling regulations with regard to over 450 55-gallon drums of spent pigment dust and sludge at the Site.

90.    In 1993, MD Fifth Ward was found to be in violation of hazardous waste management and material handling regulations for over 400 pigment drums and 12 ASTs.

91.    The VOCs, PAHs, PCBs and metals found in the soil, groundwater and interior of the buildings at the Properties are, or are evidence of, the disposal of, solid and hazardous waste by WCC and MD Fifth Ward.

92.    The historic records demonstrate WCC and MD Fifth Ward used these materials in their operations at the Site, and the presence of those materials in soil and groundwater and interior building materials demonstrates that they were discarded during those operations.

93.    WCC's and MD Fifth Ward's operations at the Properties used and produced materials that now contaminate the soil, groundwater and buildings at the Properties.

94.    The location and nature of the contamination demonstrate that the release of these substances was associated with WCC's and MD Fifth Ward's operations at the Properties.

95.    WCC and MD Fifth Ward disposed, arranged for disposal, dumped, spilled, abandoned, and/or released pollutants, contaminants, hazardous wastes and/or hazardous substances, including but not limited to VOCs, metals, PCBs, and PAHs, thus contaminating the soil, groundwater and buildings located at the Properties.

15

96.    WCC and MD Fifth Ward caused, participated in and made decisions about the use, handling, storage and disposal of substances, solid and hazardous waste that resulted in contamination of the Properties.

97.    When MD Fifth Ward sold its operations to Lumimove in 2012, it did not undertake to remediate the Properties despite having left substantial contamination in the Properties' soil, groundwater, soil vapor and buildings.

98.    In 2011, the WDNR denied MD Fifth Ward's request for site closure.

99.    WDNR's denial was based partly on incomplete delineation of contamination and partly on the WDNR's skepticism that "natural attenuation," meaning no active cleanup or remediation, as proposed by MD Fifth Ward, would remediate the Properties.

**E.    Denesha's Ownership, Operation and Pollution at the Site**

100.    On information and belief, Denesha is liable for contamination caused by WCC and MD Fifth Ward as an alter ego of those entities or as operator. Denesha was Vice President of Operations in 1986, Vice President of Engineering in or about 1992 through at least 1994, and President from at least 2006 through 2012. Documents from the WDNR demonstrate that Denesha was directly involved in decision-making regarding environmental management at MD Fifth Ward for at least a substantial portion of the time that MD Fifth Ward owned and/or operated the Properties. All allegations pertaining to WCC and MD Fifth Ward are incorporated by reference as if fully set forth herein.

**F.    Hydrite's Ownership, Operation, and Pollution of the Site**

101.    Hydrite owned and operated a building on the East Oregon parcel from approximately 1976-1986.

102.    During this time, Hydrite operated a treatment, storage and disposal ("TSD") facility at East Oregon.

103.    Hydrite's TSD facility generated stored hazardous waste, primarily spent solvent wastes (including halogenated solvents), in Building 34.

104.    The facility repackaged, compounded, and distributed alkaline, mineral acids, inorganic salts, and chlorinated and non-chlorinated solvents.

105.    The building was not diked, and there was no secondary containment in place. In addition, the concrete floor was cracked.

106.    Hydrite's operations at the Properties used and produced materials that now contaminate the soil, groundwater and buildings at the Properties.

107.    The location and nature of the contamination demonstrate that the release of these substances was associated with Hydrite's operations at the Properties.

108.    Hydrite disposed, arranged for disposal, dumped, spilled, abandoned, and/or released pollutants, contaminants, hazardous wastes and/or hazardous substances, including but not limited to VOCs, thus contaminating the soil and groundwater at the Properties.

109.    Hydrite caused, participated in and made decisions about the use, handling, storage and disposal of substances, solid and hazardous waste that resulted in contamination of the Properties.

110.    In 1985, before ending its operations at the East Oregon Parcel, Hydrite sought WDNR's approval of its closure of its hazardous waste storage and treatment facility, although Hydrite did not undertake any investigation or remediation activities.

111.    In 1988, the WDNR notified Hydrite that it had completed its closure activities and that further corrective action would not be required "at this time." The WDNR noted, however, that "[t]he Department or [the United States Environmental Protection Agency ("EPA")] could come in at some time in the future if it is determined that corrective action is required." On

information and belief, the closure activities conducted by Hydrite did not fully identify and/or remediate contamination resulting from its activities at the East Oregon Parcel.

112.    On information and belief, Hydrite is liable for contamination caused by WCC and MD Fifth Ward as alter egos of those entities or as operators. The allegations pertaining to WCC and MD Fifth Ward are incorporated by reference as if fully set forth herein.

113.    There was considerable overlap between the directors, officers, and headquarters of Hydrite and WCC from at least 1977 to 1983.

114.    WCC's status as a spin-off of Hydrite's chrome operation has been documented in a book authored by Richard Honkamp (one of Hydrite's early owners), *Success Has Been Fun*, *a History of Hydrite Chemical Co.* Honkamp wrote: "The chrome operation became so large and important that Hydrite spun off the entire business. It became known as Wayne Chemical Corp. but was run out of Hydrite's offices." *Success Has Been Fun*, p. 53.

115.    The book mentions that WCC was eventually sold to Edward Wex, Louis Winter, and Edward Strauch. Mr. Wex and Mr. Winter were officers and directors of both Hydrite and WCC between 1977 and at least 1983.

116.    As noted by Mr. Honkamp, Hydrite and WCC also shared offices at 1237 West Bruce Street in Milwaukee for multiple years.

117.    On information and belief, Hydrite "spun off" WCC to avoid liability, as it had done with other businesses exposed to waste disposal risk in the past. *See Success Has Been Fun*, p. 20. Mr. Honkamp acknowledged that chrome waste was "an issue" with respect to Hydrite's tanning business. *Id.* at 52.

118.    Mr. Wex and Mr. Winter were also officers and directors of both Hydrite and MD Fifth Ward in 1983.

119.    On information and belief, Hydrite maintained day-to-day involvement with MD Fifth Ward's environmental compliance matters as late as 2011 and possibly later.

120.    On December 7, 2011, a Hydrite employee named Paula Biewer communicated by email on behalf of MD Fifth Ward with the WDNR about updating names attached to the Properties.

121.    Ms. Biewer works as an Environmental Health and Safety Manager/Compliance Management Services Coordinator/Security Officer and has worked for Hydrite for at least 19 years.

122.    In a letter dated May 11, 2020 and in subsequent correspondence, Barclay gave notice to Hydrite of the contamination at the Properties and demanded that Hydrite compensate Barclay for costs incurred and that Hydrite pay for costs of remediation at the Properties going forward.

### G.    Lumimove's Ownership, Operation, and Pollution of the Site

123.    Lumimove acquired substantially all of MD Fifth Ward's assets (with the exception of the Properties) in 2012, and Lumimove continued operating a paint and coatings business at the Properties until 2015.

124.    This business was a continuation of the MD Fifth Ward business, and it generated hazardous waste and caused and contributed to contamination at the Properties.

125.    At the time Lumimove left the Properties in 2015, it is documented that the interior of the buildings were contaminated with strontium chromate.

126.    Lumimove's operations at the Properties used and produced materials that now contaminate the soil, groundwater and buildings at the Properties.

127.    The location and nature of the contamination demonstrate that the release of these substances was associated with Lumimove's operations at the Properties.

19

128.     Lumimove disposed, arranged for disposal, dumped, spilled, abandoned, and/or released pollutants, contaminants, hazardous wastes and/or hazardous substances, including but not limited to VOCs, metals, PCBs, and PAHs, thus contaminating the soil, groundwater and buildings located at the Properties.

129.     Lumimove caused, participated in and made decisions about the use, handling, storage and disposal of substances, solid and hazardous waste that resulted in contamination of the Properties.

130.     When Lumimove moved its operations from the Properties in 2015, it did not undertake to remediate the Properties despite having left substantial contamination in the Properties' soil, groundwater, soil vapor and buildings.

131.     In a letter dated May 13, 2020 and in subsequent correspondence, Barclay gave notice to Lumimove of the contamination at the Properties and demanded that Lumimove compensate Barclay for costs incurred and that Lumimove pay for costs of remediation at the Properties going forward.

**H.     Barclay's Acquisition of the Properties and Development of a Remediation Plan**

132.     Barclay intends to redevelop the Properties and return them to productive use for the benefit of the community.

133.     None of the Defendants have taken any action to clean up the contamination that they released into the soil, groundwater, soil vapor and buildings at the Properties to date.

134.     In 2017, Barclay's predecessor in interest, PPG GP LLC, acquired the Properties and began working with the WDNR on plans to remediate the Properties in connection with Barclay's proposed redevelopment.

135.     Barclay has conducted numerous investigations into the contamination at the Properties and continues to work with the WDNR to remediate the Properties to a level appropriate

for reuse. All activities have been conducted in accordance with Chapter NR 700 of the Wisconsin Administrative Rules.

136. No remediation has been approved by relevant authorities or implemented on the Properties to date.

137. Barclay continues to work with the WDNR, the EPA, and the City of Milwaukee to determine how best to remediate the contamination inside the buildings and protect future occupants of the buildings from the contamination. Barclay plans to convert Buildings 11, 33 and 34 to residential housing and to make some changes to Building 35 to prevent further deterioration of that building.

138. The Properties are located within the boundaries of Milwaukee's Walker's Point Strategic Action Plan and *Harbor District Water and Land Use Plan* (December 2017).

139. Both of these plans identify the area where the Site is located as ripe for redevelopment.

140. The Harbor District Plan sets as a goal removal or resolution of "legacy contamination of land . . . in the District" and creation of "housing and employment opportunities that are accessible to a broad segment of the community." *Harbor District Plan* at 36.

141. The description of ongoing development activities in the District is consistent with the plan for the Site: "While the Harbor District was historically dominated by industrial and transportation uses, new uses have begun to move into the District in recent years. Industrial loft buildings are being converted to new housing, office, start-up, and retail space, and former brownfields are being reused for new mixed-use developments." *Id.* at 37.

142. In the event Barclay and the various regulatory authorities cannot agree on a method to remediate the interiors of the buildings, some or all of them may need to be demolished. If any

or all of the buildings are demolished, there may be costs associated with the need to dispose of the demolition debris as RCRA hazardous waste or in accordance with requirements pertaining to disposal of PCB-contaminated materials.

143. Barclay has incurred costs associated with the investigation of the contamination of the Properties, identifying potentially responsible parties for the contamination at the Properties, and developing remediation strategies to address the contamination of the Properties.

144. Barclay has never used or stored hazardous substances at the Properties.

145. Barclay is the only owner of the Properties that has made any effort to work towards developing a plan to remediate the Properties and restore them to beneficial use for the Community.

146. Barclay continues to incur response costs for work at the Properties, and will continue to do so until and unless the Properties are remediated.

<u>**COUNT I**</u>
<u>**COST RECOVERY UNDER CERCLA**</u>
<u>**42 U.S.C. § 9607(A)**</u>

***Against all Defendants***

147. Barclay incorporates herein by reference each of the allegations in this Complaint as if fully stated herein.

148. Barclay is a "person" as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

149. Barclay is entitled to recover from Defendants, pursuant to 42 U.S.C. § 9607(a), response costs incurred by Barclay in connection with the environmental response effort at the Properties.

150.     A "disposal" and "release" of "hazardous substances" into the "environment" has occurred at the Properties as defined by Sections 101(8)(14), (22), and (29) of CERCLA, 42 U.S.C. §§ 9601(8)(14), (22), and (29).

151.     The Properties constitute a "facility" as defined by Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

152.     The disposal and release of hazardous substances in connection with the Properties have caused and will continue to cause Barclay to incur necessary response costs consistent with the National Contingency Plan ("NCP").

153.     Defendants are responsible parties under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), as past owners and/or operators of the Properties at the time of disposal of hazardous substances and as an arranger for disposal of hazardous substances at the Properties.

154.     Defendants owned and/or operated the Properties during these time frames:

PPG: 1905 to 1975

Hydrite: 1976 to 1986

Lumimove: 2012 to 2015

WCC:  1975 to 1985

MD Fifth Ward:  1985 to 2017

155.     On information and belief, Hydrite is liable for the actions of WCC from 1975-1983 and for the actions of MD Fifth Ward in 1983 as an alter ego of those entities.

156.     On information and belief, Hydrite is liable for the actions of MD Fifth Ward as an operator for some period of time including 2011.

157.     On information and belief, Denesha is liable as an operator and/or as the alter ego of MD Fifth Ward from 1989 until 2017.

158. Under CERCLA Section 107(a)(4)(B), Defendants are jointly and severally liable for costs of response under 42 U.S.C. § 9607(a)(4)(B).

159. Accordingly, Barclay is entitled, pursuant to CERCLA, 42 U.S.C. § 9607(a), to recover its past and future response costs in connection with the Properties from Defendants.

160. Pursuant to Section 113(l) of CERCLA, 42 U.S.C. § 9613(l), Barclay has provided a copy of this Complaint to the Attorney General of the United States and the Administrator of the United States Environmental Protection Agency.

## COUNT II
## DECLARATORY RELIEF UNDER CERCLA
## 42 U.S.C. 9613(A)

### *Against all Defendants*

161. Barclay incorporates herein by reference each of the allegations in this Complaint as if fully stated herein.

162. Because the extent and magnitude of the contamination at, around, under and in buildings located at the Properties is still being investigated and has not yet been cleaned up, Barclay will continue to incur necessary response costs in the future.

163. Pursuant to 42 U.S.C. § 9613, Barclay is entitled to a declaratory judgment establishing the joint and several liability of Defendants for such response costs for the purposes of this and any subsequent action or actions to recover further response costs.

## COUNT III
## CITIZEN SUIT UNDER RCRA
## 42 U.S.C. § 6972(A)

### *Against PPG*

164. Barclay incorporates herein by reference each of the allegations in this Complaint as if fully stated herein.

165.    A copy of the RCRA Notice sent by Barclay to PPG, with certified mail receipts, is attached as Exhibit A.

166.    Through delivery of the RCRA Notice, Barclay gave notice of the violations and its intent to file suit to PPG, PPG's registered agent, the United States Attorney General, the EPA, EPA Region V, and the WDNR as required by 42 U.S.C. § 6972(a).

167.    More than 90 days have passed since Barclay provided the RCRA Notice to PPG.

168.    The endangerment complained of in the RCRA Notice is continuing at this time or is reasonably likely to continue, because PPG has failed to take corrective actions sufficient to abate the endangerment conditions.

169.    Neither the EPA nor the State of Wisconsin have commenced or are diligently prosecuting a civil or criminal action in a state or federal court to abate the imminent and substantial endangerment to health and the environment alleged in the RCRA Notice. Nor is the EPA, under CERCLA, engaged in any of the actions described in 42 U.S.C. 6972(b)(2)(B) with respect to the conditions described in this Complaint.

170.    Pursuant to RCRA Section 7002(a)(1)(B), having given the required notice, Barclay may commence a citizen suit against "any person," "including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

171.    Pursuant to 42 U.S.C. § 6903(15), PPG is a "person" subject to the citizen suit provisions of RCRA, 42 U.S.C. § 6972.

172. The contaminants found at the Properties are "solid waste" under RCRA section 1004 because they are "discarded material," which includes liquid or semisolid material resulting from industrial or commercial operations. 42 U.S.C. § 6903(27).

173. As set forth above, PPG has engaged in the operations of handling, storage, treatment, transportation, or disposal of solid waste that has led to contamination at the Properties. Thus, PPG has contributed and is contributing to the past and present handling, storage, treatment, transportation, or disposal of a solid waste under RCRA.

174. PPG's treatment, handling, storage, transportation, and disposal of solid and hazardous waste at the Properties may present an imminent and substantial endangerment to public health and the environment as those terms are used in 42 U.S.C. § 6972(a)(1)(B).

175. In accordance with this provision, PPG is subject to injunctive relief requiring it to take necessary actions to abate this endangerment.

## COUNT IV
## NEGLIGENCE

### *Against all Defendants*

176. Barclay incorporates herein by reference each of the allegations in this Complaint as if fully stated herein.

177. Defendants failed to exercise due care in their handling, storage, use, containment and disposal of hazardous substances, pollutants and contaminants used in or generated by their operations at the Properties.

178. Defendants failed to exercise their due care by dumping, spilling, leaking, pouring, emitting or depositing contaminants in the soil or groundwater at the Properties, or in the buildings at the Properties.

179.     Defendants' conduct resulted in spills and has caused hazardous substances, pollutants and contaminants to be deposited in the soil, groundwater and vapors on the Properties and the buildings at the Properties.

180.     Defendants knew, or in the exercise of reasonable care, should have known that as a result of their activities, hazardous substances, pollutants and contaminants were substantially certain to be released to the Properties, causing or contributing to contamination at and around the Properties.

181.     Defendants also had a duty to exercise reasonable care in addressing the known contamination at the site.

182.     On information and belief, Defendants failed to exercise due care required in responding to the known contamination at the Properties and did not take the steps necessary to mitigate, clean up, and stop continuing migration of the contamination.

183.     As a direct and proximate cause of Defendants' acts and omissions with respect to their handling of contaminants at the Properties, Barclay has sustained injuries and damages in an amount to be determined at trial.

<u>**COUNT V**</u>
<u>**NUISANCE**</u>

***Against all Defendants***

184.     Barclay incorporates herein by reference each of the allegations in this Complaint as if fully stated herein.

185.     Barclay has a right and is entitled to the use and enjoyment of the Properties.

186.     Defendants, through their intentional and negligent conduct, released or caused to be released hazardous substances, pollutants and contaminants to the Properties and the buildings at the Properties, which has resulted in conditions that are hazardous to humans.

187. These releases of hazardous substances, pollutants and contaminants constitute a nuisance as they interfere substantially with the comfortable enjoyment of life, health and safety of others and further interferes with Barclay's use and enjoyment of the Properties.

188. The Defendants had actual or constructive notice of the hazards to human health and the environment resulting from the release and presence of hazardous substances, pollutants and contaminants at the Properties.

189. Defendants did not exercise reasonable care by failing to take steps to mitigate, clean up or stop the continuing migration of hazardous substances, pollutants and contaminants at and around the Properties after it knew or should have known of the existence of such contamination.

190. Defendants, fully aware of the nuisance caused by its actions, has failed to abate the nuisance.

191. Defendants' conduct and the contaminants they left behind constitute a nuisance, for which Defendants are responsible to abate.

192. Barclay has suffered nuisance damages for which Defendants are liable in an amount to be determined at trial.

**COUNT VI**
**EQUITABLE CONTRIBUTION**

*Against all Defendants*

193. Barclay incorporates herein by reference each of the allegations in this Complaint as if fully stated herein.

194. Defendants have caused or contributed to the release of hazardous substances, pollutants and contaminants on the Properties.

195. Defendants have created and maintained a public and private nuisance.

196.     Barclay, as the current party in possession and control of the Properties, shares a common liability with Defendants, as the parties that caused the contamination, to the State of Wisconsin and the public, to investigate and remediate the contamination at the Properties.

197.     Barclay has paid more than its equitable share of the costs related to the investigation and remediation of the Properties and is entitled to restitution from the Defendants.

## COUNT VII
## UNJUST ENRICHMENT

### *Against all Defendants*

198.     Barclay incorporates herein by reference each of the allegations in this Complaint as if fully stated herein.

199.     Barclay has paid for investigation and remediation at the Properties.

200.     Barclay's investigation and remediation at the Properties is a benefit conferred to the Defendants as it reduces their obligation to the State of Wisconsin.

201.     Defendants are aware that Barclay has paid for investigation and remediation costs at the Properties, and on information and belief, has and will continue to use the information derived from Barclay's investigation and remediation.

202.     Under the circumstances, it is inequitable for Defendants to accept Barclay's investigation and remediation of the Properties.

203.     Defendants are responsible to pay for its costs to date.

## PRAYER FOR RELIEF

**WHEREFORE**, Barclay demands judgment as follows:

A.     A judgment in favor of Barclay and against Defendants awarding compensatory damages, with interest and costs (including reasonable attorney fees), in an amount to be proven at trial;

B.      An Order under Section 107 of CERCLA, 42 U.S.C. § 9607, requiring Defendants to reimburse Barclay for all past and future response costs, including the costs of investigation, remediation and/or removal activities address releases and threatened releases of hazardous substances at the Properties.

C.      An Order under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), requiring Defendants to reimburse Barclay for all preliminary investigative costs related to releases of hazardous substances at the Properties;

D.      A declaratory judgment that Defendants are liable to Barclay for all past and future response costs in response to the releases or threatened releases of hazardous substances at the Properties;

E.      An injunction under Section 1007(a) of RCRA, 42 U.S.C. § 6972(a) requiring PPG to abate any imminent and substantial risk to health and the environment that may exist at the Properties as a result of PPG's contribution to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste at the Properties;

F.      An Order requiring Defendants to abate and/or remediate all pollution and/or threatened pollution at, around and/or from the Properties, and an Order requiring Defendants to pay Barclay for all damages incurred by Barclay as the result of the pollution;

G.      An Order requiring Defendants to pay Barclay pre-judgment interest on all costs and damages to be paid to Barclay;

H.      An Order awarding to Barclay all costs associated with this action, including, but not limited to reasonable attorney fees and any expert or consulting fees;

I.      Such additional and further relief in favor of Barclay as this Court deems just and proper.

## JURY DEMAND

Plaintiff Barclay demands trial by jury by the maximum number of jurors permitted by law.

Dated:  November 10, 2020          By:          *s/Ted A. Warpinski*
                                         Ted A. Warpinski (WI SB #1018812)
                                         DAVIS & KUELTHAU, s.c.
                                         318 South Washington Street, Suite 300
                                         Green Bay, WI  54301
                                         T:  920-431-2236
                                         E: TWarpinski@dkattorneys.com

                                         M. Andrew Skwierawski (WI SB#1063902)
                                         DAVIS & KUELTHAU, s.c.
                                         111 East Kilbourn Avenue, Suite 1400
                                         Milwaukee, WI  53202
                                         T:  414-276-0200
                                         E: askwierawski@dkattorneys.com

                                         Elizabeth H. Schmiesing (MN SB#0229258)*
                                         Thomas H. Boyd (MN SB#0200517)
                                         Kyle R. Kroll (MN SB#0398433)*
                                         WINTHROP & WEINSTINE, P.A.
                                         225 South Sixth Street, Suite 3500
                                         Minneapolis, MN 55402-4629
                                         T: 612-604-6400
                                         E: eschmiesing@winthrop.com;
                                            tboyd@winthrop.com;
                                            kkroll@winthrop.com

                                         *To be admitted pro hac vice*

                                         *Attorneys for Plaintiff Barclay Lofts, LLC*

N:\DOCS\906\  Case 2:20-cv-01694-JPS   Filed 11/10/20   Page 31 of 31   Document 1