# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

BARCLAY LOFTS LLC,

                    Plaintiff,

v.

PPG INDUSTRIES INC., WCC INC.,
MD FIFTH WARD PROPERTIES INC.,
MICHAEL DENESHA, HYDRITE
CHEMICAL CO., LUMIMOVE INC.
d/b/a WPC TECHNOLOGIES INC.,
ABC INSURANCE COMPANY, DEF
INSURANCE COMPANY, GHI
INSURANCE COMPANY, JKL
INSURANCE COMPANY, and MNO
INSURANCE COMPANY,

                    Defendants.

Case No. 20-CV-1694-JPS

**ORDER**

---

On December 17, 2020, Barclay Lofts, LLC ("Barclay"), a real estate development company, filed an amended complaint against the above-captioned defendants (collectively, "Defendants"), the former owners and operators of a property located in Milwaukee, Wisconsin ("the Property"), seeking costs, damages, and declaratory relief arising from the Property's environmental contamination. (Docket #24). The Court has jurisdiction under 28 U.S.C. § 1331 because Barclay's claims arise under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), and the Resources Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a). The Court has supplemental jurisdiction over the claims arising under Wisconsin state law. 28 U.S.C. § 1367(a).

On January 22, 2021, Defendant Lumimove, Inc. ("Lumimove")[1] filed an answer and counterclaim against Barclay. (Docket #33). That same day, Defendants PPG Industries, Inc. ("PPG") and Hydrite Chemical Company ("Hydrite") filed a joint motion for a more definite statement of facts in the complaint and to dismiss the state law tort claims. (Docket #31, #34). Three days later, Lumimove filed a motion for joinder to these motions. (Docket #36). For the reasons explained below, the motions for a more definite statement will be denied; the partial motions to dismiss will be granted; and Lumimove's motion for joinder will granted.[2]

1.      RELEVANT FACTS

   1.1      Historical Background and Ownership

Barclay owns the Property, which consists of two tracts of land in downtown Milwaukee's former industrial sector, both of which were utilized as part of a paint manufacturing facility. One tract is a .72-acre parcel that hosts a five-story building ("Building 11") complete with a full basement and penthouse. The other tract, right across the street, is a .877-acre parcel that contains three vacant buildings. Two of these buildings

---

[1] The company explains that its name is actually "Lumivove." (Docket #33 at 1, #36 at 1). However, no party has requested to amend the complaint to change this typographical error and, in any case, there appears to be no confusion as to who is being sued. Additionally, notwithstanding the error, the defendant in question refers to itself as "Lumimove" in its responsive pleading and motion. (*Id*). Therefore, the Court will refer to the party as Lumimove, consistent with both parties' usage.

[2] Lumimove's motion will be granted because it raised, as affirmative defenses, the issues contemplated in the motion to dismiss and motion for a more definite statement. (See Docket #33 at 47); Fed. R. Civ. P. 12(b) ("Every defense to a claim for relief in any pleading *must* be asserted in the responsive pleading if one is required. But a party *may* assert the following defenses by motion . . .") (emphasis added).

("Building 33" and "Building 34") are three-story structures with concrete slab-on-grade construction. The third building ("Building 35") is a single-story structure with a basement. All four buildings are located in the East Oregon and South Barclay Industrial Historic District and, accordingly, are registered on the Wisconsin State and National Registers of Historic Places.

Between 1905 and 1975—the prime of Milwaukee's industrial past— Pittsburgh Plate Glass company (now PPG), a national paint and varnish manufacturer, owned the Property. PPG carried out its Milwaukee operations on a nine-acre tract of land that encompassed the Property at issue. On this campus, PPG made paints, dry color, insecticide, varnish, lacquer, and pigment. For example, Building 11 was used as the dry color factory. Buildings 33 and 34 were used to manufacture and store varnish and lacquers. Building 35 was a storage facility that held up to 16 chemical storage tanks. Indeed, by 1940, records suggest that PPG boasted more than 25 underground storage tanks, which stored different types of chemicals including paint thinner, fuel oil, and arsenic acid. Barclay alleges that over the course of these paint operations, PPG allegedly "disposed, arranged for disposal, dumped, spilled, abandoned, and/or released pollutants, contaminants, hazardous wastes . . .thus contaminating the soil, groundwater and buildings located at the Propert[y]." (Docket #24 ¶ 83). Barclay maintains that PPG did not undertake remediation efforts despite "substantial contamination" of the soil, groundwater, and buildings. (*Id.* ¶ 87).

In 1975, PPG shut down its plant in Milwaukee and Hydrite entered the picture when it purchased the Property. Hydrite operated a treatment, storage, and disposal operation in Building 34 from 1976 until 1986. Hydrite's facility "repackaged, compounded, and distributed alkaline,

mineral acids, inorganic salts, and chlorinated and non-chlorinated solvents." (*Id.* ¶ 109). Hydrite never implemented certain environmental precautionary measures, such as dikes and secondary containments for spills. Additionally, the building's concrete floor was cracked. Hydrite did not engage in any remediation. Barclay alleges that Hydrite's practices and decisions resulted in contamination of the Property.

Hydrite is alleged to be the alter ego of Defendant Wayne Chemical Company ("WCC"), which was spun off from Hydrite to deal with the facility's robust "chrome operation." (*Id.* ¶ 119). WCC and Hydrite were run by the same group of managers who worked out of the same office. WCC operated on the Property in conjunction with Hydrite from 1975 to 1985, conducting similar chemical processing, storing, and generating waste. Barclay alleges that WCC also contributed to the contamination of the Property during this time. In 1982, for example, "WCC was found to be in violation of waste handling regulations with regard to over 450 55-gallon drums of spent pigment dust and sludge" on the Property, though the details of the violation are unclear (e.g., which regulations were violated, and who found WCC in violation). (*Id.* ¶ 94).

In 1985, Hydrite decided to wind down its operations. It asked the Wisconsin Department of National Resources (the "WDNR") to approve closure of its facility in Building 34. Between 1985 and 1986, Hydrite and WCC conveyed the Property to Defendant MD Fifth Ward Properties, Inc. ("MD Fifth Ward"). (*Id.* ¶ 160). In 1988, the WDNR sent Hydrite a comfort letter regarding Building 34, which explained that while further corrective measures were not warranted at the time, future entities, including the U.S. Environmental Protection Agency (the "EPA"), might instruct differently. (*Id.* ¶ 116). That same year, WCC dissolved.

Despite conveying the Property to MD Fifth Ward, Hydrite was allegedly involved with "MD Fifth Ward's environmental compliance matters [discussed below] as late as 2011 and possibly later." (*Id.* ¶ 124). Indeed, Hydrite is alleged to be the alter ego of MD Fifth Ward. (*Id.* ¶¶ 117, 124). As it happened, MD Fifth Ward was also a chemical processing company. (It is unclear if MD Fifth Ward likewise engaged in paint manufacturing.) Similar to its predecessors, MD Fifth Ward did not take precautions against or remediate the waste. For example, in 1993, MD Fifth Ward "was found to be in violation of hazardous waste management and material handling regulations for over 400 pigment drums and 12 [above-storage tanks]." (*Id.* ¶ 95). Again, the terms of this violation are unclear.

Defendant Michael Denesha ("Denesha") served in various leadership roles for WWC and MD Fifth Ward from 1986 through 2012, including as Vice President of Operations, Vice President of Engineering, and, from 2006 to 2012, as President. In those capacities, he was involved in decision-making that led to the contamination and failed remediation of the Property. Barclay claims that Denesha was an alter ego of WCC and MD Fifth Ward.

In 2012, MD Fifth Ward divested its business operations to Lumimove, a company that resumed paint manufacturing operations at the Property until 2015. Like its predecessors, Lumimove's activities contributed to the Property's contamination, and Lumimove did not conduct any remediation. To illustrate the persisting contamination, when Lumimove's operations ended in 2015, the buildings on the Property were all contaminated with a hazardous compound called strontium chromate.

### 1.2 Discovery of Contaminants

In April 2006, MD Fifth Ward, which owned the properties at the time, conducted an environmental investigation known as a "Phase II Environmental Site Assessment Report."[3] As a result of this investigation, MD Fifth Ward discovered petroleum discharge leaking from an underground storage tank on the Property. The Phase II investigation also revealed soil and groundwater contaminants, including high concentrations of trichloroethylene ("TCE"), a paint thinner that was used pre-1980, as well as arsenic, cadmium, barium, chromium, mercury, and lead. On June 6, 2006, MD Fifth Ward informed the WDNR of the storage tank leak.

The WDNR opened a Bureau for Remediation and Redevelopment Tracking System number for the leak, and ordered MD Fifth Ward to investigate the scope of the contamination and remediate as much as possible. However, Barclay alleges that MD Fifth Ward "took only limited action with respect to investigating or remediating the site until 2009." (*Id.* ¶ 41). Meanwhile, the WDNR opened another Tracking System number for the Property (though it is unclear why).

---

[3]The parties do not explain it, but a "Phase II" investigation "involves sampling and testing of soil, air, surface water and/or groundwater," and is required in certain pre-sales circumstances, such as when an initial investigation identifies "an area of [environmental] concern." Robert W. Whetzel & Todd A. Coomes, *Commercial Real Estate Loans: Environmental Due Diligence for Lenders*, Prac. L. Prac. Note (available through Westlaw) (last accessed July 28, 2021). Some properties "affected by certain environmental conditions will always require a Phase II." *Id.* These include properties containing "hazardous waste disposal facilities" or "[underground storage tanks] without proper operation documentation or close-out reports." *Id.*

In 2009, MD Fifth Ward asked the WDNR to "close" the site, which theoretically would end any further investigation and remediation requirements. The WDNR declined the request because the original source of the contamination had not been "sufficiently identified," and because the "degree and extent of contamination" in the soil and groundwater was still unclear. Efforts to close the site in 2011 were similarly denied. (*Id.* ¶¶ 43–44). After some back-and-forth, in 2012, the WDNR provided MD Fifth Ward with a list of various shortcomings of its investigative efforts: first, it remained unknown whether the "contaminant plume was stable"; second, there were no evaluations of contaminant trends; and third, there was minimal information regarding the vapor intrusions into the Property. (*Id.* ¶ 46).

Nevertheless, in 2013, MD Fifth Ward told the WDNR that it would cease work on the property. In 2014 and 2015, MD Fifth Ward filed "semi-annual progress reports" (presumably with the WDNR) stating that "[t]he [P]roperty is awaiting initiation of brownfield redevelopment activities by the prospective developer of the site. The site is currently capped and used for industrial purposes." (*Id.* ¶ 48). MD Fifth Ward made no further efforts to investigate or remediate.

### 1.3 Barclay's Ownership and Investigation

In January 2017, Barclay's predecessor in interest, PPG GP LLC,[4] purchased the Property from MD Fifth Ward and "began working with the WDNR on plans to remediate the Properties in connection with Barclay's

---

[4]The relationship between PPG, the paint manufacturer (and a defendant), and PPG GP, the real estate development company (and successor-in-interest to the plaintiff), is unclear; however, the Court suspects that the development company's naming convention is to name its properties after their historical owners.

proposed redevelopment." (*Id.* ¶ 140). In December 2017, PPG GP LLC transferred the properties to Barclay. Barclay intends to repurpose the buildings on the Property into residential complexes in a manner consistent with the mixed-use development initiatives contemplated by the Walker's Point Strategic Action Plan and the Harbor District's Water and Land Use Plan. Barclay continues to work with the WDNR, the EPA, and the City of Milwaukee to remediate the properties; however, as of late 2020, no remediation had been approved or implemented.

Both before and after the purchase, Barclay and PPG GP LLC conducted environmental investigations on the Property. (*Id.* ¶ 49) ("In connection with due diligence prior to purchasing the Propert[y] and after the purchase, Barclay has analyzed the soil, soil vapor[,] and groundwater contamination. . ."). These investigations revealed extensive contamination from volatile organic compounds ("VOCs") and polychlorinated biphenyls ("PCBs"),[5] as well as various metals including chromium, arsenic, and lead, which are consistent with the Property's use as a former paint manufacturing facility. For example, soil on the east side of the Property— where railroad tracks once led to the underground storage tanks— contained high concentrations of petroleum VOCs. Soil on the west side of the Property—where the lacquer and varnish operations used to be— contained high concentrations of chlorinated VOCs. Additionally, the investigations revealed high concentrations of chromium near the

---

[5]According to Plaintiff, "PCBs were domestically manufactured from 1929 until their manufacture was banned in 1979," and they were "commonly used in plasticizers in paints, plastics and rubber products." (*Id.* ¶ 66). Based on this information, the PCB contaminants are "most likely associated with PPG's operations in the buildings before 1975." (*Id.*)

southeast portion of Building 11, which suggest that an underground storage container there once hosted chromium compounds.

The investigations also revealed that the contamination extended from the soil to the groundwater, dust, and air. For example, Building 11's groundwater wells were contaminated with petroleum VOCs, and there were high vapor risk levels for benzene and tetrachloroethene, which required a vapor-mitigation system be installed. The wells on the east side of Buildings 33 and 34, the former varnish/lacquer manufacturing sites, contained chlorinated VOCs, primarily TCE (i.e., the paint thinner). Additionally, building samples from various porous materials taken in 2017 revealed the following compounds of concern:

<u>Building 11:</u>

- PCBs (numerous samples above the Toxic Substances Control Act ("TSCA") disposal limit of 50 mg/kg on a variety of surfaces);

- Cyanide (detected below the residential bulk sample clearance standard of 23 mg/kg);

- SVOC (benzaldehyde) (above the residential bulk sample clearance standard of 170 mg/kg);

- Hexavalent chromium (several samples above the residential bulk sampling clearance standard of 0.3 mg/kg, including one sample at 330 mg/kg);

- Cadmium (above the residential bulk sample clearance standard of 71 mg/kg);

- Arsenic (two samples above the residential bulk sample clearance standard of 35 mg/kg); and

- Lead (one sample above the residential bulk sample clearance standard of 400 mg/kg).

Building 33:

- PCBs (at less than the high occupancy cleanup level without a cap of 1mg/kg);

- Cyanide (below the residential bulk sample clearance standard of 23 mg/kg);

- SVOC[6] (benzaldehyde) (above the residential bulk sample clearance standard of 170 mg/kg);

- SVOC (bis(2-chlorhexyl)phthalate) (above the residential bulk sample clearance standard of 0.23 mg/kg);

- Hexavalent chromium (several samples above the residential bulk sampling clearance standard of 0.3 mg/kg); and

- Lead (one sample above the residential bulk sample clearance standard of 400 mg/kg).

Building 34:

- PCBs (at less than the high occupancy cleanup level without a cap of 1mg/kg);

- Cyanide (below the residential bulk sample clearance standard of . . . 23mg/kg);

- SVOC (benzaldehyde) (above the residential bulk sample clearance standard of 170 mg/kg);

- SVOC (bis(2-chlorhexyl)phthalate) (above the residential bulk sample clearance standard of 0.23 mg/kg);

- Hexavalent chromium (several samples above the residential bulk sampling clearance standard of 0.3 mg/kg); and

- Cobalt (several samples above the residential bulk sampling clearance standard of 23 mg/kg).

(*Id.* ¶ 64).

---

[6]SVOCs are semi-volatile organic compounds.

Case 2:20-cv-01694-JPS   Filed 08/05/21   Page 10 of 34   Document 56

## 2. LEGAL STANDARD

### 2.1 Motion for a More Definite Statement

"A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). "Rule 12(e) motions are appropriate when a complaint is unintelligible, not when a defendant just wants more detail." *United States v. Pansier*, 17-C-1740, 2020 WL 7209562, at *1 (E.D. Wis. Dec. 7, 2020) (citing *Bennet v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998)). These motions are "not to be used as substitutions for discovery" and "are rarely granted." *Freeman v. City of Milwaukee*, 13-CV-918, 2013 WL 12180082, at *1 (E.D. Wis. Oct. 25, 2013) (citations and quotations omitted).

### 2.2 Motion to Dismiss

Federal Rule of Civil Procedure 12(b) provides for dismissal of complaints which, among other things, fail to state a viable claim for relief. Fed. R. Civ. P. 12(b)(6). To state a claim, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In other words, the complaint must give "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016) (internal citation omitted). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Olson v. Champaign County*, 784 F.3d 1093, 1099 (7th Cir. 2015) (internal citations and quotations omitted). In reviewing the complaint, the Court is required to "accept as true all of the well-pleaded facts in the complaint and draw all

Case 2:20-cv-01694-JPS   Filed 08/05/21   Page 11 of 34   Document 56

reasonable inferences in favor of the plaintiff." *Kubiak*, 810 F.3d at 480–81. However, the Court "need not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (internal citations and quotations omitted).

3.    **ANALYSIS**

   3.1    **Motion for a More Definite Statement**

      3.1.1    **Claim One: CERCLA—Cost Recovery**

CERCLA, also known as the "Superfund Act," confers broad liability on all persons who are potentially responsible for hazardous waste contamination. *See* 42 U.S.C. § 9601 *et seq.* Under CERCLA, all current and former owners of a contaminated site are responsible for cleanup costs. *Id.* § 9607(a). A party who has incurred cleanup costs (also referred to as "response costs," or costs associated with the remediation or removal of the contamination) may recover those costs from other responsible parties under either § 9607(a)(4)(B) or § 9613(f). Section 9607(a)(4)(B) applies where the party seeking response costs "shares no blame for the contamination." *Southfund Partners Ill. v. Sears, Roebuck & Co.*, 57 F. Supp. 2d 1369, 1375 n.3 (N.D. Ill. 1999) (citing 42 U.S.C. § 9607(a)(4); *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996)). By contrast, § 9613(f) allows a party who is responsible for the contamination to "seek contribution from any other person who is liable or potentially liable under section 9607(a)."

Regardless of whether the case arises from § 9607(a)(4)(B) or § 9613(f), a plaintiff must allege, and eventually establish, the following four elements:

   (1) the site in question is a "facility" as defined by CERCLA;
   (2) the Defendant is a "responsible person" for the spill as

Case 2:20-cv-01694-JPS   Filed 08/05/21   Page 12 of 34   Document 56

defined by CERCLA; (3) there was a release of hazardous substances; and (4) such release caused the [p]laintiff to incur response costs.

*Envtl. Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 506 (7th Cir. 1992). Additionally, a party may only recoup "necessary costs of response" that are "consistent with the national contingency plan [the "NCP"]." 42 U.S.C. § 9607(a)(4)(B). The present case arises under § 9607(a)(4)(B) because Barclay alleges it was not responsible for the contamination but, as a current owner, must incur cleanup costs. The parties do not dispute the first three elements of the claim; at issue here is whether Barclay has sufficiently alleged that its response costs are necessary and consistent with the NCP.

### 3.1.1.1    Necessary Costs

A response cost, including an investigatory response cost, is necessary "when an actual and real threat to human health or the environment exist[s]." *Town of Halfmoon v. Gen. Elec. Co.*, 105 F. Supp. 3d 202, 211 (N.D.N.Y. 2015) (quoting *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 961 (9th Cir. 2013)). The policy of reimbursing only "necessary" costs serves as a "check on the temptation to improve one's property and charge the expense of improvement to someone else." *G.J. Leasing Co. v. Union Elec. Co.*, 54 F.3d 379, 386 (7th Cir. 1995) (finding no clear error in the district court's conclusion that the plaintiff had not met its burden to establish that the asbestos removal was a necessary cost). Courts have generally found that "investigative costs [are those] 'necessary' to help determine the magnitude of the threat." *Forest Park Nat'l Bank & Tr. v. Ditchfield*, 881 F. Supp. 2d 949, 978 (N.D. Ill. 2012).

Here, Barclay argues that Defendants should be obligated to reimburse Barclay for its allegedly necessary costs. (Docket #24 ¶¶ 42–48,

149). Specifically, Barclay alleges that "MD Fifth Ward reported the existence of petroleum contamination at the Properties in June 2006," and the WDNR repeatedly rejected MD Fifth Ward's successive efforts to close the property because "the degree and extent of contamination present in soil and groundwater ha[d] not been sufficiently defined and the origin of contaminant sources ha[d] not been sufficiently identified." (*Id.* ¶¶ 35, 42–48). When Barclay set out to purchase and develop the site, it incurred costs when it conducted certain investigations in order to determine the scope of the contamination on the Property. (*Id.* ¶ 49). Barclay maintains that its investigatory costs were necessary because the Property contained known hazardous contaminants of unknown scope. To date, the only costs that Barclay has allegedly incurred are those related to the initial investigation of the site. (*See id.*, *passim*). No remediation plan has been developed, much less begun. (*Id.* ¶ 142).

"Obtaining preliminary information on the levels of hazardous substances in the surrounding soil and sediment seems a necessary step before any further action can be properly taken." *Gache v. Town of Harrison*, 813 F. Supp. 1037, 1046 (S.D.N.Y. 1993). At the pleadings stage, the Court will not parse whether all of the costs incurred by Barclay were necessary, or, indeed, preliminary. *See VME Americas, Inc. v. Hein-Werner Corp.*, 946 F. Supp. 683, 693 (E.D. Wis. 1996) (finding no coverage for investigations conducted "prior to the discovery of the contamination at issue," nor for investigatory costs "incurred after a cleanup has already begun."). Those questions are best left for a time after discovery has been thoroughly completed. At this juncture, it suffices that Barclay has intelligibly alleged a claim for recoupment for necessary investigative costs.

### 3.1.1.2 Costs Consistent with the NCP

A response cost "will be considered 'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in paragraphs (5)[7] and (6)[8] of this section and results in a CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(i). The NCP is a regulatory framework promulgated by the EPA that explains how national and local entities should respond to various environmental hazards, including toxic spills. *See* 40 C.F.R. § 300 *et seq.* One of the purposes of the NCP is to "assur[e] that remedial action measures are cost-effective over the period of potential exposure to the hazardous substances or contaminated materials." 42 U.S.C. § 9605(a)(7). Section 300.400 establishes "methods and criteria for determining the appropriate extent of response authorized by CERCLA[.]" Although the subpart "is oriented toward federally funded response actions," it "may be used as guidance concerning methods and criteria for response actions by other parties under other funding mechanisms." 40 C.F.R. § 300.400(i)(2). "[P]rivate party response actions" require "only 'substantial compliance' with the applicable NCP provisions . . .provided that the response action 'results in a CERCLA-quality cleanup.'" *Pub. Serv. Co. of Colo. v. Gates Rubber Co.*, 22 F. Supp. 2d 1180, 1187 (D. Colo. 1997) (quoting 40 C.F.R. § 300.700(c)(3)(i)). In general, "nothing in this part is intended to limit the rights of any person to seek recovery of response costs from responsible parties pursuant to CERCLA section [9607]." 40 C.F.R. § 300.400(i)(2).

---

[7] I.e., the relevant provisions of the NCP.

[8] I.e., the requirement that private parties allow an opportunity for public comment on remedial plans.

Case 2:20-cv-01694-JPS   Filed 08/05/21   Page 15 of 34   Document 56

The NCP has several requirements that courts examine in order to determine whether costs were incurred in "substantial compliance" with the NCP. *See, e.g., Sealy Conn., Inc. v. Litton Indus., Inc.*, 93 F. Supp. 2d 177, 183–87 (finding substantial compliance with the NCP notwithstanding the absence of a feasibility study and noting that the state agency's "active . . . review of and comment on" various plans throughout remediation fulfilled the public comment requirement). For example, the NCP requires cost-incurring parties to perform remedial site inspections and prepare a report detailing the source and extent of contamination, as well as what further actions are warranted. 40 C.F.R. § 300.420(c)(5). Cost-incurring parties are required to engage in community relations discussions, thorough investigations, and detailed feasibility studies, the last of which must probe the viability of various alternative remedial plans. *Id.* § 300.430(c),(d), (e). The NCP further requires remedial efforts to be "cost effective," which can be evaluated with an eye towards a plan's "(1) long-term effectiveness and permanence; (2) reduction of toxicity, mobility, or volume through treatment; and (3) short-term effectiveness." *Southfund Partners*, 57 F. Supp. 2d at 1381 (citing 40 C.F.R. § 300.420(f)(1)(ii)(D)). Response actions are deemed cost effective if "costs are proportional to its overall effectiveness." 40 C.F.R. § 300.420(f)(1)(ii)(D). Notwithstanding these requirements, a majority of courts hold that investigatory costs do not need to be incurred in compliance with the NCP. *Cont'l Title Co. v. Peoples Gas Light & Coke Co.*, No. 96 C 3257, 1999 WL 753933, at *3 (N.D. Ill. Sept. 15, 1999); *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 617 (7th Cir. 1998) (noting "site-assessment costs . . . are not subject to the requirement[s]" in the NCP).

Defendants make much of Barclay's failure to allege meticulous compliance with the NCP, but it is all for nothing. Barclay has sufficiently alleged that it undertook necessary investigatory costs; thus, there is no need to prove consistency with the NCP. *CNH Am., LLC v. Champion Env't Servs., Inc.*, 863 F. Supp. 2d 793, 809 (E.D. Wis. 2012) (explaining that "because any clean-up proposal and, consequently, any clean-up of a contaminated site must first be preceded by an investigation of the nature and extent of contamination, such investigative and assessment costs need not be incurred in compliance with the NCP and are 'necessary'"). Specifically, Barclay has satisfactorily explained the nature of the investigations for which it now seeks costs (i.e., analyzing the Property's soil, soil vapor, groundwater, and porous building material under the oversight of the WDNR), as well as the results of those investigations (i.e., extensive contamination of certain chemicals at various locations on the Property). (*Id.* ¶¶ 49–64). At this juncture, there is no need to allege substantial compliance with the NCP, although the Court notes, parenthetically, that preliminary investigations seem to be contemplated by the NCP and would be required if subsequent remedial costs should be incurred. *See, e.g.*, 40 C.F.R. § 300.420(b) (discussing remedial preliminary assessments).

Hydrite's prevailing concerns about the unknown contours of the litigation will resolve themselves through discovery. For instance, it is premature, at this stage, to determine whether the WDNR's 1988 comfort letter forecloses any CERCLA claim regarding Building 34. Additionally, Barclay will be required to prove that its investigative costs were necessary; it will also be required to prove up exactly how much it is owed, if anything. As for whether Barclay will be able to prove that future remedial actions

Case 2:20-cv-01694-JPS   Filed 08/05/21   Page 17 of 34   Document 56

were undertaken consistently with the NCP, that is a lawsuit for another time. Barclay adequately states a claim for recovery under § 6907(a) for necessary investigative costs.

### 3.1.2   Claim Two: CERCLA—Declaratory Relief

In any action brought pursuant to CERCLA, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2). Subsequent actions "for further response costs . . .may be maintained *at any time* during the response action, but must be commenced no later than 3 years after the date of completion of all response action." *Id.* (emphasis added). "The entry of declaratory judgment as to liability is mandatory. The fact that future costs are somewhat speculative is no bar to a present declaration of liability." *Kelley v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 844 (6th Cir. 1994) (internal citations and quotations omitted). However, it must be noted that "[t]he clear language of the statute dictates that a declaratory judgment determines *liability* for future response costs, not *recoverability* of those costs." *United States v. Hardage*, 982 F.2d 1436, 1445 (10th Cir. 1992). Thus, "a defendant who is declared liable for future response costs may still challenge those costs as unrecoverable because the underlying response actions giving rise to the costs are inconsistent with the NCP," *id.*, or otherwise unnecessary.

Circuits are split regarding whether a claim for declaratory relief requires success on a predicate claim brought under § 9607(a). *Compare City of Colton v. Am. Promotional Events, Inc.-W.*, 614 F. 3d 998, 1008 (9th Cir. 2010) *with Cnty. Line Inv. Co. v. Tinney*, 933 F.2d 1508, 1513 (10th Cir. 1991); *see also FIP Realty Co., Ltd. v. Ingersoll-Rand PLC*, 2:19-CV-3291, 2021 WL 794459, at

Case 2:20-cv-01694-JPS   Filed 08/05/21   Page 18 of 34   Document 56

*4–7 (S.D. Oh. Mar. 1, 2021) (describing the circuit split); *Foster v. United States*, 922 F. Supp. 663, 665 (D.D.C. 1996) (noting that a plaintiff who "has not yet incurred recoverable costs" may still be able to establish "the essential facts necessary to fix liability"). The Seventh Circuit has yet to decide the issue.

Hydrite disputes whether Barclay has adequately alleged a prima facie CERCLA case under § 9607(a), and thus contends that the claim for declaratory relief under § 9613(g) cannot hold. *See* (Docket #44 at 10). The Court has already found that Barclay sufficiently stated a claim under § 9607(a); therefore, Hydrite's argument is moot. The Court does not weigh in on the circuit split because the facts do not warrant it. To the extent that Hydrite finds the Court's conclusion wanting because, in allowing Barclay to proceed on a predicate § 9607(a)(4)(B) claim for investigatory costs, it is allowing Barclay to proceed on a declaratory judgment claim without showing substantial compliance with the NCP, the Court reiterates two principles. First, an action for response costs may be brought at any time during the response action—including during the investigatory stage—and declaratory judgment for liability on response costs is mandatory. *See* 42 U.S.C. § 9613(g)(2); *Kelley*, 17 F.3d at 844. Second, liability and recovery are distinct; in order for costs to be *recoverable*, they must comport with the NCP. *Hardage*, 982 F.2d at 1445. In light of these principles, it is appropriate to allow Barclay to proceed with its claim for declaratory judgment.

### 3.1.3   Propriety of the Motion for a More Definite Statement

The above two sections address issues raised in Hydrite's motion for a more definite statement because, Hydrite claims, Barclay did not adequately allege necessity or consistency with the NCP. As explained, a motion for a more definite statement is "appropriate when a complaint is

Case 2:20-cv-01694-JPS   Filed 08/05/21   Page 19 of 34   Document 56

unintelligible, not when a defendant just wants more detail." *Pansier*, 2020 WL 7209562, at *1 (citation omitted).

Hydrite's motion, though fashioned under Rule 12(e), ought to have been brought as a motion to dismiss under Rule 12(b)(6). First, the complaint was sufficiently answerable—indeed, Lumimove filed an answer. (Docket #33). Second, the substance of the motion does not ask, "what is this case about?" but rather, "has Plaintiff adequately alleged that its response costs were necessary and consistent with the NCP?" Notwithstanding Hydrite's pretense towards clarification, the motion rigorously challenges the sufficiency of the complaint. And, as the analysis above demonstrates, the Court has been forced to evaluate the complaint exactly as it would have evaluated a motion to dismiss.

Hydrite's motion for a more definite statement must be denied because the complaint is sufficiently definite under 12(e)—there can be no question of this. However, because the Court *also* finds that Barclay has stated a claim for response costs and declaratory relief under CERCLA, Hydrite may not proceed with a motion to dismiss these claims. Their chosen litigation strategy does not afford them two bites of the apple, and, in any case, they now know how the Court will rule.

### 3.2 Motion to Dismiss State Law Claims

#### 3.2.1 Count Four—Negligence

A negligence claim consists of four elements: "(1) [a] duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury." *Antwaun A. v. Heritage Mut. Ins. Co.*, 596 N.W.2d 456, 461 (Wis. 1999). Wisconsin has adopted the Andrews approach to duty, *see Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 102 (Ct. App. N.Y. 1928)

Case 2:20-cv-01694-JPS    Filed 08/05/21    Page 20 of 34    Document 56

(Andrews, J., dissenting), which holds that "[t]he duty of any person is the obligation of due care to refrain from any act which will cause foreseeable harm to others even though the nature of that harm and the identity of the harmed person or harmed interest is unknown at the time of the act." *A.E. Inv. Corp. v. Link Builders, Inc.*, 214 N.W.2d 764, 766 (Wis. 1974). Each person has a duty to "exercise that degree of care, usually designated, 'ordinary care,' which a person of ordinary prudence would exercise under the same or similar circumstances." *Schuldies v. Serv. Mach. Co.*, 448 F. Supp. 1196, 1199 (E.D. Wis. 1978). A person breaches this duty when "it was foreseeable that [the defendant's] act or omission to act may cause harm to someone." *Rolph v. EBI Co.*, 464 N.W.2d 667, 672 (Wis. 1991) (citations and quotations omitted). The "harm must be reasonably foreseen as probable by a person of ordinary prudence under the circumstances," though there is no requirement that "the actual harm that resulted from the conduct be foreseen." *A.E. Inv. Corp.*, 214 N.W.2d at 767 (citations and quotations omitted). "[I]f harm is caused by that breach of duty, liability results." *Schuldies*, 448 F. Supp. at 1199.

### 3.2.1.1        Caveat Emptor

"'Caveat emptor' operates as a limited exception to the rule that everyone owes to the world at large the duty of refraining from those acts that may unreasonably threaten the safety of others." *Brenner v. Amerisure Mut. Ins. Co.*, 893 N.W.2d 193, 201 (Wis. 2017) (citations and quotations omitted). This doctrine, also known as "buyer beware," protects former property owners from liability to subsequent property owners for defects that existed at the time the subsequent owners took possession of a piece of property. *Id.* The doctrine applies except "where the vendor has concealed or failed to disclose a dangerous condition known to him, but not to the

Case 2:20-cv-01694-JPS   Filed 08/05/21   Page 21 of 34   Document 56

vendee, and the vendor has reason to believe that the vendee will not discover it." *Id.* (quoting *Fisher v. Simon*, 112 N.W.2d 705, 709 (Wis. 1961)).

Here, the doctrine of caveat emptor precludes Barclay's claim against MD Fifth Ward, from whom it purchased the property. Barclay alleges that it is a real estate development company that sought to turn a former paint manufacturing plant into a residential complex. (*See* Docket #24 ¶¶ 7, 138). In 2006, due to the nature of the Property's prior use, MD Fifth Ward (which, recall, is alleged to be an alter ego of Hydrite) conducted a Phase II investigation, which revealed significant contamination and resulted in a years-long (and relatively fruitless) relationship with the WDNR. (*Id.* ¶¶ 36–48). Barclay purchased the property in 2017. "In connection with due diligence *prior to purchasing* the Properties," Barclay, too, conducted investigations on the soil, soil vapor, and groundwater contamination. (*Id.* ¶ 49) (emphasis added). Barclay also alleges that it worked with the WDNR to conduct these investigations—the same agency that had, since 2006, been working with MD Fifth Ward to evaluate the extent of contamination. (*Id.*)

Barclay does not allege that MD Fifth Ward (or any Defendant) actively concealed the fact of contamination, or otherwise failed to apprise Barclay of the nature or history of the Property. Nor does Barclay allege that it did not know, or had no reason to know, of the risk involved in purchasing the Property, nor that MD Fifth Ward had reason to believe that Barclay would not discover the risk. Indeed, the complaint so thoroughly describes a history of pollution that it would be incredible if Barclay had not discovered the condition or risk prior to the purchase. *Brenner*, 893 N.W.2d at 209. This is not a situation in which an unwitting purchaser, with no power or reason to know of a latent defect, bought a tract of land—in

fact, it is the exact opposite. (*See id.* ¶ 48) (quoting MD Fifth Ward's progress reports to the WDNR, which explain that the property "is awaiting initiation of brownfield redevelopment activities by the prospective developer of the site"). Given the allegations in the complaint, it is simply untenable for Barclay to now argue they had no idea of the risks involved in purchasing an industrial paint plant with the intent of developing a residential complex. Accordingly, caveat emptor bars Barclay's state law negligence claim against MD Fifth Ward (and Hydrite, to the extent that Hydrite is considered to be an alter ego of MD Fifth Ward).

### 3.2.1.2        Economic Loss Doctrine

The economic loss doctrine precludes recovery for negligence against the other prior owners of the Property, which include PPG, Hydrite, and WCC. The economic loss doctrine bars "contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract relationship." *Van Lare v. Vogt, Inc.*, 683 N.W.2d 46, 51 (Wis. 2004) (quoting *Tietsworth v. Harley-Davidson, Inc.*, 677 N.W.2d 233, 241 (Wis. 2004)). It promotes various policies, including

> (1) maintaining the distinction between tort law and commercial law; (2) protecting the freedom of commercial parties to allocate economic risk by contract; and (3) encouraging the purchaser—viewed by the Courts as the party best able to assess the risk of economic loss—to assume, allocate, or insure against such risk.

*Triad Grp., Inc. v. Vi-Jon, Inc.*, 870 F. Supp. 2d 645, 650 (E.D. Wis. 2012) (citing *Ins. Co. of N. Am. v. Cease Elec., Inc.*, 688 N.W.2d 462, 467 (Wis. 2004)). The economic loss doctrine applies to commercial real estate transactions and precludes suit from a current owner against prior owners with whom there is no direct privity. *Tilot Oil, LLC v. BP Prods. N. Am., Inc.*, 907 F. Supp. 2d

955, 969 (E.D. Wis. 2012); *Mose v. Tedco Equities-Potter Rd. Ltd. P'ship*, 598 N.W.2d 594, 599–600 (Wis. Ct. App. 1999).

In *Mose*, much like this case, a current landowner sued a prior landowner/user (i.e., *not* the seller of the land) in tort for damages arising from environmental contamination. *Mose*, 598 N.W.2d at 598. The *Mose* court found that the Wisconsin Supreme Court had unequivocally "extended the application of the economic loss doctrine, even in the absence of privity." *Id.* (discussing *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 573 N.W.2d 842, 844 (Wis. 1998)). The court further determined that applying the doctrine to non-privity cases between current and former landowners promoted the doctrine's policies, which include encouraging well-situated parties to assess and allocate risk appropriately. *Id*. In *Mose*, the plaintiff had "assumed the risk of the economic damages when he entered into the commercial transaction," where he had "the opportunity to bargain for allocation of the risk." *Id.* The court explained that a contrary decision would give a risk-tolerant purchaser an unfair benefit in commercial transactions: such a purchaser could buy a property at a low, as-is price; then, when the property proved defective down the road, the buyer could "reach all the way back through intervening transactions, contracts, and warranties to sue the original [landowner] in tort." *Id.* at 599 (quoting *Daanen*, 573 N.W.2d at 848).

It is true that the Court does not know what price Barclay paid for the Property; however, "[c]ourts should assume that parties factor risk allocation into their agreements and that the absence of comprehensive warranties is reflected in the price paid." *Budgetel Inns, Inc. v. Micros Sys., Inc.*, 8 F. Supp. 2d 1137, 1141 (E.D. Wis. 1998) (citation and quotation omitted). Absent any allegations or argument to the contrary, the Court is

constrained to find that the risks inherent in purchasing a brownfield site would have been contemplated in the sale of the Property, particularly as between sophisticated companies (one of which engaged in pre-purchase due diligence). Barclay may not now "circumvent the contract to sue the original owner/occupier for a tort recovery for [its] economic losses." *Mose*, 598 N.W.2d at 599.

### 3.2.1.3        Neighbor Liability

Barclay has argued that Defendants owe it a general duty of care, and that it was reasonably foreseeable that the contamination of the Property would cause harm to future landowners. As discussed above, the doctrines of caveat emptor and economic loss preclude Barclay's claims for negligence. Furthermore, Barclay's reliance on *Fortier* and *Tilot Oil* are unavailing because those cases address a landowner's duty of care to its neighbors—but Barclay and Defendants have never been neighbors.

*Fortier v. Flameau Plastics* dealt with a company's duty to neighboring landowners when that company dumped chemicals into an unlicensed landfill. 476 N.W.2d 593, 597 (Wis. Ct. App. 1991). By contrast, in the present case, while the buildings on the Property might literally be neighbors to each other, they have always been owned by the same entity—be it PPG, Hydrite (and its various subsidiaries and spin offs), MD Fifth Ward, and, finally, Barclay. Accordingly, none of the defendants were ever "neighboring landowners" to Barclay such that a duty of care for the foreseeable harm of their actions would arise.

Barclay also argues that the "owner and operator of a bulk petroleum storage business owe[s] a duty of care to others not to cause injury through the release of hazardous substances into groundwater." *Tilot Oil, LLC*, 907 F. Supp. 2d at 973. It is true that in *Tilot*, this Court found the

Case 2:20-cv-01694-JPS   Filed 08/05/21   Page 25 of 34   Document 56

economic loss doctrine did not apply to a groundwater pollution case arising between two neighboring landowners. However, the Court's conclusion was based on the fact that the defendant was

> not situated as a party against whom the [economic loss] doctrine precludes actions in tort because it is a neighboring land owner, *not* one of the previous vendors, owners, or occupiers, and is alleged to have committed a tort by releasing substances off-site that have migrated onto the site in question.

*Id.* (emphasis added); *see also Northridge Co. v. W.R. Grace & Co.*, 471 N.W.2d 179, 186 (Wis. 1991) (holding that plaintiff sufficiently avoided the economic loss doctrine when it alleged "physical harm to property. . .other than the product itself."). In short, those cases are not on point. The doctrines of caveat emptor and economic loss bar the negligence suit against all prior owners of the Property.[9]

### 3.2.2 Count Five—Nuisance

To allege a nuisance claim, Barclay must state facts suggesting that Defendants' actions were

> a legal cause of an invasion of [Barclay's] interest in the private use and enjoyment of land, and the invasion is *either*
>
> (a) intentional and unreasonable, *or*
>
> (b) unintentional and otherwise actionable under the rules controlling liability for negligent[ ] conduct.

*Milwaukee Met. Sewerage Dist. v. City of Milwaukee*, 691 N.W.2d 658, 671 (Wis. 2005) (quoting Restatement (Second) of Torts § 822). Thus, a claim for *negligent* nuisance requires underlying negligent conduct—"it necessarily

---

[9]Barclay has indicated that it does not oppose Lumimove's joined motion to dismiss the negligence claim against it without prejudice. The Court is dismissing the negligence claim against all Defendants *with* prejudice—this will include the claim against Lumimove.

follows that if there was no negligence there was no nuisance." *Id.* at 673 (internal punctuation omitted) (quoting *Lange v. Town of Norway*, 253 N.W.2d 240, 244 (Wis. 1977)). On the other hand, a claim for *intentional* nuisance arises if "the actor '(a) acts for the purpose of causing [interference] or (b) knows that it is resulting or is substantially certain to result from his conduct." *Id.* (quoting Restatement (Second) of Torts § 825). Barclay seeks to proceed on claims for both negligent and intentional nuisance.

Barclay's claim for negligent nuisance cannot be sustained because, as discussed above, its claim for negligence is barred by the doctrines of caveat emptor and economic loss. *Milwaukee Met. Sewerage Dist.*, 691 N.W.2d at 674 ("If there was no negligence there was no [negligent] nuisance."). Relatedly, Barclay has failed to overcome the logical quandary that precludes an owner from bringing a nuisance claim against former owners. *See, e.g.*, *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 314 (3d Cir. 1985) ("Neighbors, unlike the purchasers of the land upon which a nuisance exists, have no opportunity to protect themselves through inspection and negotiation."). Therefore, the claim for negligent nuisance must be dismissed with prejudice.

The Court notes that the economic loss doctrine addresses the "duty" element of a negligence claim, which is not implicated the same way in intentional torts. *See Daanen*, 573 N.W.2d at 846 ("At the heart of the distinction drawn by the economic loss doctrine is the concept of duty."). Nevertheless, most courts to consider the issue have found that the economic loss doctrine precludes intentional torts, as well. *See e.g., Cooper Powers Sys., Inc. v. Union Carbide Chem. & Plastics Co.*, 123 F.3d 675, 682 (7th Cir. 1997) (holding the economic loss doctrine applies to intentional

Case 2:20-cv-01694-JPS   Filed 08/05/21   Page 27 of 34   Document 56

misrepresentation claims); *but see Latino Food Marketers, LLC v. Ole Mexican Food Inc.*, 2004 WL 632869, at *12 (W.D. Wis. Mar. 29, 2004) ("[W]hen a plaintiff asserts a claim for an intentional tort . . . [there are] valid policy reasons for preventing the defendant from hiding behind the protections of the economic loss doctrine.") (citations and quotations omitted). In any case, the Court also finds that the complaint is bereft of allegations that any defendant acted either with intent to interfere with Barclay's use of the property, or with knowledge that such contamination was substantially certain to result in an invasion of Barclay's use and enjoyment of the land. Barclay's single, conclusory allegation that it was "substantially certain" that the plant's byproducts would be released and cause contamination "at and around the Propert[y]" does not carry the day. (*See* Docket #24 ¶ 189). Perhaps such contamination was a possibility—but this is not the standard for intentional nuisance. *Milwaukee Met. Sewerage Dist.*, 691 N.W.2d at 674. For the reasons explained above, this claim must be dismissed with prejudice.

### 3.2.3   Count Six—Claim for Contribution/Restitution

Contribution is an "equitable doctrine" that accrues when one "party having a right against another also liable has discharged more than his share of the liability." *Foss v. Madison Twentieth Century Theaters, Inc.*, 551 N.W.2d 862, 867 (Wis. Ct. App. 1996). "It is the bearing of a greater share of a common liability than is justified, and not the source of the underlying liability, that characterizes a cause of action for contribution." *Id.* Accordingly, to state a claim for common law contribution, a plaintiff must allege "a common liability to the same person." *Id.*

Wisconsin's "Spill Law" is codified in Wisconsin Statute section 144.76(3). It "imposes a duty to clean up on a person who possesses or

controls a hazardous substance which was discharged even though that person did not cause the discharge." *Foss*, 551 N.W.2d at 866 (citation omitted). This duty "attaches to ownership of the land." *Id.* Absent additional facts, as between a prior landowner who sold property to a current landowner, neither "share a common liability to anyone for the clean up" of a hazardous spill. *Id.* at 867; *Raytheon Co. v. McGraw-Edison Co., Inc.*, 979 F. Supp. 858, 873 (E.D. Wis. 1997) ("[T]he question is, joint liability to whom?").

In *State v. Chrysler Outboard Corp.*, the Wisconsin Supreme Court explained that "[b]ecause the leaking or emitting of hazardous waste is an ongoing process that occurs absent human conduct, one may reasonably conclude that a person can cause that leaking by failing to clean up the hazardous waste it has generated." 580 N.W.2d 203, 218 (Wis. 1998). Barclay argues that this language compels a conclusion that the Wisconsin Spill Law "extends [liability] to past polluters and is not limited to the current owner or recent polluters." (Docket #43 at 31). Later, the Wisconsin Supreme Court held that the initiation of an action predicated on CERCLA or the Wisconsin Spill Law marks "the beginning of adversarial administrative legal proceedings that seek to impose liability upon an insured." *Johnson Controls, Inc. v. Emp'rs Ins. of Wausau*, 665 N.W.2d 257, 263–64 (Wis. 2003).

Barclay encourages the Court to read *Chrysler, Johnson Controls*, and the Wisconsin Spill Law together to find that both current and prior landowners are liable to clean up a spill. The argument does not address the foundational question, though: "joint liability to whom?" *Raytheon*, 979 F. Supp. at 873. Under the doctrine of common law contribution, both parties must be jointly liable to the same entity—be it a state agency, a trust,

or similar. In this case, as currently alleged, there is no joint liability to the same entity. While Barclay may be responsible for cleaning up the contamination under 42 U.S.C. § 9607(a), it is not liable to another party for the cleanup. The Court will dismiss the claim without prejudice, although it strongly doubts that Barclay will be able to allege a claim for contribution.

### 3.2.4   Count Seven—Unjust Enrichment

A plaintiff may plead causes of action in the alternative, even if those claims are inconsistent. Fed. R. Civ. P. 8(d)(2), (3); *Feeco Int'l Inc. v. Oxane Materials, LLC*, Case No. 13-CV-0869, 2013 WL 5273930, at *2 (E.D. Wis. Sept. 18, 2013) (finding inconsistent equitable pleadings appropriate where the parties disputed the existence of a contract). In Wisconsin, an unjust enrichment claim requires "(1) a benefit conferred on the defendant by the plaintiff; (2) appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention of the benefit by the defendant under circumstances making it inequitable to do so." *Sands v. Menard*, 904 N.W.2d 789, 798 (Wis. 2017).

CERCLA imposes a duty upon Barclay to clean up any hazardous contamination. *See* 42 U.S.C. § 9607(a)(1). However, Barclay may plead claims in the alternative. Indeed, CERCLA only prevents recovery "for the *same* removal costs or damages or claims pursuant to any other State or federal law." 42 U.S.C. § 9614(b) (emphasis added). But while Barclay may plead its claims in the alternative, it has not clearly done so here. Accordingly, the Court grants Barclay leave to amend to plead the unjust enrichment claim in the alternative.

### 3.3   Stipulated Motion to Amend Complaint

Federal Rule of Civil Procedure 15(a) provides that leave to amend a complaint "shall be freely given when justice so requires." Fed. R. Civ. P.

15(a). Courts favor granting leave to amend, but they act within their discretion to deny such leave when there is a substantial reason to do so. *Select Creations, Inc. v. Paliafito Am., Inc.*, 830 F. Supp. 1213, 1216 (E.D. Wis. 1993). As relevant here, this includes undue prejudice to the opposing party by virtue of permitting the amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Campania Mgmt. Co. v. Rooks, Pitts & Poust*, 290 F.3d 843, 849 (7th Cir. 2002).

On April 12, 2021, Barclay filed a stipulated motion to amend/correct the first amended complaint, explaining that it had settled with two of the defendants—MD Fifth Ward and Denesha. (Docket #49). Barclay sought to amend its complaint solely to (1) remove claims against MD Fifth Ward and Denesha and (2) preserve them against the insurer, GHI Insurance Company. (*Id.*) The motions for a more definite statement and to dismiss were not affected by the amendment. However, the stipulated motion to amend the complaint was only between Barclay and the two dismissed defendants.

Hydrite objected to the stipulation, arguing that the second amended complaint still sought to pursue Hydrite for MD Fifth Ward's liabilities under an alter ego theory, which causes it undue prejudice because, it argued, those liabilities have now been settled. (*See* Docket #51). Relatedly, Hydrite feared that MD Fifth Ward's insurer, who remains in the case, would be incentivized "to admit these allegations to shift liability to Hydrite for their insured's conduct." *Id.* at 4. Hydrite proposed the Court simply remove the alter ego allegations altogether.

Barclay responded that it "has not released the claims against Hydrite premised on MD Fifth Ward's tortious and illegal conduct that Hydrite controlled and directed." (Docket #54). Rather, under the

settlement with MD Fifth Ward, "Barclay expressly retained claims based on MD Fifth Ward's conduct to the extent other parties, such as Hydrite or MD Fifth Ward's insurers, may be ultimately responsible for that conduct." *Id.* Accordingly, Hydrite has not been left to litigate claims that have already been settled—the claims against it, insofar as they relate to Hydrite's control over MD Fifth Ward's actions, are live. Additionally, Barclay alleges separate claims against Hydrite, which Hydrite must litigate on the merits. *Id.*

The Court is not persuaded that Hydrite will experience undue prejudice if it permits the stipulated motion to amend. Regardless of whether MD Fifth Ward remains in the case, Hydrite will be responsible for litigating its responsibility for its own actions as well as its alter ego liability for MD Fifth Ward's actions. The Court is perplexed by Hydrite's contention that the second amended complaint "add[s]" claims against MD Fifth Ward's insurers. (*See* Docket #51 at 4). The insurers have always been included in the case; now, they have simply assumed responsibility for litigating on behalf of MD Fifth Ward. And, indeed, it has always been in GHI Insurance's interest to have MD Fifth Ward's liability be as small as possible. It seems this is a co-defendant strategy that Hydrite would need to contend with regardless of which complaint were operative. For all of these reasons, the Court will grant the stipulated motion to amend the complaint.

Hydrite has threatened to file a motion to dismiss the second amended complaint if the stipulated motion to amend is granted. It may certainly do so, but under the following conditions: First, the parties must meet and confer *before* the motion is filed. Hydrite should take care to explain the reasons why it intends to move to dismiss the complaint, and

Barclay should strongly consider filing an amended complaint. The Court expects this exercise in efficiency will obviate the need to file any motion to dismiss at all. Indeed, when the Court grants a motion to dismiss and it appears likely that a plaintiff can allege facts to cure the pleading deficiency, it also grants leave to amend. Therefore, it is in both parties' interest to discuss the matter prior to motion submissions. Second, Hydrite may not relitigate the CERCLA claims, which have been discussed in Section 3.1, *supra*. Third, briefs in support of, or opposition to, motions to dismiss should cite no more than ten (10) cases per claim. Finally, no string citations will be accepted.

## 4.    CONCLUSION

For the reasons explained above, the motions for leave to file a more definite statement must be denied; the motions to dismiss the state law claims must be granted as stated in the text of this Order; and the stipulated motion to amend the complaint will be granted. The operative complaint is now (Docket #49-1). The Court's conclusions in this Order regarding the sufficiency of the CERCLA claims and state law tort claims apply with equal force to that complaint and, consequentially, the state law claims will be dismissed as stated in the text of this Order.

Accordingly,

**IT IS ORDERED** that Defendant Hydrite Chemical Co.'s motion for a more definite statement and partial motion to dismiss (Docket #31) be and the same is hereby **GRANTED in part and DENIED in part** as stated in this Order;

**IT IS FURTHER ORDERED** that Defendant PPG Industries Inc.'s partial motion to dismiss and motion for a more definite statement (Docket

#34) be and the same is hereby **GRANTED in part** and **DENIED in part** as stated in the text of this Order;

IT IS FURTHER ORDERED that Defendant Lumimove Inc.'s motion for joinder (Docket #36) be and the same is hereby **GRANTED**;

IT IS FURTHER ORDERED that Plaintiff's stipulated motion to amend the complaint (Docket #49) be and the same is hereby **GRANTED**;

IT IS FURTHER ORDERED that the second amended complaint (Docket #49-1) shall be the operative complaint;

IT IS FURTHER ORDERED that Plaintiff's state law claims for negligence (Count IV) and nuisance (Count V) be and the same are hereby **DISMISSED with prejudice**; and

IT IS FURTHER ORDERED that Plaintiff's claims for common law contribution (Count VI) and unjust enrichment (Count VII) be and the same are hereby **DISMISSED without prejudice**.

Dated at Milwaukee, Wisconsin, this 5th day of August, 2021.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge