UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

BARCLAY LOFTS LLC,

        Plaintiff,

        v.                                  Case No. 2:20-cv-01694

PPG INDUSTRIES, INC., *et al.*,

        Defendants.

## HYDRITE'S CIVIL LOCAL RULE 16(c)(1) PRETRIAL REPORT

Hydrite submits the following Pretrial Report in accordance with the Court's Amended Scheduling Order (Dkt. 181) and Civil Local Rule 16(c)(1).

**A. A short summary of the facts, claims, and defenses.**

In 2017, Barclay bought two adjacent properties in Milwaukee (the "Properties") that had been used primarily to manufacture pigments and lacquers for nearly 100 years. The East Oregon Parcel has three vacant buildings (Buildings 33, 34, and 35) and the South Barclay Parcel has one (Building 11). The buildings, groundwater, and soil are contaminated with heavy metals, polychlorinated biphenyls ("PCBs"), polycyclic aromatic hydrocarbons ("PAHs"), volatile organic compounds ("VOCs"), and chlorinated solvents.

Barclay asks this Court to issue a CERCLA cost allocation decision and a RCRA injunction requiring defendants to clean up the Properties. Barclay, Sherman and Hydrite have settled their claims and Barclay is no longer seeking a RCRA injunction as against Hydrite. Thus, Hydrite will limit its pretrial submission to issues relative to the CERCLA claims and PPG's contribution claim against Hydrite.

This is ostensibly a CERCLA cleanup case. But no cleanup plan exists and Barclay has not determined how it will use the Properties. In any event, the evidence at trial will show that much of the contamination at the Properties is consistent with historical pigment-making operations, and not Hydrite's responsibility.

From the early 1900s to 1975—before RCRA, CERCLA, or state environmental laws were enacted—PPG used the Properties to make pigments, lacquers, and varnishes. PPG used heavy metals and other hazardous substances in its operations. PPG also stored solvents and other substances in bulk tanks, some of which leaked into the ground. Evidence will show that it is more likely than not that PPG used chlorinated solvents such as trichloroethylene ("TCE") to clean its manufacturing equipment, as was consistent with industry practice at the time. PPG sold the Properties in 1975.

WCC bought the South Barclay Parcel and, like PPG, made pigments there from 1975 to 1984. WCC is no longer a party to this case, but WPC (discussed below) assumed its liabilities in a 1984 transaction, so its equitable share should be allocated to WPC—and thus ultimately to Barclay, who has settled its claim against these entities before trial.

Hydrite bought the East Oregon Parcel in 1976. Hydrite's operations were limited to using Building 33 to make soap and Building 34 to store various solvents en route to Hydrite's chemical recycling facility in Cottage Grove between 1980 and 1985. Unlike PPG—whose operations predated environmental regulations—Hydrite had a permit to operate a hazardous materials storage facility and was regulated by the WDNR. Hydrite witnesses who worked in or near Building 34 will explain that Hydrite did not treat, manufacture, spill, or release hazardous substances into the environment at the Properties, and there is no contradictory evidence.

MD Fifth Ward (f/k/a WPC) bought both Properties from WCC and Hydrite in 1985, and operated until selling them to Barclay in 2017.[1] Like PPG and WCC, MD Fifth Ward made paint products, which contained various acids and chromates. Evidence will show that MD Fifth Ward had several problems managing hazardous substances during its three decades at the Properties.

B. A statement of the issues.

**CERCLA**

A CERCLA cost recovery claim requires Barclay to prove: (1) the site in question is a "facility" as defined by CERCLA; (2) each defendant is a responsible party; (3) there has been a release or there is a threatened release of hazardous substances; and (4) Barclay has incurred costs in response to the release or threatened release.[2]

A party may be a responsible person if it owned or operated a facility at a time any hazardous substances were disposed.[3] An operator is someone who "manage[s], direct[s], or conduct[s] operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."[4] A disposal is the "discharge, deposit, injection, dumping, spilling, leaking, or placing of any hazardous waste into or on any land so that such waste may enter the environment or be discharged into any ground waters."[5]

---

[1] This time period encompasses Lumimove's operations at the Properties from 2012 to 2015, because Lumimove bought substantially all of MD Fifth Ward's assets, leased the Properties from MD Fifth Ward, and continued operating MD Fifth Ward's business. All of these parties have settled with Barclay and will not appear at trial, but the Court should still allocate them their fair share of cleanup costs based on the evidence at trial. Barclay has agreed to reduce its claims against the remaining defendants to the same extent.
[2] *Sycamore Indus. Park Assocs. v. Ericsson, Inc.*, 546 F.3d 847, 850 (7th Cir. 2008); *Rolan v. Atl. Richfield Co.*, 2019 WL 5429075, at *5 (N.D. Ind. Oct. 22, 2019).
[3] 42 U.S.C. § 9607(a)(2); *Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1341 (9th Cir. 1992).
[4] *U.S. v. Bestfoods*, 524 U.S. 51, 66–67 (1998).
[5] *Kaiser*, 976 F.2d 1338 at 1342.

For past costs, Barclay is additionally required to "show that any costs incurred in responding to the release were 'necessary' and 'consistent with the national contingency plan ("NCP").'"[6] "Costs are 'necessary' if they are incurred in response to a threat to human health or the environment and they are necessary to address that threat."[7] Federal regulations govern compliance with the NCP. "A private party response action will be considered 'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in paragraphs (5) and (6) of this section, and results in a CERCLA-quality cleanup. . . ."[8]

Barclay is not entitled to recover costs not yet incurred. At most, it can seek a declaratory judgment for a finding of liability and a percentage allocation of future costs.[9]

CERCLA directs courts to allocate cleanup costs "using such equitable factors as the court determines are appropriate."[10] Some factors courts consider are the parties' relative fault, the Gore factors,[11] a property owner's assumption of risk, any purchase price reduction received by the owner due to contamination, and the benefits a property owner will receive from a remediated site.[12]

---

[6] *Rolan*, 2019 WL 5429075, at *5. *See also* 42 U.S.C. § 9607 (a)(4)(B) (responsible parties "shall be liable for . . . any other necessary costs of response incurred . . . consistent with the national contingency plan."); *G.J. Leasing Co. v. Union Elec. Co.*, 54 F.3d 379, 386 (7th Cir. 1995) (plaintiff had not met its burden to establish that certain costs were necessary).

[7] *Valbruna Slater Steel Corp. v. Joslyn Manufacturing Co.*, 260 F. Supp. 3d 988, 993 (N.D. Ind. 2017).

[8] 40 C.F.R. § 300.700(c)(3)(i).

[9] *See* Order (Dkt. 56), at 18 (citing *United States v. Hardage*, 982 F.2d 1436, 1445 (10th Cir. 1992) (a declaratory judgment only determines liability for future response costs, not recoverability of those costs)).

[10] *Env't Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 507 (7th Cir. 1992).

[11] These include (i) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished; (ii) the amount of the hazardous waste involved; (iii) the degree of toxicity of the hazardous waste involved; (iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and (vi) the degree of cooperation by the parties with Federal, State or local officials to prevent any harm to the public health or the environment. *ENSCO*, 969 F.2d 503, at 508.

[12] *See, e.g.*, *ENSCO*, 969 F.2d 503, at 508–09 (discussing relative fault and the Gore factors); *Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, 298 F. Supp. 3d 1194, 1199–01 (N.D. Ind. 2018) (considering an owner's assumption of risk, purchase price reduction, and economic opportunity); *Alcan-Toyo Am., Inc. v. N. Illinois*

<u>Thus, the issues relating to Barclay's CERCLA claim are the following:</u>

1. Whether the site in question is a CERCLA facility;

2. Whether each Defendant/Third-Party Defendant is a responsible party;

3. Whether there has been a release or whether there is a threatened release of hazardous substances;

4. Whether Barclay has incurred costs in response to the release or threatened release;

5. Whether Barclay's past costs were necessary;

6. Whether Barclay's past costs are consistent with the national contingency plan;

7. Whether Barclay is entitled to a declaratory finding of liability for future response costs;

8. If liability is established and any past costs are recoverable, what allocation of past costs is equitable; and

9. If liability is established, whether it is appropriate to reach an allocation determination of future costs, and if so, what allocation is equitable.

**C. The names and addresses of all witnesses expected to testify. Any witness not listed will not be permitted to testify absent a showing of good cause.**

Attached hereto as Exhibit A is a list of witnesses that Hydrite intends to call to present live testimony at trial. Hydrite also intends to designate portions of deposition testimony to be read into the record as explained in Section F. Hydrite reserves rights to call rebuttal and impeachment witnesses and to counter-designate deposition testimony in response to designations presented by Barclay and PPG.

**D. A statement of the background of all expert witnesses listed.**

Hydrite plans to call expert witness Mark Travers to testify at trial. Mr. Travers' curriculum vitae is attached hereto as Exhibit B.

---

*Gas Co.*, 881 F. Supp. 342, 347 (N.D. Ill. 1995) (considering the economic benefits an owner would receive from a remediated site).

**E. A list of exhibits to be offered at trial sequentially numbered according to General L. R. 26 where practicable.**

Hydrite's exhibit list is attached hereto as Exhibit C. In accordance with General L. R. 26 and the Court's Trial Information Guide, the parties stipulated that Barclay will use numbers 1-999, PPG will use 1000-1999, and Hydrite will use 2000-2999. Hydrite has removed from its list duplicate exhibits that appear on Barclay's list. Hydrite reserves the right to add any documents to its list that another party placed on its original exhibit (shared between the parties on December 15, 2023) list but removed from its final exhibit list.

Hydrite reserves the right to supplement its exhibit list as to documents necessary for impeachment, rebuttal, and to use any exhibit identified on any other parties' trial exhibit list.

The parties met and conferred on the trial exhibit lists and agreed that each party, pursuant to the clerk's instructions, shall provide two flash drives containing all exhibits in lieu of binders by January 18, 2024.

**F. A designation of all depositions or portions of transcripts or other recordings of depositions to be read into the record or played at trial as substantive evidence. Reading or playing more than 5 pages from a deposition will not be permitted unless the judge finds good cause.**

Hydrite intends to designate portions of transcripts of deposition testimony from two witnesses if they are not called to testify live by Barclay or PPG. These witnesses are Frank Schneiger and Mark Terril. The proposed designations are attached hereto as Exhibit D. Hydrite reserves the right to provide counter-designations to any transcript designations provided by any other party. The parties met and conferred on this issue and agreed any such objections and counter-designations will be filed with the Court on January 17, 2024.

**G. An estimate of the time needed to try the case.**

The Court has set two weeks for trial. This is an adequate amount of time; and Hydrite does not believe trial should not be extended. The parties have been unable to agree on an allocation of time among them and will raise this issue with the Court at the final pretrial conference.

**H. If scheduled for a jury trial: (i) any proposed voir dire questions; (ii) proposed instructions on substantive issues; and (iii) a proposed verdict form.**

Not applicable.

**I. If scheduled for a bench trial, proposed findings of fact and conclusions of law (see Fed. R. Civ. P. 52).**

**<u>Proposed Findings of Fact</u>**

1. This environmental litigation concerns two parcels across the street from one another: one located at 139 E. Oregon Street (including Buildings 33, 34, and 35) (the "East Oregon Parcel") and the other located at 300 S. Barclay Street (including Building 11 and a former tank farm) (the "South Barclay Parcel") (collectively, the "Properties").

2. Plaintiff Barclay Lofts LLC ("Barclay") is the current owner of the Properties.

3. Various portions of the buildings, soil, and groundwater at the Properties are contaminated with heavy metals, polychlorinated biphenyls ("PCBs"), polycyclic aromatic hydrocarbons ("PAHs"), volatile organic compounds ("VOCs"), and chlorinated solvents.

4. Barclay has initiated this action against former owners and operators of the Properties, alleging claims under Sections 107 and 113 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607(a) and 9613(g)(2), and Section 7002(a) of the Resources Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a).

5. Barclay seeks: (1) to recover past costs under CERCLA; (2) declaratory judgments of liability for future CERCLA costs against Defendant and Third-Party Plaintiff PPG Industries, Inc. ("PPG"); and (3) a RCRA injunction requiring PPG to remediate the Properties.

6. Barclay entered into settlements with non-party MD Fifth Ward Properties Inc. ("MD Fifth Ward") and Third-Party Defendant Lumimove, Inc. ("Lumimove")

under which Barclay agreed to defend and indemnify MD Fifth Ward and Lumimove and hold them harmless from any claims brought against them by any party in this action, including claims for contribution, with Barclay reducing its claims against the remaining parties in proportion to any allocation of liability to the settling parties.

7. PPG has asserted contribution claims under Section 113 of CERCLA against Hydrite, Barclay, Third-Party Defendant Sherman Associates, Inc. ("Sherman"), and Lumimove.

8. Hydrite Chemical Co. ("Hydrite) has asserted a contribution claim against PPG.

The Parties

9. Barclay is a Minnesota limited liability company and single purpose entity created by Sherman. Barclay acquired the Properties in December, 2017.

10. Sherman is a real estate development company located in Minneapolis, Minnesota.

11. PPG GP LLC owned the Properties from January to December 2017.

12. PPG is a Pennsylvania corporation that owned and/or operated the Properties from 1905 to 1975.

13. Hydrite is a Wisconsin corporation that owned the East Oregon Parcel from 1976 to 1985 and operated in Buildings 33 and 34 for a portion of that time.

14. WCC Inc. ("WCC") is a dissolved Wisconsin corporation that owned and operated at the South Barclay Parcel from 1975 to 1984.

15. MD Fifth Ward, formerly known as Wayne Pigment Corp. and WPC Technologies, Inc., is a dissolved Wisconsin corporation. MD Fifth Ward owned and operated the South Barclay Parcel from 1984 to 2017 and owned and operated the East Oregon Parcel from 1985 to 2017.

16. Lumimove is a Missouri corporation that operated at the Properties pursuant to a lease with MD Fifth Ward from 2012 to 2015.

Historical Uses of the Properties

17. The Properties were primarily used to manufacture paints, pigments, and lacquers for nearly 100 years.

18. PPG owned and/or operated a nine-acre manufacturing complex in Milwaukee from 1905 to 1975. This complex encompassed the Properties.

19. PPG used the East Oregon Parcel to make lacquers and varnishes primarily for the automotive industry. Building 33 housed the primary lacquer production operations, Building 34 was used for storage, and Building 35 stored bulk solvents in 16 aboveground storage tanks ("ASTs").

20. PPG used the South Barclay Parcel to make dry color pigments and insecticides. PPG housed the main operations in Building 11 and stored bulk solvents in underground storage tanks ("USTs") on the southern portion of the parcel (the "tank yard").

21. PPG used and disposed of lead, lead carbonate, chromium, cadmium, mercury, arsenic, and other heavy metals in its operations at the Properties.

22. In the 1960s, four of PPG's arsenic tanks outside of Building 11 leaked and released arsenic into the ground.

23. PPG used and released other hazardous substances at the Properties, including, but not limited to, PCBs and chlorinated solvents.

24. PCBs were historically used in the paint industry and were banned in the 1970s.

25. PPG was identified as the primary source of contamination at a disposal site near the Properties that contained PCBs, including in the area of the disposal site specifically devoted to PPG's waste.

26. PPG was a self-described "major producer" of chlorinated solvents, including trichloroethylene ("TCE"), at other properties in the United States in the mid-1900s (while it was operating at the Properties).

27. Chlorinated solvents were commonly used in the U.S. to degrease and/or clean industrial equipment, including paint manufacturing equipment as early as World War II (while PPG was operating at the Properties).

28. Chlorinated solvents have been detected near Buildings 33 and 34 where PPG's lacquer and varnish productions were located.

29. Chlorinated solvents have also been detected on the South Barclay Parcel—a parcel PPG owned and operated, but Hydrite did not.

30. PPG used solvents to clean equipment at the Properties.

31. PPG stored solvents in bulk at the Properties.

32. Mr. Frank Schneiger, the only witness with firsthand knowledge of PPG's operations in Milwaukee, was unable to rule out PPG's use of chlorinated solvents to clean its equipment at the Properties.

33. PPG has not provided convincing evidence that it only used non-chlorinated solvents to clean its equipment.

34. Mr. Schneiger testified that spills were common at PPG's facility.

35. Hydrite owned the East Oregon Parcel from 1976 to 1985.

36. Hydrite's operations were limited to Buildings 33 and 34.

37. For a portion of this nine-year period, Hydrite used Building 33 to make non-hazardous substances (specifically, puffed Borax soap).

38. From 1980 to 1985, Hydrite used Building 34 to store closed 55-gallon drums of spent solvents en route to Hydrite's chemical recycling facility in Cottage Grove, Wisconsin and non-hazardous materials used for Hydrite's operations at other locations in Wisconsin.

39. Hydrite's operations in Building 34 were governed by a U.S. Environmental Protection Agency ("EPA") RCRA permit and inspected by the Wisconsin Department of Natural Resources ("WDNR").

40. Hydrite's RCRA permit also governed operations that Hydrite had elsewhere in Milwaukee.

41. In 1985, Hydrite ceased using Building 34 and notified WDNR of its intent to close its operations at the East Oregon Parcel and nearby areas of Milwaukee.

42. WDNR inspected Hydrite's operations and required Hydrite to investigate potential contamination—including potential chlorinated solvent contamination—at and around Building 34.

43. Hydrite engaged an environmental consultant to assist with its investigation, which included soil sampling at the perimeter of Building 34.

44. WDNR concluded that the investigation of contaminants in the vicinity of Building 34 were "not significant enough to warrant corrective action."

45. The only additional action WDNR required was for Hydrite to clean the surface of the loading dock and ramps at Building 34 with detergent and water. Hydrite completed these activities.

46. In 1987, WDNR determined that Hydrite's facility was "not environmentally significant."

47. In 1988, WDNR granted Hydrite's request to close its operations at the East Oregon Parcel, concluding that further corrective action was not needed.

48. There is no evidence that Hydrite had any significant or reportable spills of any hazardous substance—whether TCE, another chlorinated solvent, or otherwise—in Building 34 or anywhere else on the East Oregon Parcel.

49. There is no evidence that Hydrite ever released or disposed of any hazardous substances into the environment at the Properties.

50. There is no evidence that Hydrite ever used, handled, stored, manufactured, treated, or disposed of any identified contaminants of concern at the Properties other than chlorinated solvents.

51. There is no evidence that Hydrite is responsible for any contamination at the South Barclay Parcel.

52. WCC owned and operated at the South Barclay Parcel from 1975 to 1984.

53. WCC bought PPG's dry color operations and various products.

54. WCC used and disposed of zinc chromate, strontium chromate, lead chromate, hexavalent chromium, trivalent chromium, and other hazardous substances at the South Barclay Parcel.

55. WCC is not a party to this case, but WPC assumed WCC's liabilities in a 1984 transaction.

56. MD Fifth Ward bought the South Barclay Parcel from WCC in 1984 and the East Oregon Parcel from Hydrite in 1985.

57. Like PPG and WPC, MD Fifth Ward produced pigments.

58. MD Fifth Ward operated the Properties until 2017.

59. MD Fifth Ward used and disposed of hexavalent chromium, trivalent chromium, and other hazardous substances at the Properties.

60. In 2006, one of MD Fifth Ward's USTs leaked and released petroleum contaminants at the South Barclay Parcel.

61. MD Fifth Ward is not a party to this case, but pursuant to MD Fifth Ward's settlement with Barclay, Barclay has agreed to assume and indemnify MD Fifth Ward's share (which, per WPC's assumption of liability, includes WCC's share).

62. In 2012, Lumimove bought substantially all of MD Fifth Ward's assets, leased the Properties from MD Fifth Ward, and continued operating MD Fifth Ward's business at the Properties until 2015.

63. Lumimove used and disposed of hazardous substances at the Properties.

Barclay's Acquisition of the Properties

64. Sherman, a real estate development company, was interested in buying the Properties in 2012.

65. Sherman planned to convert the industrial buildings into an apartment complex.

66. In 2012, Sherman sent MD Fifth Ward a letter, expressing Sherman's interest in the Properties.

67. In 2013, Sherman and MD Fifth Ward executed a Purchase Agreement, granting Sherman a conditional right to buy the Properties.

68. Despite signing the Purchase Agreement in 2013, it was not until 2017 that Sherman's affiliated entity, Barclay, and MD Fifth Ward closed on the sale.

69. Sherman was aware that there was contamination at the Properties and spent four years investigating the Properties' conditions and scope of contamination before Barclay purchased the Properties.

70. Sherman engaged KEY Engineering and other environmental consultants to assist with its investigation and coordination with regulatory agencies.

71. Sherman discovered significant contamination at the Properties during its due diligence from 2013 to 2017.

Barclay's and Sherman's Use of the Properties

72. Though Barclay acquired legal title to the Properties, it has been Sherman—not Barclay—controlling all investigative activities and operations at the site.

73. Barclay is a single purpose entity that does not have any employees or operations.

74. Sherman directed and managed KEY's and its other consultants' work and access to the Properties.

75. KEY's investigation continued until late 2018 or early 2019.

76. In 2018, the City of Milwaukee issued Sherman an order to raze or repair all buildings on the Properties.

77. To date, Sherman still has not razed or repaired the buildings at the Properties.

78. The EPA, WDNR, and the City of Milwaukee are all well aware of—and heavily involved in—the Properties' conditions and Barclay's plan to convert them into residential housing.

79. Evidence shows that the WDNR will not approve site closure until Sherman has remediated contamination to an acceptable level.

80. The buildings are safe to enter for non-abrasive work.

81. No one is drinking the groundwater at the Properties.

82. Sherman has installed a fence, boarded up accessible windows, welded doors shut, and hired a security service to monitor the Properties.

Barclay's Costs

83. Barclay alleges that it and its affiliates have paid over $1.5 million in pre-remediation response costs, that it expects to incur over $17.5 million in future remediation costs, and that it has paid over $2 million in attorneys' fees, expert witness fees, and litigation expenses.

The Barclay/Sherman Settlement with Hydrite

84. Barclay/Sherman and Hydrite have entered into a settlement agreement in this matter.

85. The proposed settlement provides that Hydrite shall pay to Barclay/Sherman $3,550,000 to be used primarily for remediation of the chlorinated solvents at the East Oregon Parcel.

86. The expert testimony in this case confirmed that the settlement amount paid by Hydrite is reasonable and fair to remediate the chlorinated solvent contamination at the East Oregon Parcel.

87. Barclay/Sherman and Hydrite have asked this Court, based upon the evidence produced at trial, to determine the fairness of the settlement between the parties such that a contribution bar may be ordered.

**Proposed Conclusions of Law**

Jurisdiction and Venue

1. This Court has jurisdiction over the claims in this action under Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(g)(2), Section 7002(a) of RCRA, 42 U.S.C. § 6972(a), and 28 U.S.C. § 1331.

2. This Court has personal jurisdiction over all parties.

3. Venue is appropriate in this district, because the Properties are located in it.[13]

CERCLA

4. A CERCLA cost recovery claim requires Barclay to prove: (1) the site in question is a "facility" as defined by CERCLA; (2) the defendant is a responsible party; (3) there has been a release or there is a threatened release of hazardous substances; and (4) Barclay has incurred costs in response to the release or threatened release.[14]

5. The first element is satisfied. The Properties are a CERCLA facility.

6. The third element is satisfied. Hazardous substances—including heavy metals, polychlorinated biphenyls ("PCBs"), polycyclic aromatic hydrocarbons ("PAHs"), volatile organic compounds ("VOCs"), and chlorinated solvents—have been released at the Properties.

7. The second element is satisfied with respect to PPG, WCC, MD Fifth Ward, Lumimove, PPG GP LLC, and Barclay.

8. A party may be a responsible person if it currently owns or operates a CERCLA facility[15] or owned or operated it at a time any hazardous substances were disposed.[16]

9. An operator is someone who "manage[s], direct[s], or conduct[s] operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."[17]

---

[13] 28 U.S.C. § 1391(b)(2).
[14] *Sycamore Indus. Park Assocs. v. Ericsson, Inc.*, 546 F.3d 847, 850 (7th Cir. 2008); *Rolan v. Atl. Richfield Co.*, 2019 WL 5429075, at *5 (N.D. Ind. Oct. 22, 2019).
[15] 42 U.S.C. § 9607(a)(1).
[16] 42 U.S.C. § 9607(a)(2); *Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1341 (9th Cir. 1992).
[17] *U.S. v. Bestfoods*, 524 U.S. 51, 66–67 (1998).

10. A disposal is the "discharge, deposit, injection, dumping, spilling, leaking, or placing of any hazardous waste into or on any land so that such waste may enter the environment or be discharged into any ground waters."[18]

11. Barclay is the current owner of the Properties, and is therefore a responsible party under CERCLA.[19]

12. PPG owned and operated the Properties during a time when hazardous substances were disposed, and is therefore a responsible party under CERCLA.

13. Although Hydrite owned and operated at the East Oregon Parcel, there is no evidence that Hydrite disposed hazardous substances into the environment at the East Oregon Parcel. Therefore, Hydrite is not a responsible party under CERCLA.

14. WCC owned and operated a portion of the Properties during a time when hazardous substances were disposed, and is therefore a responsible party under CERCLA. Its equitable share of response costs is assigned to MD Fifth Ward as a result of WPC's assumption of WCC's liabilities.

15. MD Fifth Ward owned and operated the Properties during a time when hazardous substances were disposed, and is therefore a responsible party under CERCLA. Its equitable share of response costs (including WCC's assigned share) is assigned to Barclay as a result of settlement.

16. Lumimove operated the Properties during a time when hazardous substances were disposed, and is therefore a responsible party under CERCLA.

17. PPG GP LLC owned the Properties during a time when hazardous substances were disposed, and is therefore a responsible party under CERCLA.

18. The final element of Barclay's CERCLA claim—Barclay's costs—contains two independent requirements. To recover any past costs under CERCLA, Barclay is required to show that: (a) it was necessary to incur them to respond to a release; and (b) they were consistent with the national contingency plan ("NCP").[20]

19. "Costs are 'necessary' if they are incurred in response to a threat to human health or the environment and they are necessary to address that threat."[21]

20. "A private party response action will be considered 'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable

---

[18] *Kaiser*, 976 F.2d 1338 at 1342.
[19] 42 U.S.C. §9607(a)(1).
[20] *Rolan*, 2019 WL 5429075, at *5. *See also* 42 U.S.C. § 9607 (a)(4)(B) (responsible parties "shall be liable for . . . any other necessary costs of response incurred . . . consistent with the national contingency plan."); *G.J. Leasing Co. v. Union Elec. Co.*, 54 F.3d 379, 386 (7th Cir. 1995) (plaintiff had not met its burden to establish that certain costs were necessary).
[21] *Valbruna Slater Steel Corp. v. Joslyn Manufacturing Co.*, 260 F. Supp. 3d 988, 993 (N.D. Ind. 2017).

requirements in paragraphs (5) and (6) of this section, and results in a CERCLA-quality cleanup. . . ."[22]

21. The Court finds that $_____ of Barclay's past costs are necessary and consistent with the NCP.

22. CERCLA permits courts to allocate costs "using such equitable factors as the court determines are appropriate."[23]

23. Some factors courts consider are the parties' relative fault, the Gore factors,[24] a property owner's assumption of risk, any purchase price reduction received by the owner due to contamination, and the benefits a property owner will receive from a remediated site.[25]

24. The Court finds many of these factors relevant here.

25. In the absence of a known, WDNR-approved remedy for the Properties, an allocation of future costs tied too closely to particular remediation activities would not be equitable. Instead, the Court allocates future costs based on each party's time on the Properties and nexus to other equitable factors, as applicable.

26. PPG used and released heavy metals, PCBs, PAHs, VOCs, and chlorinated solvents at the Properties.

27. PPG is allocated an equitable share of __% of future costs, reflecting its 70 years on both Properties and its responsibility for heavy metals, PCBs, PAHs, VOCs, and chlorinated solvents at the Properties, among other equitable factors.

28. Hydrite may only be allocated an equitable share of future costs if the Court finds Hydrite is a responsible party under CERCLA [and rejects paragraph 13 of Hydrite's proposed conclusions of law, *supra*]. In that instance, Hydrite's equitable share should reflect its years on the East Oregon Parcel (9 years of ownership, only 5 of which included any operations) and should only be limited to an allocation for the remediation of chlorinated solvents.

---

[22] 40 C.F.R. § 300.700(c)(3)(i).
[23] *Env't Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 507 (7th Cir. 1992).
[24] These include (i) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished; (ii) the amount of the hazardous waste involved; (iii) the degree of toxicity of the hazardous waste involved; (iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and (vi) the degree of cooperation by the parties with Federal, State or local officials to prevent any harm to the public health or the environment. *ENSCO*, 969 F.2d 503, at 508.
[25] *See, e.g.*, *ENSCO*, 969 F.2d 503, at 508–09 (discussing relative fault and the Gore Factors); *Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, 298 F. Supp. 3d 1194, 1199–01 (N.D. Ind. 2018) (considering an owner's assumption of risk, purchase price reduction, and economic opportunity); *Alcan-Toyo Am., Inc. v. N. Illinois Gas Co.*, 881 F. Supp. 342, 347 (N.D. Ill. 1995) (considering the economic benefits an owner would receive from a remediated site).

29. WCC used and released heavy metals, PCBs, PAHs, VOCs, and chlorinated solvents at the South Barclay Parcel.

30. WCC is allocated an equitable share of %__ of future costs, reflecting its 9 years on the South Barclay Parcel and its responsibility for heavy metals, PCBs, PAHs, VOCs, and chlorinated solvents at the South Barclay Parcel. This allocation is assigned to MD Fifth Ward pursuant to WPC's assumption of WCC's liabilities, among other equitable factors.

31. MD Fifth Ward used and released heavy metals, PCBs, PAHs, VOCs, and chlorinated solvents at the Properties.

32. MD Fifth Ward is allocated an equitable share of %__ of future costs, reflecting its 33 years at the South Barclay Parcel, 32 years at the East Oregon Parcel, and its responsibility for heavy metals, PCBs, PAHs, VOCs, and chlorinated solvents at the Properties, among other equitable factors. This allocation (plus WCC's equitable share) is attributed to Barclay, pursuant to the parties' settlement agreement.

33. Lumimove used and released heavy metals, PCBs, PAHs, VOCs, and chlorinated solvents at the Properties.

34. Lumimove is allocated an equitable share of %__ of future costs, reflecting its 3 years on both Properties and its responsibility for heavy metals, PCBs, PAHs, VOCs, and chlorinated solvents at the Properties, among other equitable factors. This allocation is attributed to Barclay, pursuant to the parties' settlement agreement.

35. PPG GP LLC is allocated an equitable share of %__ of future costs, reflecting its year of ownership of both Properties, among other equitable factors.

36. Barclay is not entitled to recover a money judgment for costs not yet incurred. With the exception of the equitable allocations declared above, Barclay's future costs are outside the scope of this litigation and this Court makes no conclusions of law as to either the reasonableness or applicability of those costs.

37. The Court approves the settlement between Barclay/Sherman and Hydrite as reasonable, fair and consistent with the purposes that CERCLA is intended to serve, subject to the following terms and conditions.

38. Barclay will assume Hydrite's share of any equitable allocation of response costs in this matter.

39. Based upon the settlement between Barclay/Sherman and Hydrite, the Court finds the degree to which a bar on contribution cross-claims will facilitate settlement outweighs the prejudice of such a bar on non-settling defendants. Accordingly, all future claims by private third parties (excluding government agencies such as the

USEPA or WDNR) relating to remediation at the properties at issue in this case (300 South Barclay and 139 East Oregon Street, Milwaukee WI) as against Hydrite, for contribution or otherwise, are hereby barred.

**J. Stipulations**

1. The parties have agreed that each party shall have 30 minutes for their opening statement.

2. Barclay/Sherman and Hydrite have reached a settlement and are dismissing all claims, cross-claims, counter-claims and third party claims by and among them. Barclay/Sherman and Hydrite will request that the Court make a determination as to the fairness of their settlement based upon the evidence at trial such that the Court may issue a contribution bar to Hydrite as to the properties at issue.

Dated: January 10, 2024.

QUARLES & BRADY LLP

*/s/ David P. Muth*

David P. Muth (WI SBN 1027027)
James E. Goldschmidt (WI SBN 1090060)
Lauren R. Harpke (WI SBN 1052269)
Lauren N. Zenk (WI SBN 1115872)
Hannah M. Schwartz (WI SBN 1118503)

411 E. Wisconsin Avenue, Suite 2400
Milwaukee, WI 53202-4426
Phone: (414) 277-5663
Fax: (414) 978-8305
david.muth@quarles.com
james.goldschmidt@quarles.com
lauren.harpke@quarles.com
lauren.zenk@quarles.com
hannah.schwartz@quarles.com

Michael S. Mostow (IL SBN 6207412)

300 N. LaSalle Street, Suite 4000
Chicago, IL 60654
Phone: (312) 715-5000
michael.mostow@quarles.com

*Attorneys for Defendant*
*Hydrite Chemical Co.*

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing copy of **Hydrite's Civil Local Rule 16(c)(1) Pretrial Report** was filed on January 10, 2024, using the Court's electronic filing system and that a true and correct copy was served via email through the electronic filing system on the following parties:

Defendant WCC, Inc.
(a dissolved Wisconsin corporation)


Christina M. McKinley
Casey A. Coyle
Sean R. Keegan
Mark Dausch
BABST CALLAND CLEMENTS & ZOMNIR, P.C.
2 Gateway Center
603 Stanwix Street
Pittsburgh, PA 15222
T: 412-394-5400
F: 412-394-6576
cmckinley@babstcalland.com
ccoyle@babstcalland.com
skeegan@babstcalland.com
mdausch@babstcalland.com

Erin M. Cook
GODFREY & KAHN SC
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202
T: 414-273-3500
F: 414-273-5198
mcook@gklaw.com

*Attorneys for Defendant PPG Industries, Inc.*


Donald P. Gallo
AXLEY BRYNELSON LLP
N20 W22961 Watertown Rd.
Waukesha, WI 53186
T: 262-409-2283

Fax: 262-524-9200
dgallo@axley.com

Justin H. Lessner
AXLEY BRYNELSON LLP
Manchester Place
2 E Mifflin St., Suite 200
P.O. Box 1767
Madison, WI 53703
T: 608-257-5661
Fax: 608-257-5444
jlessner@axley.com

*Attorneys for Defendant Lumimove, Inc. d/b/a WPC Technologies Inc.*


Ted A. Warpinski
M. Andrew Skwierawski
HALLING & CAYO, S.C.
320 East Buffalo Street, Suite 700
Milwaukee, WI 53202
T: 414-271-3400
taw@hallingcayo.com
mas@hallingcayo.com

Thomas H. Boyd
Elizabeth H. Schmiesing
Kyle R. Kroll
Cianna G. Halloran
WINTHROP & WEINSTINE, P.A.
225 South Sixth Street, Suite 3500
Minneapolis, MN 55402
T: 612-604-6400
tboyd@winthrop.com
eschmiesing@winthrop.com
kkroll@winthrop.com
challoran@winthrop.com

*Attorneys for Plaintiffs Barclay Lofts LLC and Third-Party Defendants MD Fifth Ward Properties, Inc. and Michael Denesha*

                                                         */s/ David P. Muth*