# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**BARCLAY LOFTS LLC,**

     **Plaintiff,**

     **v.**                     **Case No. 20-CV-1694**

**PPG INDUSTRIES, INC., et al.,**

     **Defendants.**

---

## DECISION AND ORDER FOLLOWING COURT TRIAL

---

**Introduction** ...................................................................................................... 2

**Findings of Fact** ................................................................................................. 3

**Evidentiary Rulings** ...........................................................................................14

**Analysis and Conclusions of Law** ....................................................................17

**1. Barclay's CERCLA Cost Recovery Claim** ...................................................18

    1.1  Whether the Properties are "Facilities" under CERCLA .........................19

    1.2  Whether PPG Qualifies as a PRP..............................................................20

    1.3 Whether There Was a Release.....................................................................23

    1.4 Whether Barclay Incurred Necessary Response Costs ...............................24

          1.4.1 Environmental Consultant Costs .................................................26

          1.4.2 Site Security and Monitoring Costs .............................................30

          1.4.3 Legal Fees.....................................................................................31

    1.5 Summary of Findings .................................................................................35

**2. Declaration of Joint and Several Liability** ...................................................36

**3. PPG's CERCLA Contribution Claims**..........................................................36

    3.1  Contribution Claim Against Sherman ........................................................38

    3.2  Allocation of Past Costs .............................................................................40

    3.3 Allocation of Future Response Costs ........................................................43

    3.4 Allocation of Liability for Future Response Costs ....................................45

3.4.1 PPG...................................................................................................45

3.4.2 Hydrite .............................................................................................55

3.4.3 Wayne Chemical, Wayne Pigment/MD Fifth Ward, and Lumimove ...........57

    3.4.3.1 Wayne Chemical .................................................................59

    3.4.3.2 Wayne Pigment/MD Fifth Ward ....................................................60

    3.4.3.3 Lumimove .......................................................................63

3.4.4 Barclay and Sherman ...........................................................................64

**4. Hydrite's Request for a Contribution Bar** ...............................................................**65**

4.1 Fair and Adequate .................................................................................67

4.2 Reasonable ........................................................................................68

4.3 Faithful to Objectives of CERCLA .......................................................................69

4.4 Conclusion .........................................................................................69

**5. RCRA Claim** ...........................................................................................**70**

5.1 Relevant Law ......................................................................................70

5.2 Imminent and Substantial Danger .......................................................................71

**Conclusion** ............................................................................................**76**

Barclay Lofts LLC is the current owner of two parcels of property located in Milwaukee, Wisconsin, at 300 South Barclay Street and 139 East Oregon Street. Both parcels contain environmental contamination of the soil, soil vapor, and groundwater. Barclay sues PPG Industries, Inc. and Hydrite Chemical Co. seeking the recovery of response costs, damages, declaratory relief, and injunctive relief under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.* and the Resources Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq.*

PPG counterclaims against Barclay and Sherman Associates, Inc. for contribution and declaratory relief under CERCLA, and cross-claims against Hydrite and Lumimove for CERCLA contribution. Hydrite cross-claims against PPG for CERCLA contribution. A trial to the Court was held in this case from January 22, 2024 to February 2, 2024. Considering

the testimony at trial and the other evidence submitted by the parties, I enter the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.

## FINDINGS OF FACT

Pursuant to Fed. R. Civ. P. 52(a)(1), the Court makes the following findings of fact based on the parties' stipulation (Docket # 322):

Parties' Claims and Procedural History

1. This is an action for recovery of response costs, declaratory relief, and injunctive relief arising from environmental contamination existing in the soil, soil vapor and groundwater at, and buildings on, property located at 300 South Barclay Street (the "South Barclay Parcel" or "East Parcel") and 139 East Oregon (the "East Oregon Parcel" or "West Parcel") (collectively, the "Properties") in Milwaukee, Wisconsin.

2. The operative complaint in this matter is the Third Amended Complaint. (Docket # 58.)

3. In Count I of its Third Amended Complaint, Barclay asserts a claim to recover pre-remediation response costs pursuant to Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a).

4. In Count II of its Third Amended Complaint, Barclay seeks declaratory judgment for future response costs pursuant to 42 U.S.C. § 9613(g)(2).

5. In Count III of its Third Amended Complaint, Barclay seeks injunctive relief pursuant to Section 7002(a) of the Resources Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a).

6. PPG has asserted a counterclaim against Barclay for contribution under CERCLA Section 113(f)(1), 42 U.S.C. § 9613(f)(1). (*See* Docket # 63.)

7. PPG also has asserted cross-claims against Hydrite Chemical Co. and cross-defendant Lumimove, Inc. for contribution under CERCLA Section 113(f)(1), 42 U.S.C. § 9613(f)(1). (*See id.*)

8. PPG has also asserted a third-party complaint against Sherman for contribution under CERCLA Section 113(f)(1), 42 U.S.C. § 9613(f)(1), and declaratory relief, alleging that Sherman is liable as an "operator." (Docket # 206.)

9. Barclay settled its claims against Wayne Pigment Corporation ("WPC or Wayne Pigment"), Michael Denesha, Lumimove, and Hydrite, although those parties originally all remained in the lawsuit subject to cross-claims. (*See* PPG-1224, 1225, 1592, 1625, 1626.) Barclay also entered into a settlement with an insurance company with respect to Barclay's claims against Wayne Chemical Corp. ("WCC" or "Wayne Chemical").

10. Prior to the trial of this matter, the parties mutually agreed to dismiss WCC, Wayne Pigment, and Michael Denesha from the lawsuit.

11. Hydrite has asserted cross-claims against PPG for contribution under CERCLA Section 113(f)(1), 42 U.S.C. § 9613(f)(1), and declaratory relief. (*See* Docket # 61.)

12. Hydrite previously had asserted a counterclaim for contribution and declaratory relief against Barclay, cross-claims for contribution against WCC and Lumimove (Docket # 61), and a third-party complaint against Sherman (Docket # 205), but it dismissed those claims upon settling with Barclay (Docket # 288).

4

<u>Ownership and Operations at the Properties</u>

13.    The East Oregon Parcel is 0.877 acres in size and contains three vacant buildings (Buildings 33, 34, and 35).

14.    The South Barclay Parcel is 0.72 acres in size and contains a vacant five-story building (Building 11).

15.    PPG formerly owned and operated the South Barclay Parcel and the East Oregon Parcel for industrial purposes from approximately 1900 until 1975.

16.    On or about December 12, 1975, PPG conveyed the East Oregon Parcel to Valley Industrial Park via Warranty Deed.

17.    On or about January 27, 1976, Valley Industrial Park conveyed the East Oregon Parcel to Hydrite via Warranty Deed.

18.    PPG conveyed the South Barclay Parcel to Wayne Chemical Corp. ("WCC" or "Wayne Chemical") via a Warranty Deed dated April 22, 1975.

19.    Wayne Chemical operated at the South Barclay Parcel from approximately 1975 to 1984, during which time it continued PPG's dry color operations business.

20.    Wayne Pigment acquired the South Barclay Parcel via a Warranty Deed dated February 10, 1984 from Wayne Chemical.

21.    Wayne Pigment acquired the East Oregon Parcel from Hydrite on or about December 16, 1985 via Warranty Deed.

22.    Wayne Pigment changed its name to WPC Technologies, Inc. in 2011.

23.    WPC Technologies, Inc. changed its name to MD Fifth Ward Properties, Inc. in August 2012.

5

24. Also in August 2012, Lumimove bought the assets of WPC Technologies, Inc., but not the Properties, while MD Fifth Ward continued to own the Properties.

25. Lumimove leased and operated the Properties from approximately 2012 to 2015 while doing business under the assumed name "WPC Technologies."

26. In January 2017, Sherman affiliate PPG GP LLC acquired the Properties from MD Fifth Ward Holdings, Inc. with the intent of redeveloping the Properties, including redeveloping buildings located at the Properties, for residential use.

27. PPG GP LLC transferred the Properties to Barclay in December 2017.

28. The Properties are subject to Raze or Repair Orders issued by the City of Milwaukee Department of Neighborhood Services ("DNS"), on February 8, 2018.

PPG Industries, Inc.

29. The Properties historically were part of a larger industrial complex developed by PPG's predecessors in interest beginning in approximately 1900. This complex has been referred to as the "Milwaukee Plant."

30. Starting in 1894, Milwaukee-based Patton Paint Co. ("Patton") owned and operated the Properties. Patton's operations included the manufacture of paints, coatings, and linseed oil.

31. PPG acquired Patton in the early 1900s, consolidated Patton into PPG in 1920, and thereafter operated the Properties as part of its paint and varnish, coatings, and resins division.

32. PPG purchased and stored various materials at the Properties.

6

33.     PPG made dry pigments and "Corona"-branded agricultural insecticides, fungicides, and seed disinfectants at Building 11.

34.     Building 11 has five stories plus a basement.

35.     PPG used different floors for different purposes, allowing gravity to help it move large amounts of dry and liquid materials.

36.     Pumps and piping were used to move liquids into PPG's processes.

37.     PPG used underground storage tanks ("USTs") and aboveground storage tanks ("ASTs") in "Yard 124" south of Building 11 to store raw materials including, for example, arsenic acid, naphtha, and bichromate.

38.     In 1964, PPG observed corrosion on four tanks located on the Properties that had been used to store arsenic acid.

39.     As a result, PPG contracted with Clayton Hunt of Hunt's Disposal to remove the tanks from the Properties and dispose of them off-site.

40.     Howard Timian, then PPG plant manager, oversaw the removal and disposal of the arsenic acid tanks.

East Oregon Parcel Operations

41.     Building 33 is a three-story brick, reinforced concrete, and steel building. The building does not have a basement.

42.     Building 34 is a three-story brick, reinforced concrete, and steel building. The building does not have a basement. This building has a concrete loading truck dock on the west side of the building.

43.     PPG manufactured lacquer and varnish products in Buildings 33 and 34.

7

44.     Building 35 is a one-story brick reinforced concrete and steel building. The foundation is concrete on wood pilings. It was built to house 16 large ASTs, which were used by PPG from the tanks' installation until 1975.

45.     PPG's manufacturing in Buildings 33 and 34 included a range of varnishes, lacquers, thinners, auto colors, striping colors, aircraft finishes, and coatings under the name "Mimax."

Hydrite Chemical Co.

46.     Hydrite owned and operated on the East Oregon Parcel only.

47.     Hydrite used Building 33 to puff (heat) a non-hazardous substance, specifically Borax, for use as a constituent in soap.

48.     Hydrite did not use Building 35.

49.     In 1980, Hydrite submitted to the EPA a notification of Hazardous Waste Activities and a RCRA hazardous waste Part A permit. Through its application, Hydrite sought approval to store hazardous waste at Building 34 and conduct other operations at its broader facility, which included Building 34 and other locations to the east and north of the Properties.

50.     In June 1982, EPA issued an interim permit to Hydrite, temporarily granting Hydrite's request.

51.     Hydrite subsequently sought permanent approval to conduct the same operations by submitting a Part B permit application to the EPA.

52.     Hydrite's permit specifically authorized it to store the following types of waste: ignitable waste (D001), spent halogenated solvents used in degreasing (F001), spent

halogenated solvents (F002), spent non-halogenated solvents (F003 & F005), and spent pickle liquor from steel finishing operations and spent phosphoric acid (D002 & K062).

53.     These hazardous waste classifications included spent chlorinated solvents, such as TCE.

54.     Hazardous waste was stored in Building 34 in 55-gallon steel drums before being shipped to Hydrite's reclamation facility in Cottage Grove, Wisconsin.

55.     Hydrite only used the first floor of Building 34.

56.     In 1985, Hydrite ceased using Building 34 and notified the Wisconsin Department of Natural Resources ("WDNR") of its intent to close its RCRA permit.

57.     WDNR inspected Hydrite's operations and required Hydrite to investigate potential contamination—including potential chlorinated solvent contamination at and around Building 34.

58.     Hydrite engaged an environmental consultant, Hydro-Search, Inc., to assist with its investigation. Among other activities, Hydro-Search's investigation involved collecting various samples of soil around and near Building 34, including at the loading dock and along the north wall of the building.

59.     In 1988, WDNR granted Hydrite's request to close its permit.

<u>Wayne Chemical Corporation</u>

60.     Wayne Chemical was a Wisconsin corporation incorporated in 1960.

61.     Wayne Chemical never owned or operated at the East Oregon Parcel.

62.     When Wayne Chemical began operating at the South Barclay Parcel, it continued PPG's pigment manufacturing processes.

9

Wayne Pigment Corporation/MD Fifth Ward and Michael Denesha

63.     Wayne Pigment was a Wisconsin corporation incorporated in 1983.

64.     Wayne Pigment was dissolved in 2017.

65.     Wayne Pigment continued manufacturing pigments at the South Barclay Parcel and in Building 11.

66.     Wayne Pigment's operations at the East Oregon Parcel consisted of office and laboratory space, storage, and beginning sometime in the 1990s, a zinc phosphate manufacturing operation in Building 34.

67.     Wayne Pigment engaged a company called Safety-Kleen to supply and dispose of chlorinated solvents, including tetrachloroethene ("PCE"), for a piece of equipment called a "parts washer" that Wayne Pigment had on the third floor of Building 33, but there is no record of Wayne Pigment using TCE.

68.     Michael Denesha was an employee (from approximately 1985 to 2017) and, eventually an officer and sole owner of Wayne Pigment until 2017 when Wayne Pigment, then operating as MD Fifth Ward, sold the Properties to PPG GP LLC.

Lumimove

69.     Lumimove is a Missouri corporation with its principal place of business located in Oak Creek, Wisconsin.

70.     In 2012, Lumimove d/b/a WPC Technologies continued Wayne Pigment's operations at the Properties pursuant to a lease until 2015, when it relocated to Oak Creek.

Barclay

71.     Barclay is a Minnesota limited liability company with its principal place of business located in Minneapolis, Minnesota. Sherman is a member of Barclay.

10

72.     Barclay is the current fee owner of the Properties.

73.     In 2013, Sherman and MD Fifth Ward executed a Purchase Agreement, granting Sherman a conditional right to buy the Properties.

74.     The original purchase price for the Properties was $2,000,000.

75.     After Sherman conducted due diligence at the Properties and learned that the Properties contained contamination, the purchase price for the Properties was ultimately reduced to $500,000.

76.     Barclay was formed specifically for the acquisition and development of the Properties.

Sherman Associates

77.     Sherman is a real estate developer based in Minneapolis, Minnesota.

78.     Sherman provided development and administrative services to Barclay for various maintenance, environmental consulting, and security at the Properties.

79.     To the extent any services were provided to or on behalf of Barclay, they were provided by Sherman.

Contamination at and on the Properties

80.     In 2015, Key Engineering was engaged by Sherman to perform environmental due diligence at the Properties in connection with Barclay's potential acquisition.

81.     In June 2015, Key performed its initial Phase I environmental site assessment.

82.     Key's 2015 Phase I identified four "Recognized Environmental Conditions" that required further investigation: the open status of the Properties under the WDNR's ERP (Environmental Repair Program) and LUST (Leaking Underground Storage Tank) programs; the presence of chrome and lead dust within the buildings, which was likely hazardous; the

11

lack of investigation of Building 35; and the presence of hundreds of unknown chemicals within one of the East Oregon Street buildings.

83.     In September 2015, Key conducted a Phase II environmental site assessment specifically to investigate potential environmental contamination around Building 35. Key's Phase II investigation found soil and groundwater contamination on the East Oregon parcel and recommended further investigation.

84.     Key's investigations demonstrated that the Properties are contaminated with VOCs, PAHs, and various metals (primarily hexavalent chromium, arsenic, and lead).

85.     Key developed a Site Investigation Report and Remedial Action Plan ("RAP").

86.     Key submitted its first RAP to the WDNR in 2016.

87.     The WDNR did not approve the RAP and requested that Key perform additional site investigation activities.

88.      Key resubmitted a revised RAP in January 2017.

89.     On August 7, 2017, WDNR issued a conditional approval of the revised RAP, requiring completion of certain additional site investigation activities outlined in the RAP before final approval.

90.     WDNR has never approved a final RAP for the Properties.

91.     Key eventually became involved in investigating the interiors of the Buildings.

South Barclay Parcel

92.     The South Barclay Parcel is contaminated with metals and non-chlorinated VOCs.

93.     Chlorinated VOCs, including TCE, are also present on the South Barclay Parcel.

94.     Non-chlorinated VOCs are primarily located in groundwater to the south and east of Building 11.

95.     In addition to the contaminants in the soil, groundwater, and soil vapor at the Properties, Building 11 on the South Barclay Parcel is also contaminated.

96.     Compounds of concern ("COCs") were detected in Building 11 as follows:

- PCBs (Aroclor 1254);

- SVOC (benzaldehyde);

- Hexavalent chromium;

- Cadmium;

- Arsenic; and

- Lead

97.     Yellow staining is observable outside of the building on the west side wall and around the windows.

98.     An exhaust vent on the roof is located near the penthouse where yellow staining is visible on the outside wall.

East Oregon Parcel

99.     On the East Oregon Parcel, chlorinated VOCs have been detected in groundwater in excess of the relevant ES near Buildings 33 and 34.

100.    The primary chlorinated VOC identified in soil and groundwater in the area of Buildings 33 and 34 is TCE.

101.    Soil, soil vapor, and groundwater contain chlorinated VOCs at and around Building 34.

13

102.    In addition to the contaminants in the soil, groundwater, and soil vapor at the Properties, the buildings on the East Oregon Parcel are also contaminated.

103.    COCs are in each of the buildings as follows:

Building 33:

- SVOC (benzaldehyde);

- SVOC (bis(2-chlorhexyl)phthalate) ;

- Hexavalent chromium; and

- Lead.

Building 34:

- SVOC (benzaldehyde);

- SVOC (bis(2-chlorhexyl)phthalate);

- Hexavalent chromium; and

- Cobalt.

104.    Floor materials (including wood and concrete) within Building 34 contain hexavalent chromium, cadmium, and lead. Brick and mortar building materials contain hexavalent chromium and other building materials (concrete, brick, and tiles) contain PCBs (Aroclor 1254) and SVOCs benzaldehyde and bis(2-chlorohexyl) phthalate.

## EVIDENTIARY RULINGS

Several of the parties' motions *in limine* and motions to exclude expert testimony were taken under advisement at the final pretrial conference. (Docket # 304.) Barclay moved to "pre-admit" multiple documents. (Dockets # 244, 246, 248, 250.) Barclay also moved to withdraw (Docket # 293) an additional motion to pre-admit evidence (Docket # 242). I grant

14

Barclay's motion to withdraw Docket # 242. Furthermore, to the extent these motions seek to "pre-admit" evidence, they are now moot as trial has concluded.

Hydrite moved *in limine* to preclude evidence of its operations on properties other than the two Properties at issue. (Docket # 235.) I did not rely on evidence of Hydrite's operations on any other properties than the two at issue, thus the motion is now moot.

PPG moved to preclude Barclay's expert, Michael Beck, from testifying. (Docket # 225.) PPG argued that Beck relied on inadmissible and unsubstantiated materials in arriving at his opinions and challenged Beck's opinions linking PPG's alleged historical use of the Properties to present-day contamination of soil, groundwater, soil vapor, and building materials. (Docket # 226.) PPG's motion to exclude Beck's testimony is denied. To begin, the motion is far too sweeping—experts are qualified on a question-by-question basis. *See Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) ("The question we must ask is not whether an expert witness is qualified in general, but whether his 'qualifications provide a foundation for [him] to answer a specific question.'") (internal citation omitted). PPG, however, moved to exclude the entirety of Beck's testimony. Furthermore, at trial, Beck testified that he would be offering opinions as to the contamination on the Properties; the relationship between the contamination and historical operations; the reasonableness and necessity of past costs; cost estimates for remediation of the parcel; and the allocation of costs amongst the parties. (Jan. 26 Tr. at 1296–97, Docket # 318.) When Barclay offered Beck as an expert to testify as to these specific subject matters, PPG did not object. (Jan. 26 Tr. at 1302.) Thus, Beck's testimony will not be excluded.

PPG also moved to exclude Hydrite's expert, Mark Travers, from testifying about PPG's alleged use and release of chlorinated solvents at the Properties. (Docket # 227.) While

I cite to Travers' testimony regarding the historic use of TCE in the decision, facts which are not common knowledge, I do not rely on his other testimony in reaching my conclusions. Thus, the motion is moot.

Barclay moved to exclude PPG's expert, Kenneth Bird, from testifying regarding "half-life" biodegradation opinions. (Docket # 229.) Bird opined in his expert report that if "organic materials were present in the environment in 1975, the combination of environmental processes has been degrading them for a period of over 46 years such that any remaining concentration is not detectable and significantly below the applicable Wisconsin and federal standards." (Docket # 233-1.) Barclay argued that Bird did not conduct any scientific assessment of the actual conditions at the Properties or measure the rate of biodegradation to arrive at his calculation. Barclay argues Bird failed to apply the WDNR and EPA methodologies in making these calculations.

Bird's opinion does not assist in allocating future liability to PPG. Bird acknowledges that the Properties are contaminated with organic solvents, PCBs, TCE, and various metals, including arsenic, lead, and chromium; however, his opinion relates only to organic solvents. (Jan. 30 Tr. at 1686, 1731, Docket # 320.) While xylene is an organic solvent (Jan. 30 Trial Tr. at 1682), this is only one of the many contaminants PPG used that can be currently found on the Properties. Bird's opinion does not address such other contaminants as arsenic or chromium. And as to the metals, Bird testified that if PPG released metals during their operations at the Properties, they would be detectable today because they do not degrade like organic solvents. (Jan. 30 Tr. at 1698–99.) In other words, Bird's opinion does not absolve PPG of liability.

16

Furthermore, Bird's methodology is suspect. While he acknowledged that the rate of biodegradation is affected by the temperature of the soil and groundwater, he did not take these factors into account when rendering his opinion. (Jan. 30 Tr. at 1715.) Rather, he testified that it "really doesn't matter" because over 46 years, "there'll be frozen times and there will be hot times and it will all even out." (Jan. 30 Tr. at 1734.) Wisconsin's climate is cold for a significant portion of the year. "It will all even out" is rather imprecise for a factor Bird states is relevant to the analysis. For these reasons, Barclay's motion is granted and Bird's biodegradation opinion is excluded.

Finally, Hydrite moved to exclude Barclay's experts, Michael Beck and Mafizul Islam, from opining that TCE and PCE on the East Oregon Parcel migrated to the South Barclay Parcel and that TCE at the East Oregon Parcel is likely to pose a vapor intrusion risk, (Docket # 237.) Neither of these opinion were relied on in rendering this decision. Thus, the motion is now moot.

## ANALYSIS AND CONCLUSIONS OF LAW

Barclay, the current owner of the Properties, alleges that PPG, Hydrite, Lumimove, and WCC are all former owners and/or operators of the Properties and caused or contributed to the environmental contamination that is present on and around the Properties. (Third Am. Compl. ¶ 2.) Barclay sues under both CERCLA and RCRA. As for its CERCLA claims, Barclay brings a cost recovery action pursuant to 42 U.S.C. § 9607(a). Barclay also seeks a declaration establishing joint and several liability. As for its RCRA claims, Barclay brings a citizen suit pursuant to 42 U.S.C. § 6972(a), seeking injunctive relief requiring the other responsible parties to take necessary actions to abate the alleged danger to the public health and environment.

PPG counterclaims against Barclay for contribution under CERCLA, 42 U.S.C. § 9613(f)(1) and cross-claims against Hydrite and Lumimove for CERCLA contribution. (Docket # 63.) PPG also brings a third-party complaint against Sherman for contribution under CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1), and declaratory relief, alleging that Sherman is liable as an "operator." (Docket # 206.)

### 1.    Barclay's CERCLA Cost Recovery Claim

Congress passed CERCLA in 1980 in response to the serious environmental and health risks posed by industrial pollution. *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009). The Act was designed to "promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Id.* (internal quotations and citation omitted). CERCLA § 107 permits both government and private party plaintiffs to recover the costs incurred in responding to and cleaning up hazardous substances at contaminated sites. *Illinois v. Grigoleit Co.*, 104 F. Supp. 2d 967, 974 (C.D. Ill. 2000).

Although Barclay initially sued WPC, Denesha, Lumimove, Hydrite, and PPG for cost recovery under § 107(a), Barclay settled its claims against all defendants except for PPG. Thus, I must decide whether Barclay has proved its § 107(a) claim against PPG by a preponderance of the evidence.

To establish a claim for cost recovery under § 107(a), a plaintiff must show that: (1) the site in question is a "facility"; (2) the defendant qualifies as a potentially responsible party ("PRP"); (3) the facility experienced a release or threatened release of hazardous substances; and (4) the plaintiff incurred costs consistent with the National Contingency Plan[1] ("NCP")

---

[1] The national contingency plan is promulgated by the Environmental Protection Agency and "provide[s] the organizational structure and procedures for preparing for and responding to discharges of oil and releases of

in responding to the release. *Von Duprin LLC v. Major Holdings, LLC*, 12 F.4th 751, 758 (7th Cir. 2021). Congress defined PRPs to include four entities: current owners and operators of a site that experienced a disposal of hazardous material, past owners or operators at the time of the release, persons who arranged for disposal of a hazardous substance at a site, and parties who transported a hazardous substance to a site. *See* 42 U.S.C. § 9607(a)(1)–(4). "Joint and several liability is the norm for PRPs under § 107(a). The exception is divisible liability—commonly called apportioned liability—where liability is assigned to PRPs according to the portion of the underlying environmental harm each caused." *Von Duprin*, 12 F.4th at 758.

### 1.1 Whether the Properties are "Facilities" under CERCLA

The first question is whether the Properties at issue are "facilities" under CERCLA. CERCLA defines a "facility" as:

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9). PPG does not contest that the Properties are "facilities" as defined by CERCLA. Indeed, the parties stipulate that the Properties are contaminated with various hazardous substances. (Stipulated Proposed Findings of Fact ("Stip. PFOF") ¶¶ 80–104, Docket # 322.) Thus, I find that the Properties at issue are "facilities" as defined by CERCLA.

---

hazardous substances, pollutants, and contaminants." 40 C.F.R. § 300.1. The NCP "outlines specific steps parties must take in choosing a remedial action plan and cleaning up hazardous waste." *United States v. Newmont USA Ltd.*, 504 F. Supp. 2d 1077, 1081–82 (E.D. Wash. 2007). "The national contingency plan is designed to make the party seeking response costs choose a cost-effective course of action to protect public health and the environment." *Id.* (internal quotation and citation omitted).

### 1.2 Whether PPG Qualifies as a PRP

Next, Barclay must show that PPG is a PRP under the statute. Barclay argues that PPG qualifies as a PRP under CERCLA because "at the time of disposal of any hazardous substance," PPG "owned or operated any facility at which such hazardous substances were disposed of." § 9607(a)(2). PPG does not dispute that it "owned and operated" the South Barclay and East Oregon parcels from approximately 1900 until 1975. (Stip. PFOF ¶ 15.) Rather, PPG disputes that the "disposal of any hazardous substance" occurred during its ownership and operation.

CERCLA borrows the definition of "disposal" from Section 1004 of the Solid Waste Disposal Act. 42 U.S.C. § 9601(29). That Act, in turn, defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

PPG argues that Barclay cannot establish that any hazardous materials were "disposed" of as defined by the statute during PPG's ownership of the Properties because any hazardous materials released during its ownership were not released into the environment but remained within the four walls of the buildings. (PPG's Post-Trial Br. at 16–24, Docket # 325.) PPG likens its situation to that in *Sycamore Indus. Park Assocs. v. Ericsson, Inc.*, 546 F.3d 847 (7th Cir. 2008), which PPG contends is dispositive here. (*Id.* at 18.) In *Sycamore*, the plaintiff purchased an industrial property with fixtures, including a boiler-based steam heating system. 546 F.3d at 848. Some years later, Sycamore discovered that the boilers, pipes, and various pipe joints that made up the old system were insulated with asbestos-containing

material. *Id.* Sycamore sued the seller of the property under 42 U.S.C. § 9607 to recover costs it incurred and would incur in removing the asbestos insulation. *Id.* The court determined that Sycamore could not meet its burden of demonstrating that defendant was a PRP because all of the asbestos insulation at the facility was either inside a building or enclosed in a pipe chase or metal case and thus "there is no real possibility of asbestos entering the environment, as required to have a 'disposal.'" *Id.* at 851–52.

Relying on *Sycamore*, PPG argues that to establish CERCLA liability, one must show that the disposal of hazardous substances occurred outside of the building; it argues that disposal of hazardous substances within a building is insufficient. (PPG's Post-Trial Br. at 17–18.) I disagree. The *Sycamore* court was addressing the narrow situation of asbestos, and specifically, how asbestos was found in the building at issue. The court found that in that situation, there was *no real possibility* asbestos could enter the environment. 546 F.3d at 851–52. The court noted that "[e]ven if the asbestos broke off, asbestos fibers would remain in the building." *Id.* at 851. The court also acknowledged, however, "that if the primary purpose and likely effect of the sale was to remove the asbestos in circumstances that would make the release of asbestos to the outside environment inevitable, the transferor could be held liable under CERCLA." *Id.*

Furthermore, PPG's interpretation of "disposal" is too narrow. Again, "disposal" is defined as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof **may enter the environment** or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3) (emphasis added). PPG argues that for Barclay to prove "disposal," it must show that PPG disposed of

21

hazardous substances within the buildings and then show that the hazardous substances from within the buildings actually entered the environment outside of the buildings, i.e., into the land, water, or air. (PPG's Post-Trial Br. at 17–18.) But that is not what the statute states. The plain language of the statute, highlighted above, states that the disposal must be such that hazardous waste *may* enter the environment, not that it *did* enter the environment. *See, e.g.*, *Amland Properties Corp. v. Aluminum Co. of Am.*, 711 F. Supp. 784, 792 (D.N.J. 1989) (rejecting party's interpretation of "disposal" as requiring waste to in fact reach the environment because the statutory language provides that "a disposal can be such that hazardous waste 'may' enter the environment").

Even so, the evidence indicates that PPG did "dispose" of arsenic acid, a hazardous waste under CERCLA, *see* 40 C.F.R. § 302.4, during its ownership of the properties. Evidence adduced at trial showed that in the spring of 1964, four tanks (specifically tanks numbered 408, 410, 479, and 480), "located in Yard 124 on the premises of the company" that had been used for the storage of arsenic acid, "were deteriorating from corrosion, and the arsenic compounds were leaking to the ground below these storage tanks." (Barclay Trial Ex. 20, Docket # 312-1 at 73.) As further explained below, CERCLA is a strict liability statute. *United States v. Saporito*, 684 F. Supp. 2d 1043, 1056 (N.D. Ill. 2010). To qualify as a PRP, Barclay need only show that PPG owned or operated the facility at the time of the disposal of *any* hazardous substance. 42 U.S.C. § 9607(a)(2). Barclay need not establish a connection between the specific disposal and the site cleanup. *See* 648 F. Supp. 2d at 1056. Because the evidence shows that while PPG owned the Properties, arsenic acid leaked from the storage drums to the ground below, Barclay has demonstrated that PPG is a PRP under CERCLA.

22

### 1.3 Whether There Was a Release

As to the third element for CERCLA liability, Barclay must show that the facility experienced a release or threatened release of hazardous substances. CERCLA defines "release," in relevant part, as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)." 42 U.S.C. § 9601(22).

The parties stipulate to the fact that the soil, soil vapor, and groundwater at both Properties are contaminated with various hazardous substances under CERCLA. (Stip. PFOF ¶¶ 92–94, 99–101.) The South Barclay parcel is contaminated with metals and chlorinated and non-chlorinated volatile organic compounds ("VOCs"), including trichloroethylene ("TCE"). (*Id.* ¶¶ 92–94.) The East Oregon Parcel is contaminated with chlorinated VOCs, including TCE. (*Id.* ¶¶ 99–101.)

PPG argues that Barclay has adduced no evidence that PPG caused the release of hazardous substances driving its remediation costs. (PPG Post-Trial Br. at 17.) However, as stated above, CERCLA is a strict liability statute. *United States v. Cap. Tax Corp.*, 545 F.3d 525, 530 (7th Cir. 2008). "Liability is imposed when a party is found to have a statutorily defined 'connection' with the facility; that connection makes the party responsible regardless of causation." *Id.*; *see also United States v. Hercules, Inc.*, 247 F.3d 706, 716 (8th Cir. 2001) ("Indeed, at least at the liability stage, the language of the statute does not require the government to prove as part of its prima facie case that the defendant caused any harm to the environment. Rather, once the requisite connection between the defendant and a hazardous waste site has been established (because the defendant fits into one of the four categories of

23

responsible parties), it is enough that response costs resulted from 'a' release or threatened release—not necessarily the defendant's release or threatened release."); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1154 (1st Cir. 1989), *decision clarified sub nom. In re Dedham Water Co.*, 901 F.2d 3 (1st Cir. 1990) ("To our knowledge, every court that has addressed this issue, with the exception of the district court in the instant case, has held that it is not necessary to prove actual contamination of plaintiff's property by defendant's waste in order to establish liability under CERCLA.").

The statutory definition of "release" is very broad, and based on the parties' stipulation that the soil, soil vapor, and groundwater at both properties are contaminated with various hazardous substances under CERCLA, I find that a "release" has occurred on the Properties.

### 1.4     Whether Barclay Incurred Necessary Response Costs

Finally, to establish CERCLA liability, Barclay must also show that it incurred "necessary costs of response" consistent with the National Contingency Plan. 42 U.S.C. § 9607(a)(4)(B); *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 791 (7th Cir. 2000) (finding that proof of response costs incurred consistent with the NCP is an element of the *prima facie* private cost recovery action under CERCLA). CERCLA, however, is "not known for its clarity, or for its brevity." *Bernstein v. Bankert*, 733 F.3d 190, 200 (7th Cir. 2013). This element is a prime example, as this single element contains multiple requirements. First, the cost must be "incurred." "[T]he mere possibility, even the certainty, that an obligation to pay will arise in the future does not establish that a cost has been incurred, but rather establishes that a cost may be incurred, or will be incurred for purposes of CERCLA." *Rolan v. Atl. Richfield Co.*, 427 F. Supp. 3d 1013, 1021 (N.D. Ind. 2019) (internal quotation and citation omitted).

24

Second, the cost must be a "response" cost. "Response" is defined as "remove, removal, remedy, and remedial action" and "enforcement activities related thereto." 42 U.S.C. § 9601(25). As one treatise states, this statutory definition is "indirect and ambiguous," leaving courts divided on what "response" includes. *See What are "necessary costs of response" within meaning of § 107(a)(4)(b) of CERCLA*, 113 A.L.R. Fed. 1 (Originally published in 1993).

Third, the "response" cost must be "necessary." "Costs are 'necessary' if they are incurred in response to a threat to human health or the environment and they are necessary to address that threat." *Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, 260 F. Supp. 3d 988, 993 (N.D. Ind. 2017) (internal citations omitted).

And finally, the costs must be consistent with the NCP. A private party response action is considered "consistent with the NCP" if "the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in paragraphs (5) and (6) of this section, and results in a CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(i). The NCP requires that the proposed clean-up method in which the costs will be incurred be submitted for public comment before it is implemented. 40 C.F.R. § 300.700(c)(6).

Barclay argues that it incurred $1,430,740 in necessary response costs consistent with the NCP. (Barclay Post-Trial Br. at 25; Barclay Resp. Br. at 13, Docket # 331.) It argues that its costs "roughly fall into three buckets: (1) environmental consultant costs, (2) legal fees, and (3) security and monitoring costs." (Barclay Post-Trial Br. at 25.) Although PPG substantially focuses its arguments on Barclay's request for future response costs (PPG Post-Trial Br. at 24–28), as stated above, the focus of this element is on costs Barclay has *incurred*, not costs it may or may not incur in future.

25

As to the "three buckets" of costs Barclay claims it has incurred as necessary response costs, PPG argues that Barclay "has done nothing to show compliance with the NCP" (*id.* at 24) and that even if it has, Barclay has already been fully reimbursed for its response costs based on the reduction in purchase price it received for the properties and through settlement payments with other PRPs (PPG Resp. Br. at 9). This argument, however, does not address Barclay's *prima facie* claim under § 107(a). While Barclay's previous payments may be relevant at the allocation stage, for purposes of determining whether Barclay has established liability under CERCLA, the question is whether Barclay has incurred response costs that are both necessary and consistent with the NCP.

### 1.4.1    Environmental Consultant Costs

Barclay asserts that it incurred a total of $710,224.63 associated with the investigation of contamination at the Properties, identifying potentially responsible parties for the contamination, and developing remediation strategies. This amount was incurred as follows:

| | |
|---|---|
| Key Engineering | $575,280.69 |
| Braun Intertec Corporation | $60,858.25 |
| The Sigma Group, Inc. | $55,641.69 |
| Integrity Environmental Services | $17,504 |
| WDNR | $940.00 |
| **TOTAL** | **$710,224.63** |

(Barclay Trial Ex. 500.)

George Sherman, CEO of Sherman Associates, testified that Sherman Associates has redeveloped properties in Milwaukee for the past twenty years. (Jan. 22 Tr. at 62, Docket # 314.) The company was particularly focused on historic buildings that could be converted into housing. (*Id.*) Sherman testified that many historic buildings have environmental issues that need addressing, and consultants are typically hired to help work through that process. (*Id.* at 64–65.)

26

Sherman testified that the Properties are located in Milwaukee's Fifth Ward, an area that up until approximately 2000 was used primarily for manufacturing. (*Id.* at 65–66.) From 2000 onward, however, the area started to take on "some residential flavor," and the City of Milwaukee had a "comprehensive plan" to convert this area to residential use. (*Id.* at 66–67.) Thus, Sherman believed that the City would accept a plan to convert the Properties to residential housing. (*Id.* at 67–68.) Sherman Associates ultimately decided to purchase the Properties and in 2013 entered into a conditional purchase agreement with MD Fifth Ward to purchase the Properties. (Barclay Trial Ex. 81.) The purchase agreement contained a section of environmental disclosures, stating that in June 2006, MD Fifth Ward notified the WDNR of potential groundwater and soil contamination and stated that the company, along with its environmental consultant, was involved in on-going investigation and negotiations regarding what, if any, remedial actions would be taken. (*Id.*) The agreement also provided for Sherman Associates to conduct an environmental investigation of the Properties prior to finalizing the sale. (*Id.*)

Sherman Associates engaged Key to perform environmental due diligence at the Properties in connection with Barclay's potential purchase of the properties. (Stip. PFOF ¶ 80.) Key performed its initial Phase I environmental site assessment in June 2015, during which it identified four areas of concern that required further investigation. (*Id.* ¶¶ 81–82.) Key conducted a Phase II environmental site assessment in September 2015, during which it found soil and groundwater contamination and recommended further investigation. (*Id.* ¶ 83.) After Key's investigations demonstrated that the Properties were contaminated with VOCs, PAHs, and various metals, it developed a Site Investigation Report and Remedial Action Plan ("RAP"). (*Id.* ¶¶ 84–85.)

27

Key submitted its first RAP to the WDNR in 2016 and after the WDNR requested Key perform additional site investigation, Key resubmitted a revised RAP in January 2017. (*Id.* ¶¶ 86–88.) The WDNR conditionally approved the revised RAP in August 2017 upon completion of additional site investigation; however, the WDNR has never approved a final RAP for the Properties. (*Id.* ¶¶ 89–90.) Sherman Associates ultimately purchased the Properties on December 15, 2016. (Jan. 22 Tr. at 89.)

Sherman testified that Sherman Associates used Braun for years on environmental investigative reports and in this case, hired Braun to review Key's work. (*Id.* at 91.) Sherman testified that because the WDNR was asking for additional studies, Sherman Associates wanted to make sure that a "second eye" was on those requests. (*Id.* at 92.) Barclay incurred $60,858.25 in costs from Braun. (Barclay Trial Ex. 500.)

In 2020, Barclay engaged Sigma to prepare engineering estimates of the costs to demolish the buildings and properly handle and dispose of the waste materials. (Barclay Proposed Findings of Fact ("Barclay PFOF") ¶ 344, Docket # 327.) Sigma conducted sampling within Building 11 to determine how far contamination migrated into the bricks and concrete. (*Id.* ¶ 346.) Sigma also recommended certain site control measures to mitigate any ongoing releases of contaminants from the building materials via stormwater or wind deposition, such as boarding up windows and doors, which were also documented in the Building Material Sampling report. (*Id.* ¶ 355.) Barclay incurred $55,641.69 in costs from Sigma.

Barclay hired Integrity to develop a site-specific Health and Safety Plan for work in the buildings. (*Id.* ¶ 377.) Barclay incurred $17,504 in costs from Integrity. Finally, Barclay

28

incurred $940 from the WDNR for Hazardous Waste Annual Generator Fees. (Barclay Trial Exs. 500-547, 500-548, 500-549, 500-550.)

As an initial matter, while there is no indication that Barclay submitted any of its costs for public comment as required by the NCP, *see* 40 C.F.R. § 300.700(c)(6), "many courts have held that initial investigation, site-assessment, and monitoring costs are recoverable under § 107(a) of CERCLA irrespective of compliance with NCP requirements," *CNH Am., LLC v. Champion Env't Servs., Inc.*, 863 F. Supp. 2d 793, 809 (E.D. Wis. 2012).

Thus, with the exception of the $17,504 in costs incurred from Integrity, I find the remainder of Barclay's stated investigation costs are compensable. The costs incurred to Integrity were for developing a plan for the health and safety of the employees working at the Properties. "Employee exposure" to hazardous materials, however, "is not the type of 'threat' redressable under CERCLA." *G.J. Leasing Co. v. Union Elec. Co.*, 854 F. Supp. 539, 562 (S.D. Ill. 1994), *aff'd*, 54 F.3d 379 (7th Cir. 1995). Rather, "'OSHA is more properly viewed as an employee protection law rather than an environmental law" . . . and thus "do[es] not come within the scope of ARARS [applicable or relevant and appropriate requirements] under CERCLA.'" *Id.* (quoting 55 Fed. Reg. 8679–8680 (March 8, 1990)).

The remainder of the costs, however, from Key, Braun, Sigma, and the WDNR, are compensable under § 107. Barclay was aware the Properties were contaminated prior to purchasing them. Key, Braun, and Sigma were retained in an effort to determine the extent of the contamination, to conduct testing and monitoring, and to propose plans for remediation. These kinds of expenses are generally compensable under CERCLA. *See VME Americas, Inc. v. Hein-Werner Corp.*, 946 F. Supp. 683, 693 (E.D. Wis. 1996); *see also CNH Am.*, 863 F. Supp. 2d at 809 ("This court is persuaded that, because any clean-up proposal and,

29

consequently, any clean-up of a contaminated site must first be preceded by an investigation of the nature and extent of contamination, such investigative and assessment costs need not be incurred in compliance with the NCP and are 'necessary.'").

Barclay also incurred $940 from the WDNR for Hazardous Waste Annual Generator Fees. (Barclay Trial Exs. 500-547, 500-548, 500-549, 500-550.) Evidence at trial showed that Sherman Associates paid two fees of $470.00 to the WDNR pursuant to Wis. Stat. § 289.67(2). This statute provides that a "generator of hazardous waste who is required to report annually on hazardous waste activities . . . shall pay an annual environmental repair fee" of $470 "if the generator is a large quantity generator." § 289.67(2). The statute further provides that these "environmental repair surcharges" "shall be credited to the environmental fund for environmental management." *Id.* § 289.67(4)(c). The "environmental fund" is "a separate nonlapsible trust fund," that consists, in relevant part, of fees collected under § 289.67(2). Wis. Stat. § 25.46(1)(gm). This statute provides that the moneys "that are received for the purpose of environmental management . . . shall . . . be considered to have been received for the purpose of nonpoint source water pollution abatement." *Id.* § 25.46(2m). This fee fits into the type of oversight and monitoring generally compensable under CERCLA. *See VME Americas, Inc.*, 946 F. Supp. at 693.

### 1.4.2    Site Security and Monitoring Costs

Barclay argues that it incurred $483,041.72 in security costs and graffiti removal under § 107(a). (Barclay PFOF ¶ 383.) As to Barclay's costs for security at the Properties, I find that they were necessary and reasonable to prevent trespassing on the Properties and to ensure that members of the community were not harmed by exposure to the contamination at the Properties. A "response" cost is defined as "remove" or "removal," 42 U.S.C. § 9601(25),

and the terms "remove" and "removal" are defined to include "security fencing or other measures to limit access," 42 U.S.C. § 9601(23).

Removal of graffiti, however, is not a compensable cost. Richard Kiemen, Sherman Associates' COO, testified that the company uses MAS Property Maintenance for graffiti removal. (Jan. 23 Tr. at 301, Docket # 315.) He testified that while security is "more absolute" in preventing trespassers (*id.* at 302), graffiti removal assists in this security because graffiti tends to indicate a building is unoccupied (*id.*) and "[g]raffiti begets graffiti" (*id.* at 303). The statute, however, speaks of "security fencing or other measures to limit access." 42 U.S.C. § 9601(23). There is no indication, beyond Kiemen's speculation, that the lack of graffiti on a building in any way limits access and thus keeps the public safe from the hazards. Thus, the $8,007.00 incurred for graffiti removable is not compensable under CERCLA.

### 1.4.3   Legal Fees

Barclay seeks attorney's fees in the amount of $237,473.30 as a necessary response cost under § 107(a). (Barclay's PFOF ¶ 391.) In *Key Tronic Corp. v. United States*, 511 U.S. 809 (1994), the Supreme Court found that given its "adherence to a general practice of not awarding fees to a prevailing party absent explicit statutory authority, we conclude that CERCLA § 107 does not provide for the award of private litigants' attorney's fees associated with bringing a cost recovery action." *Id.* at 819 (internal citation omitted). The Court further stated, however, that:

> The conclusion we reach with respect to litigation-related fees does not signify that all payments that happen to be made to a lawyer are unrecoverable expenses under CERCLA. On the contrary, some lawyers' work that is closely tied to the actual cleanup may constitute a necessary cost of response in and of itself under the terms of § 107(a)(4)(B). The component of Key Tronic's claim that covers the work performed in identifying other PRP's falls in this category. Unlike the litigation services at issue in *Alyeska [Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240 (1975)], these efforts might well be performed by engineers,

31

chemists, private investigators, or other professionals who are not lawyers. As the Tenth Circuit observed, the American rule set out in *Alyeska* does not govern such fees "because they are not incurred in pursuing litigation."

*Id.* at 819–20 (internal citation omitted).

Following *Key Tronic*, in *Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761 (7th Cir. 1994), the Seventh Circuit noted that *Key Tronic* "left the door open" to the recoupment of fees for lawyers' work that is closely tied to the actual cleanup of a site but "preclud[ed] the recovery of fees incurred in connection with bringing a cost recovery or contribution suit against other PRPs or in defending the plaintiff's interests in settlement negotiations or other proceedings establishing the extent of its liability." *Id.* at 767 n.10. Several years later, in *AM Int'l, Inc. v. Datacard Corp.*, 106 F.3d 1342 (7th Cir. 1997), the court again recognized that *Key Tronic* "held that attorney fees did not generally qualify as response costs under § 107," but that the Court "carved out a narrow exception for attorney fees not incurred in pursuing litigation." *Id.* at 1349. Applying *Key Tronic*, the court in *AM Int'l* found that litigation fees that are "racked up investigating [a party's] own legal responsibilities in dealing with the Ohio EPA . . . was not work which could have been done by engineers or chemists," but was work looking towards litigation. *Id.*

More recently, one court in this circuit explained that district courts following *Key Tronic* have held these types of attorney's fees recoverable in CERCLA actions:

> (1) those incurred in connection with the search for potentially responsible parties; (2) fees related to client conferences regarding site work and cleanup matters, site visits to review cleanup, and conferences with technical staff; (3) fees associated with investigatory efforts to identify contaminants on the property; and (4) fees related to costs of EPA monitoring or oversight of remedial action. In contrast, the following types of costs have been found not recoverable under CERCLA: (1) costs incurred in negotiating a consent decree with the EPA; and (2) costs of audits conducted by plaintiffs to review expenses charged by the EPA and concerning how much plaintiffs owed with regard to the cleanup.

32

*Valbruna*, 2018 WL 2328447, at *5 (internal citations omitted).

Barclay seeks legal fees from two law firms: Winthrop & Weinstein, P.A. and Maistelman & Associates, LLC. Barclay submits legal bills from Winthrop dating from December 2016 through October 2020. (Barclay Trial Exs. 500-59–500-93.) George Sherman testified that at the time they engaged Winthrop & Weinstein, they had "received a raze and repair order and having indications that a cleanup plan was going to become more difficult, we wanted to protect the rights we had and seek those people responsible to help with the cleanup plan, cleanup -- the cleanup remediation plan and address the blight in the building and remove the contamination." (Jan. 22 Tr. at 109.) Barclay's legal bills from Maistelman span from February 2018 through November 2020. (Barclay Trial Exs. 500-20–500-39.) Sherman testified that the Maistelman firm was retained because it "specialize[s] in government relations, and we were trying to see if we could have one more avenue with the city to extend the period or look or seek financial help from the city to repair the building. It was our intent to try to continue to find a method to do the environmental repairs that they wanted on the building." (Jan. 22 Tr. at 107–108.)

Barclay asserts that its attorney's fees are recoverable because they all fit into one of the *Valbruna* court's stated categories, specifically to "search for potentially responsible parties like PPG; to assist in client conferences concerning site work and cleanup matters; for site visits to review cleanup, and conferences with technical staff; to identify contaminants on the site; and to assist in regulatory matters." (Barclay's PFOF ¶ 389.)

Barclay has provided nearly two hundred pages of legal invoices. (*See* Barclay Trial Exs. 500-20–500-39, 500-59–500-93.) Some of these invoices likely contain entries that fall under *Key Tronic*'s narrow exception. However, it is entirely unclear which do. Many invoices

33

have redactions. Others contain vague descriptions. One example that contains both appears on the March 3, 2018 invoice from Maistelman, the February 15, 2018 entry:

> Review all emails, correspondence and attachments from Rich and George. Follow-up conversations with Rich to prepare for REDACTED. Review additional info from Rich. Phone conference with City Attorney and Chris Kraco. Prepare notes. Circle back with Rich.

(Barclay Trial Ex. 500-20.) I cannot discern from this entry whether the charge is compensable under § 107. Other costs are clearly associated with this present litigation and thus do not fall under the *Key Tronic* exception. For example, the entries on October 29, 2020 for "Review and respond to emails from local environmental counsel" and on November 11, 2020 for "Review filed complaint. Communicate with Paula regarding REDACTED. Also, reach out to the City of Milwaukee Department of City Development and advise the same." (Barclay Trial Ex. 500-32.)

The Winthrop legal bills are no clearer. For example, an entry on August 2, 2018 simply states, "Confer regarding PPG matters." (Barclay Trial Ex. 500-60.) A large portion of this invoice is completely redacted. (*Id.*) And Winthrop's bills similarly include litigation costs, such as the entries on October 29 and 30, 2020 for "Work on revisions to complaint; conference with Davis & Kuelthau" and "Revisions to complaint; communications regarding same." (Barclay Trial Ex. 500-85.)

Barclay argues that except "for limited cross examination on a few invoices, PPG offered no evidence to challenge these legal fees." (Barclay Post-Trial Br. at 29.) Barclay argues that because the test for recovery of attorney's fees under § 107 is "necessity" of fees, not "reasonableness," it needs no separate fee petition and the Court "can and should consider the attorneys' fees invoices in the record just like any other invoices, without requiring any accompanying fee petition." (*Id.* at 29 n.8.) While Barclay need not submit a separate fee

34

petition or establish the "reasonableness" of the fees, Barclay still carries the burden of proving that it incurred necessary response costs consistent with the NCP. Barclay's evidence falls far short of this standard. *See, e.g.*, *Valbruna*, 2018 WL 2328447, at *6 (finding "the vague billing entries for the work performed throughout the past ten years do not provide sufficient information for the Court to determine whether the expenses were necessary costs of the response or for the purpose of going after defendants to recoup the costs").

It is clear from *Key Tronic* that when it comes to a CERCLA § 107 action, recovery of attorney's fees is the exception, not the rule. Again, the Seventh Circuit described *Key Tronic*'s exception as "narrow." *AM Int'l*, 106 F.3d at 1349. It is meant to compensate actions that while performed by a lawyer in the case, could have just as well "be[en] performed by engineers, chemists, private investigators, or other professionals who are not lawyers." *Key Tronic*, 511 U.S. at 819–20. Barclay has failed to meet its burden as to attorney's fees. Thus, they are not recoverable.

### 1.5 Summary of Findings

As to Barclay's claim for cost recovery under § 107(a) against PPG, I find that Barclay has proved by a preponderance of the evidence that the sites in question are "facilities" under the statute; that PPG qualifies as a PRP; that the facilities experienced a release or threatened release of hazardous substances; and that Barclay incurred costs consistent with the NCP in responding to the release. However, while Barclay argues it incurred $1,430,740 in costs, I find that Barclay has proven that it incurred $1,167,755.35 in necessary costs consistent with the NCP.

## 2. Declaration of Joint and Several Liability

Once a party is found to be liable under CERCLA, "the party is jointly and severally liable for all of the response costs, 'regardless of that party's relative fault.'" *Cap. Tax Corp.*, 545 F.3d at 534 (quoting *Metropolitan Water Reclamation Dist. of Greater Chicago v. North American Galvanizing & Coatings, Inc.*, 473 F.3d 824, 827 (7th Cir. 2007)). "Courts, however, do recognize one judicially created exception to joint and several liability under § 107(a). If a liable party can establish that the harm is divisible—that is, that there is a reasonable means of apportioning the harm among the responsible parties—then that party is not subject to joint and several liability." *Id.* A party seeking apportionment bears the burden of proving that a reasonable basis for apportionment exists. *United States v. NCR Corp.*, 688 F.3d 833, 838 (7th Cir. 2012). PPG does not attempt to establish apportionment. Thus, PPG and Barclay are jointly and severally liable for the $1,167,755.35 in response costs.

## 3. PPG's CERCLA Contribution Claims

PPG brings CERCLA contribution claims against Barclay, Sherman, Hydrite, and Lumimove. Section 113(f) allows a party who believes that it has paid cleanup costs in excess of its fair share to sue to recover contribution from other parties jointly liable for cleanup at the same site. *NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682, 689 (7th Cir. 2014). PRPs who find themselves sued under § 107(a) often file a counterclaim against the original plaintiff on the basis that the party is itself a PRP who caused part of the harm and thus should contribute to any ultimate remediation liability. *Von Duprin*, 12 F.4th at 758. These contribution counterclaims proceed under § 113(f), which authorizes the allocation of liability based on "such equitable factors as the court determines are appropriate." *Id.* (quoting 42

U.S.C. § 9613(f)(1)). PPG bears the burden of proof in demonstrating an entitlement to contribution. *NCR Corp.*, 768 F.3d at 690.

The Seventh Circuit has stated that it is "essential to recognize [ ] that apportioned (divisible) liability and allocated liability are not one and the same under CERCLA. To the contrary, they are distinct, with apportioned liability imposed on the basis of principles of causation and allocated liability the product of an application of equitable factors." *Von Duprin*, 12 F.4th at 758. Once again, PPG does not attempt to establish apportionment. Thus, I must allocate liability based on the application of equitable factors.

While § 9613(f)(1) directs courts to allocate costs of cleanup between responsible parties "using such equitable factors as the court determines are appropriate," that section does not limit courts to any particular list of factors, nor does the section direct the courts to employ any particular test. *Env't Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 507 (7th Cir. 1992). However, courts often look to six criteria, referred to as the "Gore Factors" in allocating liability. *Id.* at 508. These criteria were originally proposed by then-Congressman Al Gore as an amendment to the 1980 House Superfund Bill (which did not pass), as a moderate approach to joint and several liability. *Id.* The six factors are:

> (i) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;
>
> (ii) the amount of the hazardous waste involved;
>
> (iii) the degree of toxicity of the hazardous waste involved;
>
> (iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;
>
> (v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and

37

> (vi) the degree of cooperation by the parties with Federal, State or local officials to prevent any harm to the public health or the environment.

*Id.* This list, however, is not exhaustive. "Other factors commonly taken into account are: the financial resources of the liable parties; the extent of the benefit that the parties received from the hazardous waste disposal practices; the extent of the parties' knowledge and awareness of the environmental contamination of the site; the efforts made, if any, to prevent environmental harm and the efforts made to settle the case." *United States v. Davis*, 31 F. Supp. 2d 45, 63 (D.R.I. 1998), *aff'd*, 261 F.3d 1 (1st Cir. 2001). Furthermore, "in any given case, a court may consider several factors, a few factors, or only one determining factor, as the district court did in this case, depending on the totality of circumstances presented to the court." *Env't Transp. Sys.*, 969 F.2d at 509.

### 3.1 Contribution Claim Against Sherman

PPG filed a third-party complaint against Sherman for both contribution under CERCLA § 113(f)(1) and for a declaratory judgment finding Sherman jointly and severally liable for response costs. (Docket # 206.) PPG cannot seek contribution from Sherman, however, unless Sherman is also a PRP. The parties agree that Sherman's affiliate, PPG GP LLC acquired the Properties from MD Fifth Ward Holdings, Inc. and that PPG GP LLC then transferred the Properties to Barclay in December 2017. (Stip. PFOF ¶¶ 26–27.) PPG specifically states that it does *not* allege that Sherman is the alter ego of Barclay. (PPG's Proposed Conclusions of Law ¶ 22, Docket # 324.) Rather, PPG argues that the "lack of corporate formalities and general operating structure of Barclay" supports its claim that Sherman is an operator of the Properties as defined by CERCLA. (*Id.*)

An "operator" under CERCLA must "manage, direct or conduct operations specifically related to pollution, that is, operations having to do with 'the leakage or disposal

of hazardous waste, or decisions about compliance with environmental regulations.'" *N. States Power Co. v. City of Ashland, Wis.*, 131 F. Supp. 3d 802, 823 (W.D. Wis. 2015) (quoting *United States v. Bestfoods*, 524 U.S. 51, 66–67 (1998)). An operator "must be actively involved on the site in some way that relates to the pollution," although "it is not necessary that it be directly responsible for the release of the hazardous substance." *Id.* The question is whether the parent company operates the facility, not whether the parent company operates the subsidiary. *Bestfoods*, 524 U.S. at 68. That operation "is evidenced by participation in the activities of the facility, not the subsidiary." *Id.*

George Sherman testified that Barclay itself has no employees and no bank account of its own. (Jan. 22 Tr. at 131–32.) Sherman Associates hired third-party consultants, such as Key, to perform the environmental due diligence prior to purchasing the Properties. (*Id.* at 135.) The October 14, 2013 purchase agreement for the Properties states it is between MD Fifth Ward Holdings, Inc. and Sherman Associates, Inc. (Barclay Trial Ex. 81.) The legal invoices for response costs Barclay now claims are billed to Sherman Associates. (Barclay Trial Ex. 500.) Key directed its report findings to Sherman Associates. (PPG Trial Ex. 1144.) The WDNR corresponded with Ross Stiteley at the address of Sherman Associates (Barclay Trial Ex. 109), as did the City of Milwaukee's Health Department (Barclay Trial Ex. 108). Given Barclay itself has no employees, Sherman Associates must necessarily make "decisions about compliance with environmental regulations" for the Properties. *See Bestfoods*, 524 U.S. at 66–67. This reality is demonstrated by Stiteley's correspondence with environmental regulators. Thus, because it is Sherman Associates who operates the facilities, Sherman is an "operator" under CERCLA. PPG can seek contribution from Sherman.

Finally, I note that although there is no allegation that Barclay and Sherman are alter egos, for purposes of my allocation analysis, I consider Barclay and Sherman together. Again, Barclay has no employees; Sherman acts on Barclay's behalf. Thus, it is Sherman employees who, for example, had knowledge of the condition of the Properties at the time of purchase.

### 3.2    Allocation of Past Costs

I first consider how to allocate the $1,167,755.35 in response costs Barclay has already incurred between the PRPs—Barclay, PPG, Sherman, Hydrite, and Lumimove. As discussed above, the costs Barclay has already incurred fall into the "three buckets" of environmental consultant costs, legal fees, and security and monitoring costs. In other words, Barclay has not yet incurred costs for the remediation of the Properties. Barclay stipulates that the WDNR has never approved a final Remedial Action Plan for the Properties. (Stip. PFOF ¶ 90.) David Misky, the assistant executive director of the City's Redevelopment Authority, testified that as of the date of his testimony, January 24, 2024, Barclay has submitted no further plan for cleanup, potential cleanup, or remediation of the Properties. (Jan. 24 Tr. at 577, Docket # 316.) Thus, as to these incurred response costs, the Gore factors are not entirely helpful.

Both PPG and Hydrite argue that Barclay has already been fully compensated for its past response costs through the reduction it received in the purchase price of the Properties and from the settlement payments it has already received. Hydrite's Chairmen of the Board, John Honkamp, testified that Hydrite has already paid Barclay $550,000.00 towards its past response costs. (Feb. 1 Tr. at 1949, Docket # 321.) This leaves approximately $617,755.35 in unpaid costs.

Barclay received a significant price reduction for the Properties—amounting to $1.5 million. As the Seventh Circuit stated, "if a rational buyer pursues a piece of property knowing

40

that it will have to spend X for cleanup, it will discount the potential value of the property by X and accordingly reduce its purchase price by X. 'No sensible person would pay as much for a property with a known liability as for one without, whether the price expressly discounted for the cleanup or not.'" *Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, 934 F.3d 553, 567 (7th Cir. 2019) (internal citation omitted). Here, the evidence clearly demonstrates that the price reduction was directly related to the scope of contamination.

Furthermore, George Sherman was no stranger to historic renovation projects with environmental issues. He testified that in the previous twenty years that he was involved in the Milwaukee real estate development market, he worked on another historic renovation project, Paper Box Loft, that was close to the Third Ward and involved the conversion of a manufacturing building into housing. (Jan. 22 Tr. at 63.) He testified that the Paper Box Loft properties had issues with lead paint and asbestos and acknowledged that a lot of historic buildings have environmental issues that need addressing. (*Id.* at 64–65.) He testified that he had experience with projects that involved significant environmental issues. (*Id.* at 62.)

Sherman testified that Sherman Associates originally agreed to purchase the Properties in October 2013 for $2 million. (Jan. 22 Tr. at 74; Barclay Trial Ex. 81.) He testified that he thought the Properties were worth about $2 million because it was similar to what he paid for the Paper Box Loft property, the other historic renovation project with environmental issues. (*Id.* at 72, 74.) The purchase agreement contained an Exhibit C entitled "Compliance and Environmental Disclosures" that notified Sherman Associates that the seller was aware of potential groundwater and soil contamination on the Properties and provided the WDNR tracking number and stated that it had worked with an environmental consultant, Drake Consulting Group. (Barclay Trial Ex. 81.) Sherman testified that the agreement contained a

"long list of environmental contingencies" that allowed Sherman Associates to conduct an investigation into the environmental conditions before finalizing the purchase. (Jan. 22 Tr. at 76–77.)

Sherman Associates engaged Key to investigate the environmental conditions and in 2016, Sherman Associates' associate general counsel contacted the seller to state that the estimated cleanup costs of the Properties were rising and due to the "extent of the contamination on the site" as well as the "WDNR's strong interest in it," Sherman Associates would need to spend more on testing to obtain an approved RAP. (Jan. 22 Tr. at 146–47; PPG Trial Ex. 1366.) Counsel stated that because "the costs of the clean-up exceed the original purchase price for the property, the current purchase price does not lead to a financially viable transaction." (*Id.*) Counsel stated that Sherman Associates would only move forward with the deal if the seller would agree to several new terms, including a reduced purchase price of $500,000. (*Id.*) Sherman Associates ultimately did purchase the Properties for the significantly reduced price of $500,000.

Thus, the evidence shows that through the significant discount in purchase price, Barclay has already been compensated for its past response costs. Thus, allocating any of the $1,167,755.35 to a party other than Barclay would be inequitable, allowing Barclay a double recovery. This is not a situation where Sherman was unaware of the risks associated with these Properties—as he testified, George Sherman had experience converting historic properties with environmental issues. Nor was Sherman Associates unaware of the scope of the contamination at the time of purchase. Sherman Associates clearly accounted for that risk in negotiating the reduced purchase price. (PPG Trial Ex. 1366.) For these reasons, I allocate 100 percent of Barclay's past response costs, totaling $1,167,755.35, to Barclay.

42

### 3.3 Allocation of Future Response Costs

The parties devote a significant amount of time and energy in this case arguing about the recoverability of certain future response costs, namely, demolition of the buildings on the subject Properties. This is despite Barclay acknowledging that "whether the final remedy is based on residential or industrial use is simply irrelevant at this point" (Barclay's Post-Trial Resp. Br. at 16) and PPG arguing that the Court should not allocate future costs, lest it provide an impermissible advisory opinion (PPG's Post-Trial Br. at 8–28). PPG nonetheless argues that the Court should exclude all building costs from any future allocation. (*Id.*)

It is understandable why the parties, particularly PPG, are concerned about how, exactly, Barclay will remediate the Properties. The parties' experts wildly disagree on the potential costs of remediation. PPG's expert, Kurt Herman, opines that the total response costs (both past and future) amount to approximately $6,717,066. (Jan. 30 Tr. at 1787; PPG Trial Ex. 1242.) Whereas Barclay's expert, Michael Beck, opines that future remediation of both Properties would cost approximately $13,231,000, exclusive of demolition of the buildings. (Jan. 29 Tr. at 1405; Barclay Trial Ex. 214.) Barclay's expert, Mafizul Islam, estimated that the demolition of the three buildings on the East Oregon parcel would cost approximately $3.5 million as of 2022. (Jan. 25 Tr. at 814–15, Docket # 317; Barclay Trial Ex. 210.) Islam provided an estimate for demolition of Building 11 on the South Barclay parcel in 2022 for approximately $10.7 million. (Jan. 25 Tr. at 815; Barclay Trial Ex. 209.) And these costs are only increasing with time.

But at this juncture, Barclay has no specific plan in place to remediate the Properties. The City has not mandated that the buildings be razed—the order contemplates raze *or* repair. (Barclay Trial Exs. 127–28.) Islam provided estimates for remediation both with and without

43

demolition of the buildings. (Jan. 25 Tr. at 817; Barclay Trial Ex. 216.) The law is clear that "[f]uture response costs, not yet incurred, are not recoverable under CERCLA." *Santa Clarita Valley Water Agency v. Whittaker Corp.*, 99 F.4th 458, 483 (9th Cir. 2024). Thus, to make a determination as to the *recoverability* of any not-yet-incurred costs would indeed amount to an impermissible advisory opinion. Rather, "a declaratory judgment, whereby liability for future response costs would be allocated at a set percentage across responsible parties, is the proper mechanism for recouping future response costs in the CERCLA regime." *Id.* (internal quotation and citation omitted).

While I make no determination whether future response costs, whether associated with the buildings or otherwise, are recoverable under CERCLA, the parties are reminded of the law. To recover response costs, Barclay must still prove that the costs incurred were necessary response costs consistent with the NCP. And there is no bright-line rule as to the recoverability of demolition costs—they may be recoverable, or they may not be. It will depend on whether the costs were necessary response costs consistent with the NCP, as the law defines these terms. *See, e.g.*, *Sealy Connecticut, Inc. v. Litton Indus., Inc.*, 93 F. Supp. 2d 177, 189 (D. Conn. 2000) ("[T]he Town of Watertown notice did not mandate demolition but also provided Sealy with the option to repair the Winchester Building. While the building posed public safety concerns and was a source of potential liability, the Court does not find plaintiff has demonstrated the demolition was a necessary response cost of the remediation efforts related to the contamination of the soil or the ground water within the contemplation of CERCLA."); *Plaskon Elec. Materials, Inc. v. Allied-Signal, Inc.*, 904 F. Supp. 644, 661 (N.D. Ohio 1995) (considering whether demolition costs were incurred solely to improve aesthetics

44

and marketability of property versus whether demolition was necessary to implement remedial activities relating to soil and groundwater contamination).

Again, while I make no determination as to the recoverability of future costs, I must allocate *liability* between the parties. While Barclay argues for two separate allocations, one for TCE and one for all other contaminants—I decline to do so. It is likely these remediation costs will overlap and that it will be difficult to distinguish between what action is taken to address which compound. Thus, I will set percentages of liability for each party.

### 3.4 Allocation of Liability for Future Response Costs

I begin with the overarching principle of CERCLA's remedial design—a design meant to protect the environment, "not parties that dumped hazardous waste for years." *NCR Corp.*, 768 F.3d at 712. "Congress did not intend CERCLA to make injured parties whole or to create a general vehicle for tort actions." *G.J. Leasing Co. v. Union Elec. Co.*, 854 F. Supp. 539, 561 (S.D. Ill. 1994), *aff'd*, 54 F.3d 379 (7th Cir. 1995). In other words, my focus is on cleaning up the environment, not on any party's particular business concerns. And in allocating liability, the district court's authority is "broad and loose . . . CERCLA not only entrusts the district court to make the ultimate equitable allocation of costs, but it also grants the court the authority to decide which equitable factors will inform its decision in a given case." *NCR Corp.*, 768 F.3d at 695 (internal quotation and citation omitted). I will address the allocation of liability for each party, in turn.

### 3.4.1 PPG

PPG owned and operated the subject Properties for industrial purposes for 70 years—from 1905 until 1975. (Stip. PFOF ¶ 15.) PPG's operations included the manufacture of paints, coatings, and linseed oil (*id.* ¶ 30) and in 1920, began operating the Properties as part

45

of its paint, varnish, coatings, and resins division (*id.* ¶ 31). The South Barclay parcel contains one five-story building with a basement, Building 11. (*Id.* ¶ 14.) PPG manufactured dry pigments, "Corona"-branded agricultural insecticides, fungicides, and seed disinfectants at Building 11. (*Id.* ¶ 33.) PPG used the different floors for different purposes, allowing gravity to help move large amounts of both dry and liquid materials, and used pumps and piping to move liquids. (*Id.* ¶¶ 35–36.) PPG used both underground and aboveground storage tanks in Yard 124, located south of Building 11, to store raw materials such as arsenic acid, naphtha, and bichromate. (*Id.* ¶ 37.)

Barclay's expert, Michael Beck, testified that the "drivers" of contamination on the South Barclay parcel are metals, including arsenic, chromium (both hexavalent and trivalent), and lead; and both chlorinated and non-chlorinated VOCs.[2] (Jan. 26 Tr. at 1308–09.) Specifically, Beck testified regarding several isoconcentration maps created by Key that show concentrations of various compounds found in the soil, groundwater, and soil vapor on the South Barclay parcel. (*Id.* at 1315.) For example, Beck testified that xylene is a non-chlorinated VOC compound and component of naphtha, and naphtha was primarily used to support lacquer and oil-based paint manufacturing operations. (*Id.* at 1316, 1328.)

The Sanborn Fire Insurance map, dated 1940, depicts the Properties at issue. (Jan. 26 Tr. at 1330; Barclay Trial Ex. 79.02.) Beck testified that such maps were produced to assist the fire department with the handling of potential fires and are common throughout the

---

[2]Volatile organic compounds ("VOCs") are compounds that have a high vapor pressure and low water solubility. https://www.epa.gov/indoor-air-quality-iaq/what-are-volatile-organic-compounds-vocs (last visited Sept. 13, 2024). Many VOCs are human-made chemicals that are used and produced in the manufacture of paints, pharmaceuticals, and refrigerants. VOCs typically are industrial solvents, such as trichloroethylene ("TCE"); fuel oxygenates, such as methyl tert-butyl ether ("MTBE"); or by-products produced by chlorination in water treatment, such as chloroform. VOCs are often components of petroleum fuels, hydraulic fluids, paint thinners, and dry-cleaning agents. *Id.*

46

country and often used in environmental consulting. (*Id.*) The map depicts the presence of both underground and aboveground storage tanks. (Jan. 26 Tr. at 1328; Barclay Trial Ex. 97.02.) Beck testified that the map shows underground tanks are marked with broken lines, and aboveground tanks are marked with solid lines. (Jan. 26 Tr. at 1111–12.) Beck states that the map shows six 10,000-gallon naphtha tanks located on the South Barclay parcel, with the presence of broken lines indicating storage in underground tanks. (*Id.* at 1327–28.)

Beck then compared the Sanborn map to the isoconcentration map for xylene in soil and found high xylene concentrations at depths greater than four feet South of Building 11. (Jan. 29 Tr. at 1363, Docket # 319.) He stated that the highest xylene concentrations were located south of the building, immediately east of where the former tanks were located on the Sanborn map. (*Id.* at 1364.) Beck also testified that the isoconcentration maps show higher xylene concentrations at greater depths, consistent with a release from an underground, as opposed to an aboveground, storage tank. (*Id.*)

Beck did a similar comparison for arsenic and chromium. The Sanborn map depicts five arsenic acid tanks. (Jan. 26 Tr. at 1330; Barclay Trial Ex. 97.02.) Beck testified that when compared to the isoconcentration maps, the arsenic concentrations found in the soil and groundwater are highest near the former arsenic acid tanks depicted on the Sanborn fire insurance map. (*Id.* at 1334.) The same is true for chromium. The Sanborn map depicts tanks labeled "bichromate tanks." (Barclay Trial Ex. 97.02.) When compared to the isoconcentration maps, Beck testified that the highest concentrations of chromium and hexavalent chromium are found near the bichromate tanks on the Sanborn map. (Jan. 26 Tr. at 1334.) PPG stipulates that in 1964, it observed corrosion on four tanks located on the

47

Properties that had been used to store arsenic acid and removed the tanks from the Property. (Stip. PFOF ¶¶ 38–40.)

In addition to these contaminants, the South Barclay parcel is also contaminated with chlorinated VOCs, including TCE[3], located south and southeast of Building 11, and PCBs[4], located within the shallow soils south of Building 11. (Barclay Trial Ex. 196.) Scott Krall, PPG's current global director of environmental affairs, testified that he reviewed the company's historical documents and found no reference to TCE in the Milwaukee and Newark Raw Material code book from 1931. (Jan. 29 Tr. at 1590.) Nor was TCE referenced on the 1940 Sanborn map (*id.* at 1592–93), on the 1943 and 1947 dealer price schedules for the Corona Chemical Division (Jan. 29 Tr. at 1593–94; PPG Trial Exs. 1106, 1109), or on the 1951 Sanborn map (Jan. 29 Tr. at 1594; Barclay Trial Ex. 18). Krall further testified that a document from Pollution Controls, Inc., a transporter, or disposal facility, who took waste from PPG's Milwaukee plant, show that TCE was not present in PPG's disposed waste since 1950. (Jan. 29 Tr. at 1569–70; Barclay Trial Ex. 174.) Krall has seen no records indicating that TCE was shipped to the Milwaukee plant. (*Id.* at 1598.) However, Krall further testified that he has not seen records of *any* cleaning solutions used at PPG's Milwaukee facility over the 70-year operation. (*Id.* at 1628.)

---

[3] Trichloroethylene is a colorless liquid with a chloroform-like odor. Trichloroethylene is used in many industries. It is mostly used  as a solvent to remove grease from metal parts, but it is also an ingredient in adhesives, paint removers, typewriter correction fluids, and spot removers. https://archive.cdc.gov/#/details?url=https://www.cdc.gov/niosh/topics/trichloroethylene/default.html (last visited Sept. 13, 2024 ).
[4] PCBs are a group of man-made organic chemicals consisting of carbon, hydrogen, and chlorine atoms. PCBs were domestically manufactured from 1929 until manufacturing was banned in 1979. Due to their non-flammability, chemical stability, high boiling point and electrical insulating properties, PCBs were used in hundreds of industrial and commercial applications including as plasticizers in paints, plastics, and rubber products. https://www.epa.gov/pcbs/learn-about-polychlorinated-biphenyls#what (last visited Sept. 13, 2024).

Hydrite's expert, Mark Travers, testified that TCE is effective in removing semi-cured varnishes, paints, and resins and became the most common degreaser in the 1940s. (Feb. 1 Tr. at 2022.) He testified that from 1959 to 1960, PPG's production capacity of TCE was 45 million pounds. (*Id.* at 2025.) As of 1974, PPG and one other company provided approximately 79 percent of total TCE output and by 1983, only Dow and PPG remained as TCE producers. (*Id.* at 2025–26.)

Finally, while PCBs were found in building materials, they were only detected in the soil on the South Barclay parcel. (Barclay Trial Ex. 196.) Toni Schoen, formerly employed by Key, testified that their focus was on the PCBs found in the buildings; Key only collected limited soil samples after PCBs were identified in the buildings. (Jan. 24 Tr. at 716.) PPG's expert, Kurt Herman, testified that PCBs have not been identified as a contaminant of concern in the environmental media of the Properties, meaning the soil, water, and soil vapor. (Jan. 30 Tr. at 1768.) Herman further testified that based on his review of PPG's historical records, there was nothing indicating that PCBs were included in the ingredient lists or anything included in the process descriptions that describe the use of PCBs. (*Id.* at 1805.)

As to the East Oregon parcel, Beck testified that while there is widespread low concentrations of metals and PAHs in soil, the most significant impacts are related to chlorinated VOCs such as TCE. (Jan. 29 Tr. at 1371.) Again, three buildings are present on this parcel, Buildings 33, 34, and 35. (Stip. PFOF ¶¶ 41, 42, 44.) Building 34 has a concrete loading dock on the west side of the building. (*Id.* ¶ 42.) PPG manufactured lacquer and varnish products in Buildings 33 and 34 and built Building 35 to house 16 large aboveground storage tanks, which were used by PPG from the tanks' installation until 1975. (*Id.* ¶¶ 43–44.) PPG's internal documents indicate that a railroad spur at the second story level

49

immediately south of Building 34 was used to bring in railroad tank carloads of solvent that were pumped into the storage tanks in Building 35. (Barclay Trial Ex. 173.)

The chlorinated VOCs were found across the Property, with elevated concentrations in the soil located north of Building 34, off the Building 34 loading dock, and beneath Buildings 33 and 34; and in the groundwater between Buildings 33 and 34. (Barclay Trial Ex. 196.) TCE was also found in the soil vapor. (*Id.*) For Building 33, TCE impacts are most elevated beneath northwest and southeast portions of building and for Building 34, TCE impacts are most elevated in the west and central samples, with concentrations slightly decreasing towards the east end of the building. (*Id.*)

VOCs, including naphtha[5], were detected in soil across the Property, with elevated concentrations beneath and between Buildings 33 and 34, as well as adjacent to Building 35. Isolated naphthalene impacts were found in the northwest corner of the Property. (*Id.*) Metals, such as arsenic and lead, were also found in the soil and groundwater. (*Id.*) The metals were found in the soil across the Property, with the most elevated concentrations of arsenic and lead found by the rail spur and on the west side of the Property and the most elevated concentrations of chromium in the vicinity of the northwest loading dock and between

---

[5] PPG argues that naphtha is a "petroleum-based solvent," that CERCLA has a petroleum exclusion, and that no testing or sampling was done to determine whether certain constituents on the Properties were attributable to something other than petroleum. (PPG's Proposed Findings of Facts ¶¶ 33, 49–50.) Thus, PPG argues that any costs associated with the cleanup of petroleum products should be excluded from the future costs. (PPG's Proposed Conclusions of Law ¶ 34(b)).

    It is true that the definition of "hazardous substance" specifically excludes material that is "petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance." 42 U.S.C. § 9601(14). However, once a plaintiff alleges and provides supporting evidence of a release or threatened release of hazardous substances, "the party asserting the benefit of the petroleum exclusion (usually the defendant) bears the burden of proof on that issue." *Premcor Ref. Grp., Inc. v. Apex Oil Co., Inc.*, No. 3:17-CV-00738-NJR, 2024 WL 1345628, at *4 (S.D. Ill. Mar. 29, 2024). Courts have generally applied the petroleum exclusion when the environment has been contaminated by "nothing other than unadulterated petroleum" as opposed to petroleum comingled with other hazardous substances. *Id.* (internal quotation and citation omitted). PPG improperly attempts to shift its burden of proof on the petroleum exclusion to Barclay. PPG has made no effort to demonstrate that the petroleum exclusion applies. Thus, I will not consider it.

Buildings 33 and 34. (*Id.*) The elevated metals were located in the groundwater north of Building 34 and adjacent to the rail spur, between Buildings 34 and 35. (*Id.*)

Given this evidence, I allocate 50 percent of future response costs to PPG. Several factors lead me to this conclusion. First, not only did PPG own the Properties for significantly longer than any other party, but it owned the Properties for the majority of a century devoid of environmental regulation. Again, PPG's ownership spanned the 70-year period between 1905 and 1975. The WDNR was not created until 1968, and the Environmental Protection Agency was formed in 1970.[6]

Michael Denesha began working for Wayne Chemical in 1970. (Jan. 25 Tr. at 961.) Denesha testified how technology and equipment improved in the later part of the century. He explained that Wayne Chemical made multiple improvements to the operations in the 1980s, including replacing wooden storage tanks with stainless steel ones, replacing tanks that were open with tanks that were enclosed, and replacing the filter presses with "state of art" ones. (*Id.* at 984, 987, 993.) He testified that in the late 1970s and 1980s "environmental laws kept changing" and a company had to respond, "or you didn't stay in business." (*Id.* at 998.) Denesha testified that filtering and dust collection improved greatly in the 1970s and 1980s, leading to much cleaner operations. (*Id.* at 998–99.) Thus, it stands to reason that operations conducted during a period of no environmental oversight and less sophisticated equipment would produce greater pollution and less record-keeping documenting the pollution. This is not meant as an aspersion on PPG, but simply an acknowledgement of how business was conducted pre-environmental regulations.

---

[6]https://dnr.wisconsin.gov/wnrmag/2021/Spring/Timeline (last visited Sept. 13, 2024); https://www.federalregister.gov/agencies/environmental-protection-agency (last visited Sept. 13, 2024).

Furthermore, Denesha testified as to his personal observations of the state of the Properties in 1975. (*Id.* at 962–63.) Denesha testified that his first visit to the Properties came the day after Edward Wex, Wayne Chemical's owner, announced to his employees that the company purchased PPG's pigment operation. (*Id.*) Denesha testified that he observed tanks on the property with a "fair amount" of orange at the base on the dirt and noted that none of the tanks were sitting on concrete. (*Id.* at 964.) As he started getting involved with the company, Denesha learned the tanks were sodium bichromate tanks. (*Id.*) Denesha testified that the first time he entered Building 11 was in 1975 after Wayne Chemical purchased it and described the operation as "old" and "kind of dirty, dusty." (*Id.* at 966.) He testified that the walls were stained yellow and orange. (*Id.*) He further testified that Wayne Chemical initially continued PPG's pigment operations, and that lead chromates, zinc chromates, and strontium chromate are all yellow pigments PPG made. (*Id.* at 969.)

Second, with the exception of PCBs and TCE, PPG admits to using multiple of the contaminants currently found on the Properties, including arsenic, chromium, and xylene. (Stip. PFOF ¶ 37.) PPG acknowledges that its arsenic tanks corroded and needed to be removed and disposed of off-site. (*Id.* ¶¶ 38–39.) The 1940 Sanborn map confirms PPG's storage of arsenic, chromium, and xylene on the Properties and current isoconcentration maps of these contaminants in soil and groundwater correspond to where these chemicals were stored on the Properties. In other words, it is clear that PPG bears responsbility for this contamination.

PPG asserts, however, that there is no evidence that PPG used TCE or PCBs at the Properties. PPG points primarily to the lack of reference to either compound in PPG's historical documents. For example, it is not mentioned on the Sanborn maps or in various

materials lists. (PPG's Proposed Conclusions of Law ¶ 63.) And PPG's current global director of environmental affairs, Krall, testified that he found no reference to these compounds in the Milwaukee and Newark (Milwaukee's sister plant with similar operations) plants' materials books. (Jan. 29 Tr. at 1590.) But a lack of *direct* evidence of PPG's use of these products does not mean that *no* evidence exists. "CERCLA liability may be inferred from the totality of the circumstances; it need not be proven by direct evidence." *Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 886, 892 (10th Cir. 2000). As the Tenth Circuit stated, this is "especially true under . . . circumstances . . . [where] eyewitness testimony or other direct evidence concerning specific waste disposal practices . . . during the 1940s—well before the enactment of environmental laws—is rarely available." *Id.*

In this case, the circumstantial evidence supports PPG's use of these compounds. The lack of documentation is unsurprising given the absence of environmental oversight during this time frame. And as to TCE, Krall testified that he had not seen records of *any* cleaning solutions used at PPG's Milwaukee facility over the 70-year operation. (Jan. 29 Tr. at 1628.) But PPG certainly must have used *some* sort of cleaner, and TCE was the most common degreaser in the 1940s and PPG was one of the largest producers of TCE during relevant period. (Feb. 1 Tr. at 2022, 2025.) It is highly unlikely that PPG would not have used TCE at all. And as to PCBs, they were domestically manufactured from 1929 until manufacturing was banned in 1979. Thus, for the majority of the Properties' ownership subsequent to PPG's, PCBs were not being manufactured. Again, it is highly unlikely that PPG bears no responsibility for PCBs.

I note, however, that PCBs are not a major contaminant on the Properties. PCBs were only detected in the soil on the South Barclay parcel and were not identified as a contaminant

of concern in the soil, water, and soil vapor. (Jan. 30 Tr. at 1768; Barclay Trial Ex. 196.) PCBs have likely become a strong focus for the parties because the highest concentrations are found in the building materials themselves. But again, it is unclear at this juncture whether costs associated with the buildings themselves (including demolition) will be recoverable under CERCLA.

Thus, while the evidence tying PPG to the use of TCE and PCBs could be stronger, the evidence that PPG did use multiple other chemicals currently contaminating the Properties is undisputed. This supports assigning PPG a significant portion of liability for the Properties' remediation costs.

Finally, PPG bears greater liability for its failure to take responsibility for the environmental harm it caused. It is significant that all defendants, except for PPG, have settled with Barclay. *Davis*, 31 F. Supp. 2d at 63 (stating that a common factor taken into account in assessing liability is "the efforts made to settle the case"). PPG focuses too heavily on its argument that PCBs and TCE are "currently driving remediation costs at the Properties" and that this is where Barclay's direct evidence against it is weakest. (PPG's Proposed Conclusions of Law ¶ 66.) PPG's concern that Barclay is simply trying to use CERCLA to build new apartment complexes on PPG's dime (PPG's Post-Trial Br. at 1) has obfuscated the matter at hand—cleaning up the environment. It is entirely unclear at this juncture whether the buildings will need to be razed or repaired; nor is it clear that PPG will ultimately bear any of the cost of this. What is clear, however, is that the groundwater, soil, and soil vapor on the Properties are contaminated and are contaminated with hazardous substances that PPG admits it used. And in PPG's Form 10-K filed with the United States Securities and Exchange Commission for fiscal year 2022, it specifically states that the

54

company has $217 million currently reserved for environmental remediation efforts and that "Management believes that the outcome of these environmental contingencies will not have a material adverse effect on PPG's financial position or liquidity." (Jan. 26 Tr. at 1271; Barclay Trial Ex. 162.) Given PPG admits it polluted the Properties and the fact the company has funds specifically earmarked for addressing such remediation, it is entirely unclear why PPG was not more willing to settle and expedite the Properties' cleanup.

For these reasons, PPG is allocated 50 percent liability for future response costs.

### 3.4.2    Hydrite

The extent of Hydrite's liability is largely uncontested. Hydrite only owned the East Oregon parcel from 1976 until 1985 and agrees it used Building 34 to store hazardous waste, including TCE, per a permit issued by the EPA. (Stip. PFOF ¶¶ 17, 46–53.) Hydrite did not store phosphoric acid, arsenic, PCBs, or chromium. (Jan. 25 Tr. at 909.) Hydrite's EPA permit was issued in June 1982 and Hydrite ceased using Building 34 and sought to close its permit in 1985. (Stip. PFOF ¶¶ 50, 56.) The hazardous waste was stored in Building 34 in 55-gallon steel drums before being shipped to Hydrite's reclamation facility in Cottage Grove, Wisconsin. (*Id.* ¶ 54.) The WDNR inspected Hydrite's operations and required Hydrite to investigate potential contamination—including potential chlorinated solvent contamination at and around Building 34. (*Id.* ¶ 57.)

As part of Hydrite's request to close the storage facility, the EPA completed a RCRA facility assessment. (Barclay Trial Ex. 49.) The report documented that Hydrite received several violations, including keeping incomplete operating records. (*Id.*) The report described the storage of waste products in Building 34, noting that the 55-gallon drums were stacked up to three drums high, the storage area was not diked to provide secondary containment, and

the concrete floor had a few cracks. (*Id.*) The report stated that given the setup of the outside ramp, spills near the door or on the ramp would have drained into the soil adjacent to the opening. (*Id.*) Also, the area around the loading dock was not curbed and the soils around the dock could be contaminated due to leaks on the dock's surface. (*Id.*) The report also recorded known and suspected releases during Hydrite's tenure on the East Oregon parcel. (*Id.*) The EPA recommended soil samples be collected and analyzed for VOCs in the container storage area of Building 34. (*Id.*)

Hydrite engaged an environmental consultant, Hydro-Search, Inc., to assist with its investigation. (Stip. PFOF ¶ 58.) Among other activities, Hydro-Search's investigation involved collecting various samples of soil around and near Building 34, including at the loading dock and along the north wall of the building. (*Id.*) Hydro-Search's investigation found sporadic low levels of VOCs in the soil along Building 34 and the loading dock. (Hydrite Trial Ex. 2040.) In May 1988, the WDNR approved Hydrite's closure of the facility and determined "that corrective action will not be required at this time," though noted that the EPA "could come in at some time in the future if it is determined that corrective action is required." (Hydrite Trial Ex. 2044.)

Key's testing of the soil and groundwater on the East Oregon parcel indicated elevated levels of TCE north of Building 34, off of the Building 34 loading dock, and beneath Building 34. (Barclay Trial Ex. 196.) The isoconcentration map of TCE in the soil shows high concentrations of TCE beneath Building 34, as well as TCE in the groundwater underneath, and slightly north, of Building 34. (*Id.*)

Based on this evidence, I allocate 20 percent liability for future response costs to Hydrite. While Hydrite's tenure on the Properties was limited both in duration and in type of

contamination caused, the TCE contamination is not insignificant. Beck testified that the TCE contamination goes deep—with substantial concentrations from the zero to two-foot interval all the way to the six to eight-foot interval, reaching the groundwater. (Jan. 29 Tr. at 1373.) And these concentrations are located beneath and slightly north of Building 34, the WDNR's areas of concern in the 1980s. While Hydrite's plant engineer during the relevant period, Charles Clarke, testified that the WDNR was wrong about several items in the report, including whether the tank storage area was diked to prevent run-off and whether there were cracks in the cement floor (Jan. 25 Tr. at 920, 922–23), there is no reason to credit Clarke's recollections some forty years later over the contemporaneous observations of the WDNR inspector.

I am also not convinced, however, that Hydrite is responsible for the entirety of the TCE contamination. Again, TCE was found on both parcels, including the South Barclay parcel that Hydrite did not own or operate. As explained above, I find it highly probable that PPG is at least partially responsible for the TCE contamination. Thus, I find allocating Hydrite 20 percent liability of future response costs equitable.

### 3.4.3 Wayne Chemical, Wayne Pigment/MD Fifth Ward, and Lumimove

The Properties were owned and operated by various "Wayne entities" from 1975 until 2017. As to the South Barclay parcel, Wayne Chemical purchased the property from PPG in 1975. (Stip. PFOF ¶ 62; Jan. 25 Tr. at 962.) In 1984, Wayne Pigment purchased Wayne Chemical's assets and then-current liabilities, which included accounts payable and accrued profit-sharing and pension liabilities—not "environmental" liabilities. (Hydrite Trial Ex. 2260.) Wayne Pigment acquired the South Barclay Parcel in 1984 from Wayne Chemical. (Stip. PFOF ¶ 20.) Wayne Pigment changed its name to WPC Technologies in 2011 and

57

WPC Technologies changed its name to MD Fifth Ward Properties in 2012. (*Id.* ¶¶ 21–23.) Lumimove bought WPC Technologies' assets in 2012 but did not buy the Properties. (*Id.* ¶ 24.) Lumimove, however, leased and operated the Properties under the name "WPC Technologies" from 2012 to 2015 while MD Fifth Ward continued to own the Properties. (*Id.* ¶¶ 24–25.) In January 2017, Sherman affiliate PPG GP LLC acquired the parcel from MD Fifth Ward. (*Id.* ¶ 26.)

As to the East Oregon parcel, Wayne Pigment acquired the property from Hydrite in 1985. (*Id.* ¶ 21.) From 1985 until 2017, the East Oregon parcel was owned and operated by some form of Wayne Pigment (i.e., WPC Technologies, MD Fifth Ward). PPG GP purchased the East Oregon parcel in January 2017. (*Id.* ¶ 26.)

As an initial matter, PPG argues that the "Wayne Entities" should bear 19 percent of the liability for future response costs. (PPG Proposed Conclusions of Law ¶ 62.) Barclay argues, however, that there is no legal basis to group Wayne Chemical, Wayne Pigment, and Lumimove together. As to Wayne Chemical and Wayne Pigment, Barclay argues the two observed corporate formalities and were separately registered. (Barclay Post-Trial Br. at 27.) Barclay argues that the only way to impute liability between Wayne Chemical and Wayne Pigment is through alter ego liability or direct operator liability, and PPG has proved neither. (*Id.* at 26.)

I agree that there is no basis on which to conflate Wayne Chemical, Wayne Pigment, and Lumimove. While Wayne Pigment is the same as WPC Technologies and MD Fifth Ward, there is no evidence that Wayne Chemical and Wayne Pigment are alter egos. Nor should Lumimove be grouped together with the other "Wayne entities." Lumimove never owned the Properties, but leased and operated the Properties from 2012 to 2015. PPG does

58

not argue alter ego theory. Rather, it appears PPG groups the "Wayne Entities" together because with the exception of Lumimove, none of the other entities are currently parties to the lawsuit and Barclay has assumed their share of liability. (PPG Proposed Conclusions of Law ¶ 62 n.496.) Thus, I will address Wayne Chemical, Wayne Pigment, and Lumimove separately.

### 3.4.3.1 Wayne Chemical

Wayne Chemical never owned or operated the East Oregon parcel. Rather, Wayne Chemical owned and operated the South Barclay parcel for approximately ten years, immediately after PPG. During this period from approximately 1975 to 1984, Wayne Chemical continued PPG's dry color operations business. (Stip. PFOF ¶ 19.)

Michael Denesha worked for Wayne Chemical and then for Wayne Pigment from 1970 until his retirement in 2012. (Jan. 25 Tr. at 961.) Denesha held various positions during this time, beginning as a batch operator, then maintenance supervisor, vice president of engineering, and eventually president. (*Id.*) Denesha testified that Wayne Chemical manufactured strontium chromate, zinc chromate, lead chromates, and moly oranges in Building 11 (*id.* at 1002) and stored the bulk of its raw materials, including nitric acid, sodium hydroxide, sulfuric acid, muriatic acid, and chromium, outside in aboveground storage tanks (*id.* at 1004). Specifically, Denesha testified that chromium was generated, handled, stored, and used on the South Barclay parcel during Wayne Chemical's ownership and operation. (Jan. 26 Tr. at 1083–84.)

Denesha testified that when Wayne Chemical purchased the South Barclay property from PPG, he observed yellow and orange staining on the interior of Building 11 (Jan 25 Tr. at 966–67), as well as wooden tanks with open tops (*id.* at 981). He testified that Wayne

59

Chemical removed the wooden tanks and replaced them with stainless steel ones that are less prone to leaking. (*Id.* at 984.)

Given the lack of evidence that Wayne Chemical contributed to the contamination of the South Barclay parcel during its brief ownership and given the evidence Wayne Chemical improved the conditions on the property to reduce the possibility of contamination, I assign Wayne Chemical zero percent of liability for future response costs.

### 3.4.3.2 Wayne Pigment/MD Fifth Ward

Wayne Pigment owned and operated both Properties from 1985 until 2017. Wayne Pigment's operations at the East Oregon Parcel consisted of office and laboratory space, storage, and beginning sometime in the 1990s, a zinc phosphate manufacturing operation in Building 34. (Stip. PFOF ¶ 66.) Specifically, Denesha testified that the first floor of Building 33 was used to store finished goods and that the laboratory was built on the third floor in the 1990s, while the zinc phosphate operation was in Building 34, utilizing all three floors. (Jan. 25 Tr. at 1021.) Wayne Pigment did not use Building 35. (*Id.*)

In the laboratory on the third floor of Building 33, Wayne Pigment made small batches of paint to assist in the pigment manufacturing process. (Jan. 26 Tr. at 1093.) Specifically, customers would "give us a formula as to what . . . they wanted . . . [and] they wanted the formula tested at our place before we shipped pigment to them." (*Id.*) Wayne Pigment engaged a company called Safety-Kleen to supply and dispose of chlorinated solvents, including tetrachloroethene ("PCE"), for a piece of equipment called a "parts washer" that Wayne Pigment had on the third floor of Building 33. (Stip. PFOF ¶ 67.)

Denesha testified that while Wayne Pigment did not use TCE, arsenic, cyanide, or cadmium, in the late 1990s or early 2000s, the company was utilizing various VOCs including

strontium chromate and toluene. (Jan. 25 Tr. at 1022–23.) The VOCs were stored in tanks within a containment system. (*Id.* at 1023–24.) Wayne Pigment also used hexavalent chromium in its operations. (*Id.* at 1025.) Denesha denied any major spills during his tenure with Wayne Pigment, however, he acknowledged there might have been some minor spills of hexavalent chromium. (*Id.* at 1029.)

As to the South Barclay parcel, Denesha testified that chromium was generated, handled, stored, and used on the property during both Wayne Chemical's and Wayne Pigment's ownership and operation. (Jan. 26 Tr. at 1083–84.) Lead chromate was also used until the mid-1990s and hexavalent chromium from 1975 through 2012. (*Id.* at 1084.) Michael Checker was hired by Wayne Chemical in 1981. In 1988, Checker began working on the fifth floor in Building 11, the filtration floor. (*Id.* at 1117–18.) Checker testified that Wayne Pigment used aboveground storage tanks on the south end of Building 11. (*Id.* at 1123.) Checker stated that Wayne Pigment had two, 25,000-gallon tanks of sodium dichromate; two nitric tanks; and a caustic tank. (*Id.* at 1124.) Both Denesha and Checker testified that the tanks were enclosed in a containment system, which Denesha testified was made of reinforced concrete and built in the late 1980s. (Jan. 25 Tr. at 1017; Jan. 26 Tr. at 1124.) Both also testified that no major leaks or ruptures of these tanks occurred during their employment with Wayne. (Jan. 25 Tr. at 1017; Jan. 26 Tr. at 1124.)

Denesha testified that in 2006, Wayne Pigment was "looking to get a new bank" and the bank required environmental testing. (Jan. 25 Tr. at 1019.) Wayne Pigment hired Drake Environmental to conduct testing at the Properties. (*Id.*) Denesha states that Wayne Pigment first learned of environmental contamination through Drake's testing. (*Id.* at 1020.) Denesha testified that he does not believe Wayne was the cause of any of the contamination. (*Id.*)

61

Despite both Denesha's and Checker's testimony that no major spills occurred during Wayne Pigment's ownership of the Properties, and despite Denesha's contention that he was unaware of the contamination until Drake's testing, the trial evidence shows that in the early 1990s, Wayne Pigment was cited for various violations by the WDNR and Denesha was involved in the investigation. (PPG Trial Ex. 1124.) Specifically, in March 1992, the WDNR noted that approximately 200,000 gallons of liquid contaminated with approximately 450 pounds of hexavalent chromium was discharged to the sanitary sewer per day. (*Id.*) A wastewater stream contaminated with lead was treated to remove the lead from the liquid and liquid was then discharged to the sanitary sewer. (*Id.*) The WDNR further noted that the lab generated one 55-gallon drum a year of a toluene/isopropyl/lacquer thinner mix and that two drums containing the product waste were located in a room east of the lab. (*Id.*) One of the drums had an open top with a funnel and neither drum was dated or labeled. (*Id.*)

The WDNR noted a concrete slab with "soil like material on it" located on the southeast corner of Building 11 that was significantly stained yellow, as was a vent located on the south wall of the building. (*Id.*) In April 1993, based on the March 1992 investigation, the WDNR cited Wayne Pigment for several violations on the South Barclay parcel, including lead found near the railroad track and chromium near a vent. (Jan. 25 Tr. at 1031; PPG Trial Ex. 1124.) In June 1993, the WDNR sent a memorandum to Wayne Pigment confirming that soil samples from the yellow-stained areas tested positive for chromium. (PPG Trial Ex. 1124.) The inspectors found Building 11 "heavily contaminated with pigments composed of heavy metals," and expressed concern regarding storage of waste pigment drums. (*Id.*)

I allocate 20 percent liability for future response costs to Wayne Pigment. As with Hydrite, while Denesha and Checker dispute the WDNR's findings from the early 1990s, I

credit the contemporaneous observations of the WDNR inspector and testing results from the relevant period over Denesha's and Checker's recollections some thirty years later. Wayne Pigment owned and operated the Properties for a significant period of time—approximately 32 years. And during this period, the WDNR reports show poor storage habits of hazardous waste and contamination of the soil. Wayne Pigment does not dispute that it used multiple of the hazardous chemicals, such as hexavalent chromium, that are now contaminating the Properties. Twenty percent is an equitable share for Wayne Pigment to shoulder.

Wayne Pigment, however, was dissolved in 2017 and is no longer a party to this lawsuit. (Stip. PFOF ¶ 64.) "When a court cannot 'assign an ideal measure of monetary responsibility to an otherwise responsible party'—because, for example, that party is immune from suit, bankrupt, or defunct—this gives rise to an orphan share." *Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Env't Prot.*, 725 F.3d 369, 380 n.4 (3d Cir. 2013) (quoting *United States v. Kramer*, 953 F. Supp. 592, 595 (D.N.J. 1997)). "A court may equitably allocate orphan shares among liable parties at its discretion." *Id.* Given Barclay's settlement with Wayne Pigment's insurer and its agreement to release its claims against Wayne Pigment (PPG Trial Ex. 1224), I find it equitable to assign Wayne Pigment's 20 percent "orphan's share" to Barclay and Sherman.

### 3.4.3.3 Lumimove

Lumimove never owned either of the Properties. Rather, Lumimove leased and operated the Properties for approximately three years, between 2012 and 2015. (Stip. PFOF ¶ 25.) Lumimove continued Wayne Pigment's operations during this time. (*Id.* ¶ 70.) In 2015, the WDNR received a complaint that Wayne Pigment was illegally dumping hazardous waste. (PPG Trial Ex. 1324.) Inspectors visited Building 11 on the South Barclay parcel;

63

however, much of the equipment had already been moved in anticipation of the Properties' sale. (*Id.*) Inspection showed yellow staining on the walls and floor throughout the facility that inspectors were told was strontium chromate. (*Id.*)

Very little evidence was presented at trial as to Lumimove's contribution to the contamination of the Properties. Thus, I find it equitable to assign zero percent of future response costs to Lumimove. I base this conclusion on the fact that Lumimove never owned the Properties and its operations on the Properties was very brief. Most importantly, however, is the lack of evidence that Lumimove contributed to any of the pollution. While strontium chromate staining was found on the walls during Lumimove's tenure at Building 11, there is no indication that Lumimove, rather than Wayne Pigment, caused the staining.

In short, as to the "Wayne entities," Wayne Pigment/MD Fifth Ward is assigned 20 percent of future response costs, while Wayne Chemical and Lumimove are assigned zero percent.

### 3.4.4 Barclay and Sherman

Finally, I allocate 10 percent liability for future response costs to Barclay and Sherman. It is undisputed that Barclay purchased the Properties in a polluted state. Unlike PPG, Hydrite, and Wayne Pigment, Barclay does not use contaminants such as hexavalent chromium as part of its business operations. Thus, there is no evidence that Barclay caused the original pollution on the Properties. Barclay was, however, fully aware of the extent of the contamination. Key conducted extensive testing on Barclay's behalf prior to Barclay's purchase of the Properties. Furthermore, Barclay's counsel, in negotiating the final sale of the Properties, specifically stated that Barclay's "latest estimate" to clean up the Properties was $2.5 million. (PPG Trial Ex. 1366.) In requesting a purchase price reduction to $500,000,

64

Barclay's counsel noted the "many redevelopment challenges facing" the Properties. (*Id.*) In other words, Barclay purchased the Properties with its eyes open to the extent of environmental contamination.

Even if it did not cause the pollution, PPG argues that Barclay exacerbated the pollution by failing to maintain the Properties. (PPG's Proposed Findings of Fact ¶¶ 245–67.) While it is unclear whether any of Barclay's actions or inactions related to the structures sitting on the two parcels specifically contributed to further pollution of the soil vapor, soil, and groundwater, Barclay certainly shares some responsibility for allowing the Properties to remain in their polluted state without a remediation plan in place. Once again, the parties are stymied by hypothetical costs associated with the buildings themselves, despite Barclay's acknowledgment that this issue is a lawsuit for another day. And in the meantime, the groundwater, soil vapor, and soil sit polluted. Barclay could have begun efforts to clean up the environment; however, Barclay continues to have no remediation plan in place. Given Barclay's knowledge of the level of pollution prior to purchase and its inaction cleaning up the environment since the purchase, allocating Barclay and Sherman 10 percent of liability for future response costs is equitable.

#### 4. *Hydrite's Request for a Contribution Bar*

Although Barclay originally sued several former owners and operators of the Properties, it has entered into settlements with all of them except for PPG. (Barclay's PFOF ¶¶ 15, 392.) These settlements include Barclay indemnifying the former defendants for contribution claims against them. (*See* Declaration of Thomas H. Boyd ¶ 3, Ex. A, Docket # 83-1 at 10.) In other words, Barclay has assumed the responsbility of all parties other than PPG, leaving Barclay and PPG as effectively the only PRPs in the case.

In December 2023, Barclay and Hydrite entered into a settlement in principle resolving the parties' claims. Hydrite agreed to pay Barclay $550,000.00 for past costs and to fund an escrow account in the amount of $3 million to pay for future costs incurred to address TCE and other chlorinated solvent contamination on and under the East Oregon Parcel. (Docket # 218-1.) Hydrite seeks to invoke the so-called "contribution bar" found in § 9613(f)(2), which provides as follows: "A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. § 9613(f)(2). While this statute expressly applies to settlements with federal or state governments and is silent as to its applicability to private party settlements, courts in this circuit have "interpreted this language expansively, finding that 'private settling parties are [also] protected from claims for contribution which may be brought by other PRP's.'" *Lusher Site Remediation Grp. v. HMS Elkhart, LLC*, No. 3:18-CV-506, 2021 WL 5356105, at *2 (N.D. Ind. Nov. 16, 2021) (quoting *United States v. SCA Servs. of Indiana, Inc.*, 827 F. Supp. 526, 532 (N.D. Ind. 1993)). In so finding, courts recognize "a strong federal interest in promoting settlement," which is "especially pronounced in complex matters such as CERCLA claims, where the amount of evidence to be gathered for assessing liability is voluminous. It is hard to imagine that any defendant in a CERCLA action would be willing to settle if, after the settlement, it would remain open to contribution claims from other defendants." *Allied Corp. v. ACME Solvent Reclaiming, Inc.*, 771 F. Supp. 219, 222 (N.D. Ill. 1990).

When determining whether to approve a settlement, the Court considers if the settlement is: (1) fair and adequate; (2) reasonable; and (3) faithful to the objectives of CERCLA. *Lusher*, 2021 WL 5356105, at *3. Approval of a settlement is "committed to the

trial court's informed discretion." *SCA Servs. of Indiana*, 827 F. Supp. at 532 (internal citation omitted).

### 4.1    Fair and Adequate

Whether a settlement is fair and adequate considers both procedural and substantive fairness. *Id.* As to procedural fairness, Hydrite argues that both parties negotiated primarily through counsel for approximately 18 months. (Hydrite's Post-Trial Br. at 19, Docket # 323.) John Honkamp, Hydrite's current chairman of the board, testified that the parties' settlement negotiations were at arm's length and hard fought, with counsel on both sides zealously advocating for their respective clients. (Feb. 1 Tr. at 1959–60.) I agree that the settlement was procedurally fair. *See Lusher*, 2021 WL 5356105, at *3 (finding the settlement procedurally fair because "the parties were each represented by counsel and reached the agreement after a lengthy mediation process").

As to substantive fairness, the driving issue in this case is the impact on non-settling parties, specifically PPG. *See id.* ("One issue that can often arise with these types of settlements between a private party seeking contribution and a defendant is the impact on non-settling parties."). As one court in this circuit explained, this issue arises "because a claim for contribution under 113(f)(1) of CERCLA necessarily requires allocation . . . [t]herefore, when one party settles, and is allocated a certain amount of liability, other parties' liability can be impacted depending on the method of apportionment a Court uses." *Id.* (internal citation omitted). And the Seventh Circuit uses the pro tanto approach to reduce the share of non-settling parties' liability following Court approval of a settlement. *Id.*; *Garrison Southfield Park LLC v. Closed Loop Ref. & Recovery, Inc.*, No. 2:17-CV-783, 2021 WL 4397865, at *4 (S.D. Ohio Sept. 27, 2021) ("The Seventh Circuit mandates application of the pro tanto approach in

private-party CERCLA cases."). Under this approach, when a private litigant bringing a claim under CERCLA has settled with a defendant, it reduces the liability of the non-settling parties by the actual cash value of the settlements. *Akzo Nobel Coatings, Inc. v. Aigner Corp.*, 197 F.3d 302, 308 (7th Cir. 1999).

The crux of PPG's argument is that given the uncertainty of any future response costs, there is no way of knowing whether the $3 million Hydrite agreed to pay for future response costs will be sufficient. It is true that at this juncture, it is unknown the precise dollar amount of future response costs. However, the highest future remediation estimates presented at trial included a number of variables, such as a need to demolish the buildings, and ranged from $8.36 million to $18.89 million. (Jan. 25 Tr. at 850–51.) Hydrite is only liable for twenty percent of the future response costs. Even considering the highest number in an extraordinarily large range—approximately $18 million—amounts to a liability of only $3.6 million for Hydrite (twenty percent of $18 million). PPG, on the other hand, is liable for fifty percent of the future response costs. PPG would only be entitled to contribution from Hydrite if and when it pays more than its fair share, as determined by each party's percentage of fault. *Appleton Papers Inc. v. George A. Whiting Paper Co.*, 572 F. Supp. 2d 1034, 1044 (E.D. Wis. 2008). Given the highest estimate for future response costs presented and Hydrite's allocation of twenty percent of the future response costs, it is highly unlikely that after reducing PPG's liability by the dollar amount of the settlement, that PPG will still have a collectible contribution claim against Hydrite. For these reasons, I find the settlement adequate and fair.

### 4.2 Reasonable

The settlement must also be reasonable. In evaluating reasonableness, the Court considers the foreseeable litigation risks and transaction costs associated with litigation as well

68

as the likely efficaciousness of the settlement as a vehicle for cleansing the environment; the extent to which it satisfactorily compensates the public for actual and anticipated costs of remedial and response measures; and the relative strength of the parties' litigating positions. *Lusher*, 2021 WL 5356105, at *4. Considering these factors, I find that the settlement is reasonable. Once again, Hydrite is only liable for twenty percent of future response costs and only when utilizing the highest estimate does $3 million fall short of twenty percent. Furthermore, this $3 million is ready and available to begin remediating the environment, which is the ultimate goal of CERCLA. Thus, the settlement is also reasonable.

### 4.3    Faithful to Objectives of CERCLA

Finally, the settlement must be faithful to the objectives of CERCLA. Congress enacted CERCLA for two purposes: (1) to "establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites" and (2) "to shift the costs of cleanup to the parties responsible for the contamination." *Metro. Water Reclamation Dist. of Greater Chicago v. N. Am. Galvanizing & Coatings, Inc.*, 473 F.3d 824, 827 (7th Cir. 2007). Hydrite has taken responsbility for a portion of the contamination at the Properties given its past actions. And, as stated above, the $3 million will serve the purpose of remediating the environmental damages. In other words, this settlement serves the purposes of CERCLA.

### 4.4    Conclusion

For these reasons, I approve the settlement agreement between Barclay and Hydrite as it is fair, reasonable, and consistent with the objectives of CERCLA. Thus, I grant Hydrite's motion to bar contribution claims.

### 5. *RCRA Claim*

#### 5.1  Relevant Law

Barclay also brings a claim against PPG under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a). Passed in 1976, "RCRA is a comprehensive environmental statute that empowers [the] EPA to regulate hazardous wastes from cradle to grave." *Liebhart v. SPX Corp.*, 917 F.3d 952, 957 (7th Cir. 2019) (internal quotation and citation omitted). Unlike CERCLA, RCRA is not principally designed to effectuate the cleanup of toxic waste sites or to compensate those who have attended to the remediation of environmental hazards. *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996). Rather, RCRA's primary purpose is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, "so as to minimize the present and future threat to human health and the environment." *Id.* (citing 42 U.S.C. § 6902(b)). Congress "deliberately limited RCRA's remedies to injunctive relief—more specifically, injunctive relief obtained before the property is cleaned up, while the danger to health or the environment is 'imminent and substantial.'" *Avondale Fed. Sav. Bank v. Amoco Oil Co.*, 170 F.3d 692, 694 (7th Cir. 1999) (quoting 42 U.S.C. § 6972(a)(1)(B)). RCRA does not allow a party to recover cleanup costs. *Id.*

While the "[c]hief responsibility for the implementation and enforcement of RCRA rests with the . . . EPA, . . . like other environmental laws, RCRA contains a citizen suit provision, § 6972, which permits private citizens to enforce its provisions in some circumstances. *Meghrig*, 516 U.S. at 483–84. Specifically, RCRA provides for two distinct types of citizen suits: "violation" actions under 42 U.S.C. § 6972(a)(1)(A), and "endangerment" actions under 42 U.S.C. § 6972(a)(1)(B). *Grossmanns6 Fam. Real Est. LLC v.*

*Great Lakes Synergy Corp.*, No. 20-CV-905, 2020 WL 6392867, at *7 (E.D. Wis. Nov. 2, 2020).

Barclay states that its citizen suit is an endangerment action under § 6972(a)(1)(B). (Barclay's Post-Trial Br. at 9.) As relevant here, the statute provides that:

> [A]ny person may commence a civil action on his own behalf . . . against any person . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C.A. § 6972(a)(1)(B). The section authorizes district courts to grant injunctive relief and "order [a violator] to take such other action as may be necessary" to remediate the endangerment. *Liebhart*, 917 F.3d at 958. To succeed on a RCRA claim, a plaintiff must show that: (1) the defendant has generated solid or hazardous waste; (2) the defendant is contributing to or has contributed to the handling of this waste; and (3) this waste may present an imminent and substantial danger to health or the environment. *Id.*

### 5.2    Imminent and Substantial Danger

In this case, PPG challenges the third element of Barclay's RCRA claim. (PPG Post-Trial Br. at 32.) PPG argues that it is not enough for Barclay to show that the Properties are currently contaminated. (*Id.*) Rather, it must establish that the contaminants present an imminent and substantial danger to health or the environment. (*Id.*) PPG argues that the "only threat the contamination presents is to Barclay's preferred business use of the Properties." (*Id.* at 34.)

While RCRA states that the contaminant's endangerment must be "imminent," imminent does not necessarily equate to "immediate." *See Liebhart*, 917 F.3d at 961. The Seventh Circuit found that although the Supreme Court in *Meghrig* instructed that an

71

endangerment "can only be 'imminent' if it 'threaten[s] to occur immediately,'" the Court "qualified that statement when it approvingly quoted the Ninth Circuit's interpretation that the statutory term 'implies that there must be a threat which is present now, although the impact of the threat may not be felt until later.'" *Id.* (internal citations omitted). However, the mere fact that contamination exists at any level, in and of itself, will not establish imminent danger. In *Liebhart*, the Seventh Circuit explained that while "RCRA does not require that plaintiffs demonstrate contamination above some agency-derived threshold level of concentration" to succeed on their claim; neither can a plaintiff simply show "some bit of soil on their property" tests positive for a contaminant to prove their RCRA claim. 917 F.3d at 959–60. Rather, there must be "accompanying evidence that establishes some connection between the existing contaminants and some imminent and substantial endangerment to health." *Id.* at 960; *see also Schmucker v. Johnson Controls, Inc.*, 477 F. Supp. 3d 791, 810 (N.D. Ind. 2020), *aff'd*, 9 F.4th 560 (7th Cir. 2021) (finding that a "contamination's presence alone does not equate to an imminent and substantial endangerment to the environment"); *City of Evanston v. N. Illinois Gas Co.*, 381 F. Supp. 3d 941, 959–60 (N.D. Ill. 2019) ("Contamination that does not currently present a possible threat is insufficient.").

On the evidence presented at trial, I cannot find imminent and substantial endangerment as required by RCRA. Barclay's primary argument that both human health and the environment are in danger is the mere presence of contaminants at unsafe levels on the Properties. Barclay argues that Building 11 is contaminated with levels of hexavalent chromium and PCB that exceeds safe levels for either residential or industrial use and gave rise to the City's raze or repair order. (Barclay's Post-Trial Br. at 11.) It argues that Buildings 33 and 34 are also contaminated with heavy metals and PCBs. (Barclay's Resp. Br. at 4.)

Barclay further argues that the soil and groundwater on the Properties are contaminated with arsenic, lead, and VOCs at concentrations significantly higher than levels established by the WDNR for the protection of public health and the environment. (Barclay's Post-Trial Br. at 12.)

Barclay acknowledges that the buildings themselves are currently vacant. (*Id.*) It argues, however, that despite efforts to prevent trespassers onto the Properties, including securing the Properties with fencing, boarding the windows, securing the doors, and employing active security monitoring, evidence remains that trespassers are nonetheless getting into the Properties. (*Id.*) Barclay argues that these individuals' health is immediately at risk. (*Id.*) What Barclay presents, however, is speculation. A plaintiff must show a "reasonable prospect of a near-term threat of serious potential harm" to succeed on its RCRA claim. *City of Evanston*, 381 F. Supp. 3d at 959.

The trial evidence showed the potential risk of harm to *future* occupants. Curtis Hedman, a toxicologist and risk assessor for the Wisconsin Department of Health Services, testified that in assessing risks to human health, one must establish potential exposure pathways, which could include ingestion, dermal, or inhalation, and then obtain activity-based sampling data that would show environmental levels of the contaminants of concern. (Jan. 24 Tr. at 641–42, 653.) Then, those concentrations would be compared to health-based levels to determine whether there is an elevated risk. (*Id.* at 653.) Hedman testified that while the department determined that the buildings contained concentrations of contaminants above levels of a concern, they did not obtain activity-based sampling to finish assessing the risk. (*Id.* at 654.) As such, the risk to future occupants remains undetermined. (*Id.* at 656.)

73

Barclay's expert, Islam, similarly testified that the presence of TCE poses a substantial risk to *future* building occupants. (Jan. 25 Tr. at 866–67.) Islam also testified that more testing must be done to fully assess the potential risk to human health and the environment posed by the Properties. (*Id.* at 841.) Beck also testified that keeping the buildings in their current state *could* create an issue with rainfall and wind moving materials off-site. (Jan. 29 Tr. at 1393.)

Thus, while Barclay speculates that trespassers are in imminent danger from contaminants found in the buildings, it is entirely unclear what the exposure pathway to this risk is. The Wisconsin Department of Health Services expressed concerns regarding inhalation of contaminants from drilling or abrasion of the structures that may come with remodeling work. (Barclay Trial Ex. 139.) While the groundwater and soil are also contaminated, there is no indication of an exposure pathway to humans with the Properties in their current state.

And as to the environment, once again, while the soil and groundwater are contaminated with arsenic, lead, and VOCs, the mere presence of contamination alone is insufficient to constitute imminent and substantial endangerment. *Schmucker*, 477 F. Supp. 3d at 810. "This is true even for groundwater—the simple existence of contaminated groundwater does not automatically impel an endangerment claim." *Miller v. City of Fort Myers*, 424 F. Supp. 3d 1136, 1147 (M.D. Fla. 2020). "It may well be desirable for nature to remain in a pristine condition, but an endangerment claim requires some threatened or potential effect beyond the fact that a substance is present belowground that is not naturally occurring." *Schmucker*, 477 F. Supp. 3d at 810. Islam testified that while migration of contaminants "is happening," he does not know how far the contamination has migrated; specifically stating that whether it has migrated to sites beyond the Properties has "not been

established." (Jan. 25 Tr. at 868–69.) Thus, there is no evidence that the contaminants on the Properties constitute an imminent and substantial danger to the environment.

Barclay's lack of evidence on imminent and substantial endangerment becomes even clearer when considering its requested remedy. Barclay requests injunctive relief in the form of ordering PPG to conduct additional investigative work "to determine the exact contours of the remediation that will be required at the Properties," as well as PPG working with regulators such as the WDNR to obtain the additional data needed to review and approve remediation proposals. (Barclay Post-Trial Br. at 15–16.) In other words, Barclay is looking for PPG to assist in providing the evidence that would demonstrate the potential risk to the public and the environment, if any. This puts the cart before the horse. Barclay bears the burden of proving its RCRA claim, including that the contamination may present an imminent and substantial danger to health or the environment. But the evidence at this juncture is lacking, and Barclay cannot use RCRA to fund the testing it should have already conducted to meet its burden of proof.

In its response brief, Barclay further requests that PPG be ordered to undertake remediation in accordance with all applicable regulatory requirements. (Barclay's Post-Trial Resp. Br. at 7–8.) But "the RCRA is not a 'cleanup' statute." *LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d 933, 949 (7th Cir. 2019). Even if a plaintiff shows that a dangerous contaminant exists on a property, so long as it is contained and restricted from access, the RCRA claim fails. *See id.* ("We sympathize with plaintiffs' position—TCE is a dangerous contaminant and the current plan leaves the contamination in place (though contained and restricted from access). But, despite plaintiffs' characterization, the RCRA is not a 'cleanup' statute.").

For these reasons, Barclay has failed to prove by a preponderance of the evidence that it is entitled to relief on its RCRA claim. Thus, Barclay's RCRA claim is dismissed.

## CONCLUSION

No one disputes that the South Barclay and East Oregon parcels are polluted. Nor do the parties dispute the contaminants found on the Properties—including hexavalent chromium, arsenic, lead, and TCE. Rather, the parties' dispute centers around who should clean up these properties. But the parties' dispute is driven by the specter of demolishing the four buildings found on the Properties. PPG argues that Barclay made a poor business decision in purchasing these polluted properties and now wants PPG to foot the bill for remodeling the structures so that Barclay can use the Properties in its ideal manner—as residential housing. Barclay, however, denies that this lawsuit is about the building costs, arguing that whether the buildings will need to be demolished is an issue for another day. Barclay contends PPG is trying to shirk its responsbility for pollution found on Properties PPG owned and operated for 70 years. And several other parties, including Hydrite and Wayne Pigment, have responsbility for the pollution as well.

Whether Barclay is, in effect, attempting to receive an advisory opinion on whether demolition of the buildings will be a shared expense amongst all PRPs, is not an issue before me. Again, whether demolition of the buildings is a recoverable response costs under CERCLA is a matter for another day. But the Properties are polluted, and remediation is required. Thus, after considering the testimony and evidence adduced at trial, and as further explained above, I grant judgment as follows:

- As to Barclay's claim against PPG to recover pre-remediation response costs pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), I find that the Properties in

question are "facilities" under the statute; PPG qualifies as a PRP; the facilities experienced a release or threatened release of hazardous substances; and that Barclay incurred $1,167,755.35 in response costs consistent with the NCP. Barclay and PPG are jointly and severally liable for these costs.

- PPG has asserted a counterclaim against Barclay for contribution under CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1). As to Barclay's claim for pre-remediation response costs, 100% of Barclay's past response costs, totaling $1,167,755.35, is allocated to Barclay.

- PPG has asserted a third-party complaint against Sherman for contribution under CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1), and declaratory relief, alleging that Sherman is liable as an "operator." I find Sherman is liable as an operator under CERCLA and PPG can seek contribution from Sherman.

- As to Barclay's claim seeking declaratory judgment for future response costs pursuant to 42 U.S.C. § 9613(g)(2), while I make no determination as to the recoverability of future costs, I allocate liability as follows: PPG is allocated 50% liability for future response costs. Hydrite is allocated 20% liability for future response costs. And Barclay and Sherman are allocated 30% liability for future response costs, including 10% liability for Barclay and Sherman, and the 20% "orphan's share" of Wayne Pigment/MD Fifth Ward.

- Hydrite moves to bar contribution claims pursuant to 42 U.S.C. § 9613(f)(2). This motion is granted.

- Finally, I find that Barclay has failed to prove its claim against PPG under RCRA, 42 U.S.C. § 6972(a), by a preponderance of the evidence. Thus, Barclay's RCRA claim is dismissed.

**ORDER**

**NOW, THEREFORE, IT IS HEREBY ORDERED** that judgment is entered in Barclay's favor against PPG to recover pre-remediation response costs pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a). Judgment is also entered in PPG's favor as to its contribution claim against Barclay and Sherman. 42 U.S.C. § 9613(f)(1). Thus, Barclay is responsible for 100% of Barclay's past response costs, totaling $1,167,755.35.

**IT IS FURTHER ORDERED** that pursuant to Barclay's claim seeking declaratory judgment for future response costs pursuant to 42 U.S.C. § 9613(g)(2), PPG is allocated 50% liability for future response costs. Hydrite is allocated 20% liability for future response costs. And Barclay and Sherman are allocated 30% liability for future response costs, including 10% liability for Barclay and Sherman, and the 20% "orphan's share" of Wayne Pigment/MD Fifth Ward.

**IT IS FURTHER ORDERED** that PPG's cross-claim for contribution against Hydrite is dismissed. The Court enters a contribution bar in Hydrite's favor pursuant to 42 U.S.C. § 9613(f)(2).

**IT IS FURTHER ORDERED** that Barclay's claim for injunctive relief pursuant to Section 7002(a) of RCRA, 42 U.S.C. § 6972(a), is dismissed.

**IT IS FURTHER ORDERED** that Barclay's motions to "pre-admit" evidence (Dockets # 244, 246, 248, 250) are **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Barclay's motion to withdraw (Docket # 293) is granted. Docket # 242 is withdrawn.

**IT IS FURTHER ORDERED** that PPG's motion *in limine* as to Michael Beck (Docket # 225) is denied. PPG's motion *in limine* as to Mark Travers (Docket # 227) is denied as moot. Barclay's motion *in limine* as to Kenneth Bird (Docket # 229) is granted. Hydrite's motions *in limine* (Docket # 235 and Docket # 237) are denied as moot.

**FINALLY, IT IS ORDERED** that the Clerk of Court will enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 18th day of September, 2024.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge